TJ Angstman
Wyatt B. Johnson
ANGSTMAN JOHNSON
3649 Lakeharbor Lane
Boise, Idaho 83703
Telephone: (208) 384-8588
Facsimile:  (208) 853-0117
Johnson ISB: 5858
Angstman ISB: 5738


Nikki Smith
3649 Lakeharbor Lane
Boise, Idaho 83703
Telephone: (208) 384-8588
Facsimile: (208) 853-0117
Smith ISB: 9030


Attorneys for Omar Castillon, Dusty Knight, Justin Peterson, Leon Russell, Christopher Jordan, Jacob Judd, Michael Ford-Bridges, Raymond Bryant.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OMAR CASTILLON, DUSTY KNIGHT, JUSTIN PETERSON, LEON RUSSELL, CHRISTOPHER JORDAN, JACOB JUDD,  MICHAEL FORD-BRIDGES, AND RAYMOND BRYANT,<br><br>       Plaintiffs,<br><br>vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, Inc.<br><br>       Defendant. | Case No<br><br>COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF |

## EXECUTIVE SUMMARY

1.      Corrections Corporation of America, Inc. (hereinafter "CCA") is the nations largest owner and operator of partnership correction and detention facilities and one of the largest prison operators in the United States, behind only the federal government and three states. CCA currently operates 67 facilities, including 47 company-owned facilities, with a total design capacity of approximately 92,000 beds in 20 states and the District of Columbia.

2.      CCA has an easily proven policy and persistent pattern of misconduct occurring in the CCA operated prison in Kuna, Idaho, known as the Idaho Correctional Center (hereinafter "ICC").  This persistent pattern of misconduct described evidences a policy within CCA prisons which creates a partnership between CCA and certain prison gangs.  Functionally, this partnership rewards prison gangs with a powerful position within (and consequently outside of) the prison and allows CCA to enhance its profitability.

3.      Violent acts committed by the prison gangs are used by CCA as an inexpensive device to gain control over the inmate population.  This method of control depends upon the infliction and prospective fear of cruel and unusual punishment, such as the attempted murder of the Plaintiffs which occurred in this case (hereinafter the "Attempted Murders").  The use of prison gangs rather than CCA salaried agents to engage in coercive violence such as the Attempted Murders gives CCA plausible deniability and at the same time enables it to reduce staffing expenditures for prison guards—therefore increasing corporate profitability. This persistent pattern of misconduct continues in violation of a settlement agreement negotiated in the District of Idaho and is grounds to hold CCA liable for deprivation of the civil rights of the Plaintiffs.

4.      CCA's use of violent prison gangs to inflict cruel and unusual punishment is more than a persistent pattern of misconduct.  This partnership between CCA and the gangs is official CCA policy or custom wherein CCA employs gang negotiators to advise gang leadership about CCA objectives and concerns and to hear, consider, and address matters of concern to the gang leadership.  As referenced in the attached documents, it is the policy of CCA to avoid reporting crimes occurring within CCA facilities to local law enforcement so gang members will continue to further the objectives of CCA, facing no fear of prosecution for their involvement.  It appears that this use of prison gangs as an instrumentality to inflict cruel and unusual punishment has been a longstanding practice or custom within prisons run by CCA, and as such it has become standard operating procedure within all CCA prisons.

5.      The practice of using gang violence as a corporate cost savings measure is beyond reprehensible.  Not only does it destroy the possibility that the Plaintiffs and other similarly situated inmates will have an opportunity to be rehabilitated, it creates a powerful gang hierarchy in the community inside and OUTSIDE the prison.  In fact, Idaho now has the highest gang membership ratio of any state in America! This image is from the FBI's 2011 Gang Assessment. An obvious and foreseeable side effect of CCA's policy of empowering and rewarding gangs in its prisons is that prison gangs can recruit inside prison and flourish outside of prison once gang members have served their sentences—wreaking havoc in our



community.  Evidence in this case may show that this outcome is by design since CCA will have "repeat customers" from former inmates when they are arrested for gang activity after being released from prison.

6.      CCA's inmates are faced with a lose/lose choice when they arrive in a CCA prison.  This is detailed in the attached interview of Norma Rodriguez, Unit Manager, the policymaker at ICC responsible for moving the Plaintiffs into the pod where they were attacked, Ms. Rodriguez says, at page 8, "**The minute you start isolating your pods the offenders are running your pods.  That is how it is now….**" *See* **Exhibit A**.  If inmates have no gang affiliation, they will be recruited by prison gangs.  Those that do not join one gang (or another) will be attacked.  The net result is that many inmates without gang affiliation will, eventually, join a gang in prison as a matter of self preservation.  These gang members are obligated to "pay back" the protection they receive in prison by "doing work" for the gang, both in prison and after they are released.

7.      The State of Idaho (the "State") is obviously and justifiably concerned about CCA's policies that enhance gang power bases in prison.  *See* the Serious Incident Report **Exhibit B** and the August 28, 2008 Randy Blades letter to Phillip Valdez, Warden, attaching the Higgins Report[1] (the "Blades Letter and Higgins Report")**.**   About six months before the Plaintiffs were attacked CCA entered into a settlement of claims related to a similar incident. *See* **Exhibit C**, the attached Settlement Agreement from *Kelly et al. v. CCA, et al.* Case 1:11-CV-00185-EJL.   CCA agreed, in that settlement agreement, to protect prisoners, like the

---

[1]  Plaintiffs' counsel initially intended to attach the Blades letter and Higgins Report to this Complaint.  CCA has asked  that counsel for Plaintiffs not attach copies of these documents to this Complaint.  The Blades letter attaching the Higgins Report is already published online by journalists so attaching it is not necessary.  A true and correct copy can be found here:
https://www.prisonlegalnews.org/includes/_public/_publications/prison%20brutality/idaho_doc_analysis_of_violence_at_idaho_corr_ctr_2008.pdf

Plaintiffs, from gang violence.  CCA failed, miserably, to follow the requirements of that

settlement.  Moreover, the State has issued Standard Operating Procedures ("SOP") for CCA to

follow in running the prison which prohibits CCA from giving gangs this power base.

According to the May 21, 2012 IDOC Serious Incident Review Report (SIR) *See* **Exhibit B**,

CCA is in violation of several SOP and this condition appears to have persisted for several years

given the fact that similar concerns were noted in the Blades Letter and Higgins Report, the

Kelly settlement agreement, and the SIR.  Additionally, Ms. Rodriguez's interview clearly

establishes the policy to segregate and empower the gangs existed before she went to work there.

8.    America's communities are being sacrificed for corporate profits for CCA's

shareholders.  While mixing the gangs up in prison may require more guards in each prison, and

thus a reduction in CCA profits, such is completely appropriate.  If CCA cannot make a profit

without empowering gangs, CCA is obtaining its profits without properly accounting for the cost

of its policies to society.  In other words, certain inmates who could otherwise be rehabilitated in

prison turn to a life of crime due to the gang affiliation that is required for safety in a CCA-run

prison.  Moreover, a strong gang presence in our communities reduces property values, increases

law enforcement costs, and risks innocent lives of guards, police, and innocent hardworking

members of our society (like those who will be called upon to serve on our jury should this case

proceed to trial).

9.    While the cost to deflate the gangs' control of the ICC prison may be high, CCA

certainly has sufficient wealth and income to provide for the security and safety of those inmates

entrusted to their care.  Unfortunately, CCA has incentivized its corporate officers to place

profits ahead of inmate safety and the well-being of the communities where CCA operates.  CCA

was celebrating its profitability with analysts on a conference call on May 3, 2012, and at that

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 5

time issued a "forward looking statement" where CCA predicted profits between **$153,153,000** and **$161,161,000** for the full year of 2012. Just two days later the Attempted Murders occurred and were dismissed by CCA in the press as a minor incident. The enclosed video of the Attempted Murders is clear evidence that this was more than a minor incident and could easily have resulted in the death of some or all of the Plaintiffs.

10.     As of October 22, 2012, CCA's market capitalization was approximately $3.3 billion. During the calendar year 2012, it is anticipated CCA will distribute $80MM to its shareholders in dividends. In 2011, CCA's six most highly compensated executives made more than $12MM:

| | |
|---|---|
| Damon T. Hininger/President and Chief Executive Officer | $3,696,798 |
| Richard P. Seiter/Special Assistant to the CEO | $1,845,566 |
| John D. Ferguson/Chairman of the Board and Fmr CEO | $1,734,793 |
| Todd J. Mullenger/Executive Vice President and CFO | $1,835,048 |
| Anthony L. Grande/EVP and Chief Development Officer | $1,735,039 |
| Brian D. Collins/EVP and Chief Human Resources Officer | $1,505,146 |

11.     CCA's corporate conscience has been brutally obscured by the enormous profits, dividends and compensation it receives. CCA is aware and courts have recognized that for-profit prisons inherently risk violation of constitutional rights if violation of such rights would be profitable:

> The court in *Manis v. Corrections Corp. of America,* 859 F.Supp. 302 (1994) said that "[a] private party that performs a government function for a fee" does not face the dilemma of a public officer who might run afoul of the Constitution in seeking to serve the public. Corporate officers are hired to serve the corporation and its shareholders, who were chiefly interested in advancing their financial standing. "Especially when a private corporation is hired to operate a prison, there is an obvious temptation to skimp on civil rights whenever it would help to maximize shareholders' profits… In such circumstances, the threat of incurring money damages might provide the *only* incentive for a private corporation and its employees to respect the Constitution."

12.    The attached videos[2] and pictures *See* **Exhibit D**, demonstrate that the






Plaintiffs have suffered serious and substantial injuries, since they were stabbed while in CCA's

custody in an attempted mass murder.  This attempted mass murder was a direct result of a

policy dictated by CCA that empowers gangs and reduces the number of guards.  The attached

DVD shows video and pictures of the Attempted Murders as well as the knives and other

weapons that were used (such as the photos pictured above). Plaintiffs hope resolution of this

case will prevent similar incidents and protect our communities from gangs.  As the court

recognized in *Manis*, an award of punitive damages sufficient to punish AND DETER the

harmful policies in the future is necessary.  Since CCA is so profitable, the best *and only* way to

have a deterrent effect is for the jury to make a punitive award that is large enough to impact

what might be distributed to shareholders in future years.   Then, and only then, will the

---

[2] Videos and other evidence is also available at www.angstman.com/cca/.

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 7

shareholders take action to demand the board of directors replace management whose policies led to a reduction in corporate dividends.

13.     While the Plaintiffs do not specify any particular amount of punitive damages that would be sufficient to have the deterrent purpose envisioned by Congress and the courts in fashioning this remedy, based on the information presently available the number will need to be substantially more than the compensation paid to the executives named in this complaint.

## JURISDICTION AND VENUE

14.     This action arises under the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983.   Jurisdiction exists pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4).  Venue is properly found in this District pursuant to 28 U.S.C. §1391(b), in that all Plaintiffs reside, and Plaintiffs' claims arose, within the District.

## PARTIES

15.     Plaintiffs Omar Castillon, Dusty Knight, Justin Peterson, Leon Russell, Christopher Jordan, Jacob Judd, Michael Ford-Bridges, and Raymond Bryant are adult citizens of the United States and are prisoners incarcerated under the jurisdiction of the Idaho Department of Corrections.  All Plaintiffs were incarcerated at the Idaho Correctional Center (ICC) in Kuna, Idaho, on May 5, 2012, and are presently in custody of the Idaho Department of Corrections in the state of Idaho.

16.     Raymond Bryant is 36 years old. In the Attempted Murders, Mr. Bryant sustained one stab wound to his right temple requiring stitches, one stab wound on the back of his head requiring stitches, one stab wound in his left cheek requiring stitches, one stab wound on his throat requiring stitches, one stab wound by his left ear requiring stitches,  one stab wound on his chest,  and one stab wound on his left elbow requiring stitches.

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 8

17.     Christopher Jordan is 36 years old.  In the Attempted Murders, Christopher Jordan was stabbed on the top his head and retained a black eye.  Mr. Jordan was then thrown into solitary confinement (hereinafter "the hole") and received no medical attention until May 7, 2012.

18.     Plaintiff Dusty Knight is 30 years old.   During the Attempted Murders, Mr. Knight was stabbed eighteen (18) times in his head, face, and hands and he required stitches in his head, face, and hand.   Mr. Knight is currently experiencing dizzy spells and migraine headaches. He requested medical attention for migraine headaches and loss of vision, but has received no examination by an eye specialist, nor have any x-rays or outside evaluations been performed.

19.     Justin Peterson is 26 years old.  During the Attempted Murders, Mr. Peterson sustained one stab wound in the back of his head, one stab wound in the back of his neck, two stab wounds on his left arm, one stab wound under his armpit in his ribs, and one stab wound in his upper thigh.

20.     Jacob Judd is currently 24 years old. During the Attempted Murders, Mr. Judd was stabbed once on the top of his head, once in the back, once in his armpit, once in the hand, and was poked in the eye. Mr. Judd became incontinent during the Attempted Murders from fear and still experiences nightmares. Mr. Judd experienced a loss of vision for a week after this incident. His vision continues to be problematic.

21.     Plaintiff Michael Bridges is 24 years old.  During the Attempted Murders, Mr. Bridges was stabbed five times in his face, chest, shoulder, ribs, and head, requiring stitches in his head and cheek.

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 9

22.     Leon Russell is 38 years old.   During the Attempted Murders, Mr. Russell sustained one stab wound in his right temple by his eye, one stab wound on his lower cheek, one stab wound under his right eye requiring stitches, and one stab wound on the back of his neck requiring stitches.

23.     Omar Castillon is 28 years old. During the Attempted Murders, Mr. Castillon's head was slammed against the wall and he was maced.

24.     Defendant Corrections Corporation of America (CCA) is a for-profit business incorporated under the laws of Maryland.  As part of its enterprises, CCA operates the private prison, ICC.

25.     ICC was constructed on state-owned land in Kuna, Idaho, with public tax funds. ICC is operated under the jurisdiction of the IDOC.  IDOC entered into a contract with CCA under which CCA is paid to manage and operate ICC on a day-to-day basis.

## STATEMENT OF FACTS

### A.     *General Allegations*

26.     The Eighth Amendment to the Constitution prohibits the imposition of "cruel and unusual punishments."  It follows that prisons have a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  In other words, people are sent to prison as punishment, not for punishment.  "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 834 (internal citation omitted).  Government officials "are not free to let the state of nature take its course" in America's prisons. *Farmer*, at 833.

27.     The Supreme Court and the Ninth Circuit have made it clear that prisons violate the Eighth Amendment rights of prisoners both when they *undertake an act* that places a prisoner at substantial risk of serious harm and when they *fail to act* to abate such a risk.  "Thus,

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 10

violations of the Eighth Amendment may occur as 'a result of either a prison official's act *or omission*.' *Farmer [v. Brennan]*, 511 U.S. [825], 834 [1994]." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (emphasis supplied in *Clem*).

28.     A jury may assess punitive damages if the defendant is either (a) motivated by evil intent; or (b) acts with recklessness or callous indifference toward the federally protected rights of others. *See Smith v. Wade*, 461 U.S. 30, 55 (1983).

29.     In its contract with the Idaho Department of Corrections ("IDOC"), CCA agreed that "at all times which inmates are in [CCA] custody, [CCA] shall provide security and control of inmates . . . [and] [CCA] shall develop and implement safety . . . procedures."

30.     CCA, pursuant to its own policy and practice, houses inmates who claim the same gang affiliation together in the same cellblock, which is arranged so that they all may have lunch, recreation time, and other time outside of their cells together.  The cells are side by side, so that the gang members can talk to one another even if they are confined to their cell.  The gangs refer to this housing arrangement as having their own "walk."

31.      CCA, pursuant to its own policy and practice, allow gangs to request a "walk" of their own, and then houses them and their affiliates together.

32.     Housing inmates from the same gang together in a "walk" allows the offenders to control the unit and allows them to increase their power base.

33.     Housing inmates from the same gang together in a walk violates IDOC policies and procedures which CCA is supposed to follow.

34.      CCA knows that placing prisoners that are the target of violent gangs within the gang's walk is substantially certain to result in a violent assault against the target by the gang.

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 11

Even if a prisoner is not targeted by the gangs for violence, they will likely be targeted for recruitment into the gang and assaulted if they refuse.

35.     CCA has historically placed prisoners that it knew were the target of violent gangs within the gang's walk, resulting in violence against those prisoners.

36.     CCA has historically failed or refused to remove prisoners from dangerous situations.

37.     CCA has historically placed prisoners in situations in which they needed to fight.

38.     CCA has historically used inadequate staff to prevent or promptly stop violence against prisoners.

39.     In August 2008, CCA received the results of an IDOC investigation that concluded that increased violence and decreased prisoner safety at the ICC was due to, among other things, gang members operating openly at the ICC with little fear of being held accountable.

40.     On or about April 27, 2011, CCA received the Amended Class Action Complaint for Declaratory and Injunctive Relief in *Kelly v. CCA*, Case 1:11-cv-00185, United States District Court, District of Idaho (the "Class Action Complaint").

41.     The Class Action Complaint alleged, among other things, that CCA:

   a.   Frequently placed vulnerable prisoners with predators;

   b.   Failed to protect prisoners who request and need protection from violence;

   c.   Turned a "blind eye" to violence at ICC;

   d.   Failed to adequately investigate attacks, therefore making it unable to prevent attacks from recurring;

e.   Refused to discipline guards whose action or omissions precipitated prisoner violence; and

f.   ICC is overcrowded, understaffed, inadequately supervised, and the guards are inadequately trained.

42.   On September 16, 2011, CCA settled the Class Action *See* **Exhibit C** by agreeing, among other things:

a.   That "CCA will immediately place inmates who claim to be at risk of physical assault from other inmates into appropriate housing, as determined by staff, during investigation of the claim" (para. 5);

b.   That "CCA will make housing assignments based on all factors the facility deems appropriate for the safety of the inmates, consistent with IDOC SOP" (para. 9); and

c.   That CCA would institute training for its correctional officers including: "policies and procedures; inmate rights including protection from assaults; emergency plans/incident management; institutional safety; supervision of inmates; inmate manipulation; inmate management; inmate accountability; direct supervision; special needs offenders; and security threat groups[3]" (para. 11).

43.   The District Court ordered dismissal of the Class Action based upon the stipulation. *See* **Exhibit E.**

44.   Following the dismissal of the Class Action, receipt of the Blades Letter and Higgins Report, CCA continued to follow its policy and practice of housing inmates from the same gangs in the same "walks."

45.   Following the dismissal of the Class Action, CCA has continued with a policy and practice which includes gang leadership in prison management decisions.

---

[3] "Security threat group" is a term commonly used by CCA for prison gangs.

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 13

46.     In accord with this policy and practice, CCA consults with gang leadership in regard to moves of gang members within the prison.

47.     In accord with this policy and practice, CCA will not hold gang members accountable for misconduct, because the gang will make the control of the prison more difficult or even dangerous for CCA employees and staff.

48.     CCA's policies and practices of housing members of the same gangs together, consulting with gang leadership regarding prisoner moves, and refusing to hold gang members accountable for misconduct, has resulted in gang members gaining more control and authority within the prison.

49.      CCA has identified a number of gangs operating within the facility, known by ICC as "security threat groups" ("STG").  CCA is aware that members of some gangs will assault members of other gangs due to the level of dislike between gangs.  CCA is also aware that some gangs prey upon certain groups of general population prisoners, including informants (generally known in the prison as "rats" or "snitches") and sex offenders.

50.     CCA has identified the Aryan Knights, a violent white supremacist gang, as a STG at ICC.

51.     CCA has identified the Severely Violent Criminals, a violent gang, as a STG at ICC.  Prior to May 5, 2012, CCA granted the Severely Violent Criminals and the Aryan Knights their own "walk" at ICC.

52.     Prior to May 5, 2012, CCA knew that the Aryan Knights and Severely Violent Criminals targeted the Plaintiffs in this suit for attack.

53.     Prior to May 5, 2012, the Plaintiffs and others told CCA that the Plaintiffs would be in physical danger from the Aryan Knights and Severely Violent Criminals if they were

housed in the Aryan Knight and Severely Violent Criminal controlled "walk."  The Plaintiffs asked to not be placed in the Aryan Knight and Severely Violent Criminal controlled "walk."

54.     Prior to May 5, 2012, the Plaintiffs' complaints were brought to the attention of the CCA official with final policymaking authority, by office or delegation.  Pursuant to the direction of such official, the targeted prisoners were not placed in appropriate housing during investigation of the claims.  Rather, on May 5, 2012, CCA transferred the Plaintiffs into the Aryan Knight and Severely Violent Criminal controlled "walk," despite the protests and objections of the Plaintiffs.

55.     On or about May 4, 2012, while they were moving the Plaintiffs into the "walk" controlled by the Aryan Knights and Severely Violent Criminals gangs, CCA officers heard threats of violence yelled at the Plaintiffs.

56.     Within twenty-four hours of being placed in the unit, on May 5, 2012, the Aryan Knights and Severely Violent Criminals joined forces, armed with shanks, razors, and other weapons, to attack the Plaintiffs as depicted in the attached video. *See* **Exhibit D.**

57.     On May 5, 2012, the Aryan Knights and Severely Violent Criminal were let out of their cells for recreation, separately from the Plaintiffs. Six of the Aryan Knight and Severely Violent Criminal gang members hid in a closet which was supposed to be kept locked. After the Aryan Knights and Severely Violent Criminals were supposed to be gone, the Plaintiffs were let out for recreation. They were immediately attacked by the hiding Aryan Knights and Severely Violent Criminals.

58.     Each of the Plaintiffs was stabbed, except Mr. Omar, some as many as eighteen times. The victims suffered physical and emotional injuries requiring stitches and medical

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 15

attention, and some suffer ongoing medical issues resulting from the location of their stab wounds.

59.    CCA would have avoided the Attempted Murders if CCA had taken adequate precautions to protect the Plaintiffs such as desegregating gangs and employing sufficient guards.

60.    The actions and omissions by CCA are part of a persistent pattern of misconduct of CCA, occurring either pursuant to CCA policy, or as a product of CCA's deliberate indifference to the federally protected rights of the ICC prisoners.

61.    The actions and omissions by CCA are a longstanding practice or custom that constitutes the standard operating procedure of CCA.

62.    The actions and omissions by CCA were pursuant to policies established by the CCA decision-making official who was a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision for CCA, or by a CCA official who was delegated final policymaking authority.

63.    The actions and omissions by CCA were ratified by the CCA decision-making official who was a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision for CCA, or by a CCA official who was delegated final policymaking authority.

64.    CCA's actions and omissions have occurred with recklessness or callous indifference toward the federally protected rights of the prisoners at ICC.

65.    This persistent pattern of misconduct appears to go beyond the specific plaintiffs in this case, demonstrating an apparent policy within CCA prisons to create a partnership between CCA and the leadership of prison gangs.  Functionally, such a partnership would reward

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 16

prison gang leadership with power and control over their "walk" for influencing subordinate gang members to engage in violence against members of the prison population.  This violence is used as a device to gain control over the inmate population through the infliction and prospective fear of cruel and unusual punishment, such as the Attempted Murders.  The use of prison gangs rather than CCA salaried agents to engage in coercive violence such as the Attempted Murders would give CCA plausible deniability and enable it to reduce staffing expenditures for prison guards and therefore increase profitability.

66.     Prisoners placed in a gang-controlled "walk" are at risk if they do not join the gang, pay extortionate protection payments "rent" or "work" for the gang (attacking others if commanded to). This system also has the consequence of creating new gangs as unaffiliated prisoners come together in groups for the purpose of protect themselves from existing gangs. In this type of system, gang membership is increased and gang loyalty is necessary.

67.     The apparent partnership between CCA and the leadership of prison gangs increases the threat of harm to inmates within the CCA prisons, as well as the surrounding community upon the eventual release of the individuals forced to engage in gangster lifestyle as a means of survival.

**B.      _CCA's Deliberate, Reckless and Callous Indifference_**

68.     Plaintiffs incorporate all prior paragraphs of this Complaint, and the attachments hereto and further allege as follows:

69.     CCA's policy of housing members of violent gangs together cedes power to the gangs in prison.  CCA's policymakers are aware that this makes the prisons more dangerous, but since the gangs enforce their own code of conduct, CCA is able to reduce staffing and increase profitability.

COMPLAINT FOR DAMAGES, AND FOR DECLARATORY AND INJUNCTIVE RELIEF-
PAGE 17

70.     CCA is deliberately, recklessly, and callously indifferent to prisoner health and safety.  CCA refuses to provide funds for, and Warden Wengler refuses to hire and train, a sufficient number of correctional officers.  It is impossible for ICC to provide prisoners with adequate protection from assault—or to timely intervene when an assault has commenced—with as few guards as ICC has on its staff, especially since the gangs have been given so much power by assigning them to their own "walks" where attacks such as the Attempted Murders can be planned out in advance.  Policymakers within the prison such as Unit Supervisor Rodriguez recognize that the gangs are "running the pods" and that rectifying that situation will require substantially more guards and a prolonged show of force to take control of the gang situation. CCA refuses to alter its gang housing policies due to the expense involved despite the fact that they know that inmates and guards are likely to be injured by gang members.

71.     CCA fails to require or ensure that prisoner assaults will be adequately investigated in order to determine what steps should be taken to prevent future assaults, and to determine whether misconduct or malfeasance by a guard caused or contributed to the assault.

72.     CCA fails to ensure that guards are properly trained to prevent violence. Consequently, CCA deliberately places prisoners in housing units knowing they are likely to be assaulted and refuses to remove prisoners from housing after threatened attacks.

73.     ICC remains a violent facility despite awareness of excessive violence dating back from at least 2008.

74.     ICC's in-house medical unit and media relations employees minimize the extent of prisoner injuries. For instance, CCA released the following after the Attempted Murders:

"Thirteen inmates were involved in a fight at Idaho's private prison. Idaho Correctional Center says more than a dozen inmates were injured in a fight over the weekend. ICC says all injuries were minor and inmates were treated on

site. It was described as an isolated dispute among inmates.  The area was locked down."

75.     ICC has a practice of refusing to refer for prosecution the perpetrators of prisoner assaults, except in rare situations.

76.     ICC generally operates at or above its operating capacity.  As noted in the 2010 Legislative Report, ICC's population in November 2009 was 100.2% (2,021 prisoners) of its operating capacity of 2,016 prisoners.   This predicament, although profitable for ICC, is dangerous to prisoners.  For instance, having a small number of empty beds makes it difficult to quickly move prisoners away from a dangerous environment.

77.      The failures described above continue to this day, placing all prisoners of ICC at unnecessary and substantial risk of being assaulted by other prisoners.    These failures and wrongful acts are motivated by evil motive and intent.  In other words, the Plaintiffs contend their rights have been sacrificed intentionally so that CCA may make an unfair profit by skimping on inmate (and guard) safety precautions as the court recognized in *Manis v. Corrections Corp. of America,* discussed above.

## JURY DEMAND

78.     A JURY TRIAL IS REQUESTED ON ALL CLAIMS SO TRIABLE.

## FIRST CLAIM FOR RELIEF

79.     Plaintiffs repeat and re-allege each of the allegations set forth in the preceding paragraphs as if set forth in full herein.

80.     Based on the facts set forth above, Plaintiffs Raymond Bryant, Michael Bridges, Jacob Judd, Christopher Jordan, Dusty Knight, Omar Castillon, Justin Peterson, and Leon Russell assert that Corrections Corporation of America, Inc., enacted and pursued or acquiesced in the policies and practices set forth above, and engaged in the acts described above, which

resulted in a violation of rights secured to them by the Eighth and Fourteenth Amendments to the U.S. Constitution.  Plaintiffs seek injunctive, compensatory and punitive damages against the Defendant pursuant to 42 U.S.C § 1983.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully pray that this Honorable Court will:

81.     Grant Plaintiffs, pursuant to 42 U.S.C. § 1983, compensatory damages against defendant Corrections Corporation of American, Inc., in an amount as the proof will show at trial.

82.     Grant Plaintiffs, pursuant to 42 U.S.C. § 1983, punitive damages against defendant Corrections Corporation of American, Inc., in the amount sufficient, to punish and discourage CCA and other similarly situated persons and entities from engaging in this type of reprehensible conduct in the future.

83.     Grant such additional and further relief, including injunctive relief and an award of attorney's fees and costs, as the Court may deem proper under the circumstances.

DATED this 9th day of November, 2012.

ANGSTMAN JOHNSON


/s/  T.J. Angstman_____
T. J. Angstman
Attorneys for the Plaintiffs