Commendation or disciplinary action:

and her lack of managing the employees and her unit resulted in an atmosphere that allowed this incident to occur.

Corrective action should be considered with Sgt. Carrick for failing to use Use of Force equipment (OC) to control the incident. His actions delayed the containment and resolution of this incident.

Unit staff should be held accountable for signing post orders and for following them.

In spite of the fact that Officer Skogsberg's actions may have contributed to this incident the panel members commend him for his courage in taking action to stop the offenders' assault.

The panel would also like to commend Sgt. Sharp for his actions to take control of the incident and directing staff.

Staffing:

Although the unit appeared to have appropriate staffing several of those staff were performing other duties which distracted them from the duties assigned to the post they were filling.
Supervisory staff who are filling in officer posts need to insure that they focus on that post and do not leave the area.

Staffing of the unit needs to be consistent. In reviewing the schedule it appeared that staff were double posted.

Policy and SOP:

The facility should consider utilizing a command structure that models the Incident Command System. Staff are unsure of what emergency system they are using and when it is appropriate to activate it, and seem to feel that ICS is appropriate only for large scale emergencies. The panel recommend that all staff receive more training in the Incident Command System and perform routine simulations to become proficient in the ICS system.

Post orders need to be revised to reflect a safe operational system allowing staff time to complete the required tasks. In reviewing the post orders the panel found that if staff followed what was written they would gain accountability as the staff would be controlling the movement instead of the offenders.

Operational Issues:

The STG population is grouped into quadrants in D-E-F which increases the STG power base. This population should be diversified among quadrants and pods.

Staff should be enforcing the living guide and unit rules for cell conditions.

Staff should be accountable for following the Post Orders and facility memorandums. This incident may have been avoided had staff been following the D-E-F and General Post Orders.

Pat searches and unclothed body searches could be completed with more regularity. Pat searches should be completed of offenders exiting their cells and leaving the unit or going on to the recreation yard. Property brought out of cells should be searched by staff. Offenders returning to the unit or from the recreation yard should be pat searched and accompanying property searched as well. D-E-F and General Post orders could be more specific and use stronger language about the importance of maintaining a safe facility through proper searches.

Multiple cell searches by multiple staff are listed on a single search summary form. Each individual cell

Appendix E
105.02.01.002
(Appendix last updated 8/4/11)

Exhibit 10

Operational Issues:
search should be reported singularly for clarity on contraband found and issues with the cell.

CCA's IMT system seems to create confusion among staff as to who is in charge of the incident and who is managing the immediate resolution by directing the ERT members who respond to the incident. This confusion extends farther when determining whether or not to use ICS. CCA indicates that IMT is similar and compatible with ICS. However, ICS provides clear understanding and direction as to how to announce the Incident Commander and command structure for the incident. By eliminating the use of a dual system (IMT and ICS), CCA would eliminate the confusion among staff when responding to an incident.

D-E-F Post Orders provide the offenders a 5-minute window to exit their cells for dayroom and recreation time. This 5-minute period is to allow offenders to gather any property that they might need during day room hours. Facility operations could be improved by eliminating this 5-minute grace period and instead, announce the movement to the dayroom/recreation 5 minutes before the movement. D-E-F staff indicated that they must keep to their schedule and thus fail to follow post order requirements for direct offender supervision at each cell before the cell door is opened and the offender is allowed to exit the cell and begin the 5-minute egress period. If staff follows the post orders as written, it would take 40 minutes to transition to and from the dayroom for each dayroom period.

Staff should complete informal counts of offenders leaving the unit to maintain offender accountability. In this case if the floor officer had counted the offenders left on the tier, he would have realized that 6 offenders were unaccounted for.

During and after the incident, not all of the offenders were restrained because staff felt that they were not a threat. These offenders were moved and allowed back out of their cells without restraints. All offenders should be restrained in an incident to ensure safety to staff and other offenders.

Either the janitor's closet was left un-secured or unit staff missed a lock that had been tampered with on the janitor's closet during security device inspections. Staff must complete security device inspections carefully and follow the post orders which require the janitor's closets to remain secured. Staff visibility could be improved by adding a window to the janitor closet door or an expanded metal gate instead of the solid door.

Offenders should be required to keep windows clear in order to verify that the window has not been tampered with. Cell windows could be covered to conceal D-E-F deficiencies and lead to the ability for offenders to escape from the facility.

Window checks to verify that each cell window is secured and in good condition should be completed and documented at regular and frequent intervals to ensure that they are in good condition and provide security as intended.

Incident commanders and shift supervisors should follow evidence handling and crime scene protection standard procedures to ensure that evidence is appropriately collected and can be used to prosecute offenders who commit crimes.

Staffing in D-E-F was not maintained at an appropriate level and was inadequate at the time of the incident. Each position identified should be filled and staffed to ensure safety in the unit and adequate emergency response.

The ERT responded quickly to the incident and began resolution efforts immediately. There was confusion in the response that could have been avoided if staff and taken a few seconds to organize their actions when entering the tier, including ensuring that the crime scene and evidence was preserved. Staff was in a

Appendix E                                                                                   Page 8 of 10
105.02.01.002
(Appendix last updated 8/4/11)

Exhibit 10

Operational Issues:

hurry to resolve the incident and overlooked evidence collection and crime scene preservation.

Staff is reluctant to use force options available to them and at the adequate level to safely resolve the incident. For instance, this incident involved immediate imminent life-safety concerns, yet no physical force was used, and only OC was used to quell the attack when other less lethal options were available (pepper ball launcher, munitions.) Some responding staff responded to the incident with OC but chose not use it even though it would have been appropriate to do so and would have helped in containment and isolation of the incident. Less-lethal shotguns are stored [2 - IC 9-340(b)(4)(a)(i): specific security information].

Staff failed to complete adequate and proper tier checks by looking in each cell and visually verifying the safety and well-being of the occupants by seeing living, breathing humans. This error directly contributed to the incident.

Training:

Staff failed to adequately protect and collect evidence and the crime scene and allowed offenders to tamper with the evidence and crime scene. The crime scene log was also inadequate. Staff should be trained to have a better understanding in this area.

Staff is not consistently conducting pat searches, which is allowing contraband and weapons to be passed from offender to offender. Cell search logs do not indicate that staff are finding any significant contraband. These factors contribute to a lack of safety and security in D-E-F.

Staff should to be trained to complete adequate tier checks by checking on offenders and the conditions of the offenders' cells.

When completing escorts of the combative offenders from the pod, staff failed to maintain adequate spatial relationships between each escort.

Staff failed to use leg restraints on the close custody offenders involved which could have allowed them to continue combative behavior.

Supervisors and staff are confused about ICS and when and how it is to be used. Further in depth training of ICS is needed.

Equipment Issues:

Staff responded to this incident without equipment that was available to them but could have been used to gain offender compliance while decreasing the risk to staff safety such as: shields, protective vests, leg restraints, respirators/gas masks, a pepper ball launcher [2 - IC 9-340(b)(4)(a)(i): specific security information], and less lethal munitions.

Less lethal munitions and weapons to deploy those munitions are located in [2 - IC 9-340(b)(4)(a)(i): specific secu...]. This location [2 - IC 9-340(b)(4)(a)(i): specific security information]. The panel recommends that an area [2 - IC 9-340(b)(4)(a)(i): specific sec...] be identified to store these weapons. Also, to avoid confusion, the weapons can be fashioned with orange stocks identifying them as less lethal deployment systems.

Staff is reporting for duty without checking out the proper equipment needed to complete their duties such as flashlights, or checking out the equipment and not using it.

The brand and make of OC used by staff did not seem as effective as other brands and makes such as

Appendix E                                                                 Page 9 of 10
105.02.01.002
(Appendix last updated 8/4/11)

Exhibit 10

Equipment Issues:

| Sabre Red.  The panel suggests that ICC management further research this issue. |
|---|

Other:

| This same type of incident, with offenders hiding in the janitor's closet, happened less than one year ago. While the panel was told changes were made so this type of incident could not happen again, it appears that staff had reverted back to the same practices that allowed both incidents to occur.  Furthermore, the unit manager and unit staff stated the shortcuts were in an effort to keep their schedules on time as not to disrupt the offender population.  These changes were either approved by the unit manager, who was the same unit manager for both incidents, or she had knowledge that the unit was being operated in this manner and she took no steps to correct the issues. The panel recommends that facility managers address the issue of management of the unit. |
|---|

Signatures of review panel

_DN. Mosby_                         _1462_                         _6-7-12_
Chairperson                         Associate #                     Date
_Nicole Windsor_                    _4182_                          _6/7/12_
Panel member                        Associate #                     Date
_H. Tim Murphy_                     _7520_                          _6/7/12_
Panel member                        Associate #                     Date

*(Add additional rows if necessary)*

Appendix E
10
105.02.01.002
(Appendix last updated 8/4/11)

Page 10 of

Exhibit 10



Exhibit 10

# IDAHO DEPARTMENT OF CORRECTION
## Interview Summary

| Facility: ICC | Investigator: Sgt. N. Fraser | | Date: 06/01/12 |
|---|---|---|---|
| Name of Subject (and ID number): Marty Moore | | | Case Number: SIR |
| Date of Interview: 05/18/2012 | Start Time: 0926 | Finish Time: 0951 | Location: ICC Administration |
| Others Present at Interview: Tim McKay, Jimmie Crosby | | Recorded? Yes | Location of Recoding: H Drive |

### Type Of Subject

[ ] Complainant [ ] Victim [ ] Witness [ ] Suspect [x] Staff [ ] Offender [ ] Public [ ] Contractor

### Interview Summary (type in cell below)

Interview with Councilor Marty Moore:

- She was here but did not respond.
- She was part of the planning process of moving the offenders in DEF.
- They had open beds on F1. There are to many factors with putting people on F1. You can't put sex offenders and things like that on the tier.
- They were trying to create a "walk". F1 typically has AK, SVC, and Sureño.
- This group wanted to all be together so we gave them a "walk".
- When asked if she knew there were problems between the YFS and AK she answered "Yes and No" She knew that she did not want to mix them. In her mind she thought they were on their own walk; they should be fine. If policy and procedure are followed they should be fine. "Ya there's tensions but we're not mixing them."
- They all wanted to be on the same walk. They are younger kids and they just all wanted to be together. So she thought "Why not, we need a use for those beds."
- They cleared out that quadrant of the tier and gave them their own walk.
- If a group of offenders want to be housed together and they have the ability to do so they will make the accommodation.
- A walk is a certain number of cells, designated as grouped together, and that is a walk. Before they put someone in there they make sure they have no enemies in that area because they come out together.
- F1 house active gang members. There are Surenos, AK, SVC. They are "solid" they don't have sex crimes. No one on that walk has sex crimes. If she is going to put someone on that tier, that is the criteria. They must get along with the AK.
- Norteno's are housed on a different walk because they are enemies with the Surenos.
- They know what they can mix.
- There were a couple off offenders that told staff that they did not get along with the AK but she explained that they would not be on their walk. She believes there was peer pressure amongst their own guys because there were a couple who said if they are going they are all going. So when she talked to them they stated they were going. A couple of them were really excited because they had been asking to get together because they were all spread around.
- They threw it out there because they were not using the beds.
- Ms. Rodriguez even put things up in pod control that said you have to be careful in F1, you cannot open any extra doors and they had not had an issue like that.
- They do not count on guys who are locked up 24/7 having nothing better to do then to figure out

Appendix A
504.02.01.001
(Appendix last updated 2/24/11)

Page 1 of 3

Exhibit 10