UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OMAR CASTILLON, DUSTY KNIGHT, JUSTIN KEITH PETERSON, LEON RUSSELL, CHRISTOPHER S. JORDAN, JACOB JUDD, MICHAEL FORD-BRIDGES, and RAYMOND BRYANT,<br><br>Plaintiffs,<br><br>vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, INC.,<br><br>Defendant. | Case No. 1:12-cv-00559-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are (1) Defendant's Motion to Dismiss (Dkt. 19), and (2) Plaintiffs' Motion to Seal exhibits to Plaintiffs' counsel's declaration filed in response to Defendant's Motion to Dismiss (Dkt. 35). The Court finds that the parties have adequately stated the facts and legal arguments in their briefs and that the decisional process would not be significantly aided by oral argument. In the interest of avoiding delay, the Court will decide this matter on the written motions, briefs, and record without oral argument. D. Idaho L. Civ. R. 7.1.

For the reasons set forth below, the Court will grant Plaintiff's Motion to Seal and grant in part and deny in part Defendant's Motion to Dismiss.

**MEMORANDUM DECISION AND ORDER - 1**

# BACKGROUND

Plaintiffs are prisoners in the custody of the Idaho Department of Correction ("IDOC") and at all relevant times were incarcerated at Idaho Correctional Center ("ICC"), a private prison operated by Defendant Corrections Corporation of America under contract with the IDOC. (First Amended Complaint ("FAC"), Dkt. 14, ¶15.) On May 4, 2012, Plaintiffs were moved into a housing unit of ICC known as F-pod or Pod F1. Plaintiffs claim they were afraid to move because the pod was heavily populated by members of two gangs, the Aryan Knights and the Severely Violent Criminals. (*Id.* ¶¶49-55.) According to Plaintiffs, Defendant has a policy of housing individuals with the same gang affiliation in the same housing unit, which creates a gang-controlled "walk." (*Id.* ¶¶30-34.) Plaintiffs also claim that Defendant intentionally uses prison gang members to control other inmates, "includes gang leadership in prison management decisions," and "refus[es] to hold gang members accountable for misconduct," all in an effort to increase its profit margin. (*Id.* ¶¶45-48.)

Gang members on the walk almost immediately began threatening Plaintiffs within earshot of correctional officers. The day after Plaintiffs were moved to F-pod, six members of the Aryan Knights and the Severely Violent Criminals did not return to their cells after they were let out for recreation.  Instead, they hid in a closet that should have been locked. The guards then let Plaintiffs out for recreation without first ensuring that all of the other inmates were back in their cells. (*Id.* ¶57.)

When Plaintiffs were walking toward the recreation area, the six gang members

**MEMORANDUM DECISION AND ORDER - 2**

came out of the closet and savagely attacked Plaintiffs with various homemade weapons. The attackers seriously injured all eight Plaintiffs, one of whom was stabbed 18 times. (*Id.* ¶¶16-23.)

Plaintiffs brought the instant action, alleging that Defendant violated their Eighth Amendment right to be free from cruel and unusual punishment by failing to protect them from the attack. Plaintiffs assert that F-pod presented a known and substantial risk of serious harm to Plaintiffs, but that Defendant was deliberately indifferent to that risk.

## PLAINTIFFS' MOTION TO SEAL

Plaintiffs have filed a Motion to Seal exhibits attached to Plaintiffs' counsel's declaration submitted in response to Defendant's Motion to Dismiss. Because Defendant has taken the position in the past that the documents are privileged, Plaintiffs request that they be sealed at this stage of the proceedings even though Plaintiffs' ultimate position is that the documents are not privileged. Defendant has not opposed the motion, and the documents appear to raise confidentiality concerns. For these reasons, the Court will grant Plaintiffs' Motion to Seal at this time.

## DEFENDANT'S MOTION TO DISMISS

Defendant makes two arguments in support of its Motion to Dismiss. It contends that (1) the entire case must be dismissed because the FAC fails to state a claim upon which relief may be granted, and (2) the claims of six of the eight Plaintiffs must be dismissed because those Plaintiffs failed to exhaust their administrative remedies.

**A.     Motion to Dismiss for Failure to State a Claim for Relief**

MEMORANDUM DECISION AND ORDER - 3

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alteration omitted). Although a complaint attacked by a motion to dismiss for failure to state a claim "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.*

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and alteration omitted).

The Supreme Court has identified two working principles that underlie this dismissal standard. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than

**MEMORANDUM DECISION AND ORDER - 4**

conclusions." *Id.* at 678-79. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at 679. "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Plaintiffs bring their claims under 42 U.S.C. § 1983, the civil rights statute. To state a valid claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Where, as here, an inmate claims that a private prison has violated the inmate's constitutional rights, the plaintiff must meet the test articulated in *Monell v. Department of Social Services*, 436 U.S. 658, 691-94 (1978). *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012) (applying *Monell* to private entities performing state functions).

Under *Monell*, a plaintiff must show the following: (1) the plaintiff was deprived of a constitutional right; (2) the defendant had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (internal quotation marks omitted). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be

**MEMORANDUM DECISION AND ORDER - 5**

founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

In arguing that Plaintiffs have failed to state a claim for relief, Defendant correctly notes that the FAC is peppered with sensationalistic allegations. Although the Court has concluded that these allegations need not be stricken, it has disregarded the hyperbole and looked to the underlying factual allegations in considering Defendant's Motion to Dismiss.

### 1.  Existence of Policy or Custom

Defendant argues that the FAC does not plausibly allege that Defendant has an unconstitutional policy or custom as required by *Monell*. Specifically, Defendant challenges Plaintiffs' assertion that Defendant has a policy of housing members of a gang along the same walk and of "consulting with gang members when making housing decisions." (Memo. in Supp. of Mot. to Dismiss, Dkt. 19-1, at 9.)

The Court agrees that Plaintiffs' allegations do not plausibly support an inference that Defendant has an ongoing "partnership" with prison gangs at ICC or "includes gang leadership in prison management decisions." (FAC ¶¶4, 45.) Plaintiffs offer no specific factual allegations supporting such a conclusion. However, the Court concludes that Plaintiffs have sufficiently stated a plausible *Monell* claim by alleging that Defendant maintained a policy or custom of (1) participating in a "ghost worker" scheme resulting in fewer correctional officers and thus contributing to danger in the prison, and (2) housing

**MEMORANDUM DECISION AND ORDER - 6**

prison gang members together in the same housing unit.

With respect to the so-called ghost worker scheme, Plaintiffs allege that prison management regularly reports to the IDOC that guards work shifts, including overtime shifts, when those guards are not actually working. (*Id.* ¶71.) Thus, the records submitted to IDOC show that each shift is fully staffed, when in reality fewer guards are available to help prevent violence among inmates. Plaintiffs also allege that Defendant has a policy of using guards with "injuries and medical restrictions that prohibit them from performing their duties within the confinement areas." (*Id.*)

Defendant argues that the FAC "fail[s] to describe any widespread pattern of constitutional violations involving inmate-on-inmate assaults that would indicate a need for more or different training by CCA, or that any prior assaults resulted from an inadequate number of correctional staff on duty." (Memo. in Supp. of Mot. to Dismiss at 15.) A claim for failure to train should generally, except in "a narrow range of circumstances," allege a pattern of violations sufficient to place the defendant on notice of the need to train its employees. *Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011) (internal quotation marks omitted).

But here, the allegations are not simply that Defendant provided poor training or did not provide enough training. Rather, Plaintiffs claim that Defendant instituted a fraudulent policy that would obviously result in fewer guards on duty than reported. And with fewer guards to patrol the prison, inmates were in more danger than they would have been had the prison been fully staffed. The FAC's allegations raise a plausible inference

**MEMORANDUM DECISION AND ORDER - 7**

that Defendant was aware of a substantial risk of serious harm to its inmates as a result of its ghost worker scheme. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.").

With respect to their claim that Defendant improperly houses gang members in the same unit, Plaintiffs state,

> CCA, pursuant to its own policy and practice, houses inmates who claim the same gang affiliation together in the same cellblock, which is arranged so that they all may have lunch, recreation time, and other time outside of their cells together. The cells are side by side, so that the gang members can talk to one another even if they are confined to their cell.

(*Id.* ¶30.) Plaintiffs also allege that the IDOC investigated Defendant in 2008 and concluded that "increased violence and decreased prisoner safety at the ICC was due to, among other things, gang members operating openly at the ICC with little fear of being held accountable." (*Id.* ¶39.)

Although Defendant contends that Plaintiffs' attack in May 2012 is too far removed from the IDOC's 2008 investigation, the allegation that gang members were still being housed on the same walk at the time of the attack raises a plausible inference that CCA had not resolved the problems identified by the IDOC years earlier.  As Plaintiffs point out, the congregated gang members have time to engage in any number of nefarious

**MEMORANDUM DECISION AND ORDER - 8**

activities, including planning attacks on other inmates—which is precisely what the

Aryan Knights and the Severely Violent Criminals did when they conspired to hide in a

closet and to attack Plaintiffs with various shanks and shivs. The FAC plausibly alleges

that Defendant was aware that its policies increased the risk of violence in gang walks yet

refused to change that policy.

### 2.    Policymaking Authority

"Under *Monell*, municipalities are subject to damages under § 1983 in three

situations: when the plaintiff was injured pursuant to an expressly adopted official policy,

a long-standing practice or custom, or the decision of a final policymaker." *Ellins v. City

of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013) (internal quotation marks omitted).

Defendant relies on *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010),

in arguing that the decision to move Plaintiffs into the same pod as the gang members

who attacked them "cannot be imputed to CCA as a corporate policy" because the official

who approved the move was not a final policymaker and because the housing decision

was discretionary. (Memo. in Supp. of Mot. to Dismiss at 13.)

In *Clouthier*, which was before the Ninth Circuit on appeal from summary

judgment, the plaintiffs argued that the county was liable for a jail official's decision not

to discipline jail employees. *Clouthier*, 591 F.3d at 1253. However, the plaintiffs did not

offer any evidence that the official was a policymaker "or, even if he were, that he made a

conscious, affirmative choice to approve [the employees'] actions and adopt them as

official policy." *Id.* The court noted that "to hold cities liable under section 1983

**MEMORANDUM DECISION AND ORDER - 9**

whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law creating an end run around *Monell*." *Id.* (internal quotation marks and alterations omitted).

*Clouthier* is inapposite for two reasons. First, Plaintiffs are not required to come forward with evidence at the motion to dismiss stage, just allegations plausibly suggesting that Defendant is liable for Plaintiffs' injuries—which Plaintiffs have done. Second, Plaintiffs do not base their claims solely on their allegation that a final policymaker approved the decision to move them into the gang-controlled walk. They also assert that their constitutional rights were violated pursuant to "an expressly adopted official policy [or] a long-standing practice or custom" of housing members of a gang together in the same walk, which made that housing unit particularly dangerous. *Ellins*, 710 F.3d at 1066. As the Court has already determined, the FAC sufficiently alleges the existence of such a policy or custom.

### 3.    Causation

Defendant also contends that Plaintiffs have failed to adequately allege that a policy or custom was the moving force behind the alleged violation of Plaintiffs' constitutional rights. It argues that "[t]he housing transfer of the eight Plaintiffs to the F Pod that occurred May 4th did not cause the May 5th assaults to occur—the assaults occurred because the assailants hid from correctional officer view." (Memo. in Supp. of Mot. to Dismiss at 17.)

**MEMORANDUM DECISION AND ORDER - 10**

Defendant appears to suggest that however dangerous the pod might have been, the attackers' independent actions constituted a superseding cause eliminating any § 1983 claim. This argument illustrates a fundamental misunderstanding of § 1983 and Eighth Amendment jurisprudence. Claims that a prison policy amounts to deliberate indifference "to the threat of serious harm or injury" by one prisoner against another are cognizable under § 1983. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal quotation marks, citation, and alterations omitted).

Plaintiffs' theory is that Defendant created a substantial risk of serious harm by instituting and maintaining a policy or custom of placing too few guards on duty and of housing prison gang members in the same area, despite a known risk of increased violence as a result of those policies. The FAC sufficiently states Eighth Amendment policy claims under *Monell*.

**B.     Motion to Dismiss for Failure to Exhaust**

Pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*, a prisoner is required to exhaust all of his administrative remedies within the prison system before he can bring a

civil rights lawsuit challenging the conditions of his confinement. 42 U.S.C. § 1997e(a).

"Proper" exhaustion of administrative remedies is required, meaning that the prisoner

must comply "with [the prison's] deadlines and other critical procedural rules because no

adjudicative system can function effectively without imposing some orderly structure on

the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

 "There is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The exhaustion requirement is based on the important policy concern that prison officials

should have "an opportunity to resolve disputes concerning the exercise of their

responsibilities before being haled into court." *Id.* at 204.


 Failure to exhaust is an affirmative defense that is "subject to an unenumerated

Rule 12(b) motion rather than a motion for summary judgment." *Wyatt v. Terhune*, 315

F.3d 1108, 1119 (9th Cir. 2003). In deciding a motion to dismiss for lack of exhaustion,

the Court "may look beyond the pleadings and decide disputed issues of fact." *Id.* at 1120.

If a prisoner has failed to exhaust his administrative remedies, the appropriate remedy is

dismissal without prejudice. *Id.*

 The defendant bears the burden of proving failure to exhaust. *See Brown v. Valoff*,

422 F.3d 926, 936 (9th Cir. 2005). If the defendant does so, "the burden shifts to the

plaintiff to show that the administrative remedies were unavailable." *Albino v. Baca*, 697

F.3d 1023, 1031 (9th Cir. 2012). Confusing or contradictory information given to a

**MEMORANDUM DECISION AND ORDER - 12**

prisoner "informs [the] determination of whether relief was, as a practical matter, 'available.'" *Brown*, 422 F.3d at 937.

Administrative remedies will be deemed unavailable and exhaustion excused if an inmate shows that the required procedural steps were "not known and unknowable with reasonable effort." *Albino*, 697 F.3d at 1037. A complaint will not be dismissed for failure to exhaust if the prison improperly processed an inmate's grievance, if prison officials misinformed an inmate regarding grievance procedures, or if jail staff took any other "affirmative actions" that interfered with an inmate's efforts to exhaust. *Id.* at 1034, 1039. It is not enough that the prisoner was subjectively unaware of proper grievance procedures; that lack of awareness must be "objectively reasonable." *Id.* at 1038.

Defendant acknowledges that Plaintiffs Knight and Jordan fully exhausted their claims through the prison grievance process, but argues that the remaining six Plaintiffs did not.

### 1.    ICC Grievance Procedure

ICC follows IDOC's inmate grievance process, which consists of three stages. First, any inmate with a concern is required to seek an informal resolution by filling out an Offender Concern Form, addressed to the staff person "most capable of responding to and, if appropriate, resolving the issue." (Purcell Decl., Dkt. 19-2, at ¶11.) If the issue cannot be resolved informally through the use of a concern form, the inmate must then file a grievance form. (*Id.* at ¶12.) A grievance form must be filed no later than 30 days after the incident giving rise to the grievance. (*Id.*)

**MEMORANDUM DECISION AND ORDER - 13**

When submitting a grievance, the inmate must attach a copy of the concern form, showing the inmate's attempt to settle the issue informally. Grievances must contain "specific information including the nature of the complaint, dates, places, and names" and must be signed by the inmate. The inmate can only raise one issue per grievance. The staff member "most capable of responding to and, if appropriate, resolving the issue" must answer any properly completed grievance. (*Id.* at ¶13.) After a "reviewing authority, who is usually a deputy warden," reviews the staff member's response, the inmate is notified of the disposition of the grievance. (*Id.*)

If the decision on an inmate's grievance is not satisfactory to the inmate, the inmate may appeal that decision within 14 days of receiving the response to the grievance. (*Id.* at ¶14.) The "appellate authority," usually the head of the prison, must issue his or her decision on the appeal within 16 days. (*Id.* at ¶15.) Not until the completion of all three of these steps—concern form, grievance form, and grievance appeal—is the grievance process exhausted. (*Id.* at ¶16.)

Defendant has met its "very low" burden to show failure to exhaust by submitting evidence establishing that "(1) a grievance procedure existed and (2) [the six Plaintiffs] did not exhaust the grievance procedure." *Albino*, 697 F.3d at 1032. After having their initial grievances returned without action for failure to comply with applicable rules, Plaintiffs Russell, Judd, Bryant, and Ford-Bridges properly submitted concern forms and grievances regarding the attack and therefore completed the first two steps of the

**MEMORANDUM DECISION AND ORDER - 14**

grievance process. (*Id.* at ¶¶27, 33, 38, and 48; Atts. I, M, P, and U.) In responding to

these Plaintiffs' grievances, which requested compensation for the inmates' injuries,

Chief of Unit Management Tracy Koosman stated, "Compensation is not done through

the Grievance procedure. If you would like to pursue this, you can do so utilizing outside

sources." (*Id.*, Atts. I, M, P, and U.) Assistant Warden Kessler acted as the "reviewing

authority" on these grievances and stated, "Concur with first response." (*Id.*) None of

these Plaintiffs appealed the denial of their grievances.


Plaintiff Peterson also properly submitted a concern form and grievance about the

attack. Before responding to the grievance, Koosman met with Peterson, who stated that

he now felt safe where he was. (*Id.*, Att. F.) Kessler agreed with this resolution of the

grievance, and no further action was taken. Neither Koosman nor Kessler mentioned

anything about the compensation Plaintiff requested in his grievance. (*Id.*) Peterson did

not appeal the grievance and therefore completed only the first two steps of the process.

Plaintiff Castillon submitted a grievance form regarding the attack but did not

attach a copy of a concern form. Thus, the grievance was returned to him without being

processed, and Castillon completed, at most, only the first step of ICC's grievance

procedure. (*Id.* at ¶44; Att. T.)

The question now becomes whether Plaintiffs Russell, Judd, Bryant, Ford-Bridges,

Peterson, and Castillon can prove that further administrative remedies were effectively

unavailable because of the actions of prison officials.

**MEMORANDUM DECISION AND ORDER - 15**

### 2.       Plaintiffs Russell, Judd, Bryant, and Ford-Bridges

The Court concludes that Plaintiffs Russell, Judd, Bryant, and Ford-Bridges

complied with the PLRA's exhaustion requirement because, although they did not appeal

their grievances through the third level of the grievance procedure, that third level of

review was effectively unavailable to them.

Koosman told the inmates, "If you would like to pursue [compensation], you can

do so utilizing outside sources." Whether or not Koosman intended to give permission to

Plaintiffs Russell, Judd, Bryant, and Ford-Bridges to dispense with any further

exhaustion, that is certainly how it appeared. The Court finds Koosman's statement, along

with Kessler's approval of it, essentially informed Russell, Judd, Bryant, and Ford-

Bridges that no further administrative remedies were available.

Defendant argues that the several grievances filed by these four Plaintiffs after

they received Koosman's response about "outside sources" shows that they were not

misled into believing they had done all they could do within the prison grievance system.

(Reply in Supp. of Mot. to Dismiss, Dkt. 42, at 5-6.) The facts arguably suggest

otherwise.

Defendant's Reply in Support of the Motion to Dismiss states:

> Inmate Russell—after being informed early June, 2012 that
> his second grievance was denied and that compensation was
> "not done" through the grievance process, failed to appeal but
> had no problem filing two subsequent grievances on June
> 11th and 27th grieving the same incident and asking for
> compensation. If Mr. Russell was "misled" about available
> remedies, why would he continue to file grievances seeking

**MEMORANDUM DECISION AND ORDER - 16**

> compensation but fail to appeal to the warden?
>
> Plaintiff Judd likewise did not appeal to the Warden from AW Kessler's June 4th denial of relief, but he did find the time on June 11th to file a separate concern form to AW Kessler seeking compensation and asking why he was moved to a different tier . . . .
>
> Plaintiff Bryant similarly received a "no compensation" denial from Koosman/Kessler in response to his May 30th grievance, but thereafter filed no fewer than three separate grievances (June 6th, June 11th and October 16th) seeking compensation but failing to appeal to the Warden from his May 30th grievance. Plaintiff Bridges also filed separate grievances on June 8th, June 11th, and two on October 19th, seeking compensation *after* Koosman/Kessler informed him that compensation was "not done" via grievances.

(*Id.*) (internal citations omitted).

However, this representation of Plaintiffs' grievance activities is belied by the declaration of ICC's grievance coordinator and the exhibits attached thereto. Koosman responded to each grievance with the "outside sources" statement, but Plaintiffs did not receive that response until Kessler approved it. (Purcell Decl. ¶13.) In each case, the inmates received these responses on June 18, 2012. (*Id.*, Atts. I, M, P, and U.) Thus, Russell submitted his separate June 11th grievance *before* he received the Koosman/Kessler response to his earlier grievance on June 18th, not after. (*Id.*, Att. I.) Judd also submitted an additional grievance regarding the incident, but at the time he had not yet received the Koosman/Kessler response to his previous grievance. (*Id.*, Att. M.) Bryant only filed one grievance after he received the "outside sources" response, not three as Defendant claims. (*Id.*, Att. P.) And Ford-Bridges submitted two grievances—not

**MEMORANDUM DECISION AND ORDER - 17**

four—after he received the response. (*Id.*, Att. U.) Defendant does not explain how it was unreasonable for any Plaintiff to submit an additional grievance when he had not yet received a response to the first grievance.

True, three Plaintiffs (Russell, Bryant, and Ford-Bridges) filed at least one other grievance after learning from Koosman and Kessler that compensation could be sought through outside sources. The Court disagrees, however, that these later grievances show that these Plaintiffs were not misled. It would be unreasonable to expect them to have known precisely how to exhaust in this particular situation, given the information provided by Koosman and Kessler and the confusing nature of the grievance system and required forms.

The grievance policy requires that an inmate address a concern form to "the appropriate staff member." (*Id.*, Att. C.) As pointed out by several Plaintiffs, this instruction led them to send multiple concern forms regarding the attack to different staff members in an attempt to ensure that the right person received it. (Judd Decl., Dkt. 32, ¶5; Bryant Decl., Dkt. 29, ¶8; Ford-Bridges Decl., Dkt. 30, ¶5.) Therefore, Plaintiffs had multiple concern forms they believed they had to grieve. The policy does not inform an inmate what to do if he believes that more than one staff member is "appropriate" and able to address his concerns. (*See* Purcell Decl., Att. C.)   Given the lack of clarity in the grievance policy, it is understandable why Plaintiffs continued to submit grievances after they received their responses from Koosman and Kessler.

In addition, the policy calls for a single form for both a grievance and an appeal

**MEMORANDUM DECISION AND ORDER - 18**

and includes a sample Grievance/Appeal Form. There are two separate sections of this form, one to be used if the inmate is submitting an initial grievance, and another to be used if the inmate is appealing an adverse response to a grievance. (*Id.*, Att. C.) But Russell, Judd, Bryant, and Ford-Bridges each obtained from prison staff and submitted at least one Grievance/Appeal Form that does *not* match this sample. (*Id.*, Atts. H, M, O, & U.) This outdated form contains just one section, and requires that the inmate check a box—a Grievance Box or an Appeal Box—depending on which procedure the inmate wishes to invoke.

Finally, in support of its Motion to Dismiss, Defendant submitted a grievance policy approved on April 23, 2012, less than two weeks before Plaintiffs were attacked. (*Id.* ¶6; Att. C.) But the documents showing that Plaintiffs received a copy of the Inmate Handbook, which contains the grievance policy, are all dated before April 23, 2012, and appear to involve a different grievance policy. (*Id.*, Att. B.) To be clear, the Court does not mean to imply that it is Defendant's burden to show that the inmates were aware of the grievance procedure in place. *See Albino*, 697 F.3d at 1032 (defendant's initial burden is simply to show that a grievance process existed and the plaintiff did not follow it). But this oddity is yet another fact contributing to the Court's conclusion that Plaintiffs Russell, Judd, Bryant, and Ford-Bridges have sufficiently proved that based on the actions of prison staff, it was objectively reasonable for them to believe that they had exhausted all available administrative remedies.

Koosman's statements that compensation was "not done" through the prison's

**MEMORANDUM DECISION AND ORDER - 19**

grievance process and that the inmates could pursue their compensation claims "utilizing outside sources," along with Kessler's approval of those statements, were reasonably interpreted by these four Plaintiffs as a waiver of the grievance appeal requirement and as permission to sue, an interpretation that was further supported by the multiple irregularities in the ICC grievance process that occurred here. Koosman and Kessler essentially told these inmates, "We can't help you, so you can go to court now." They affirmatively, though most likely inadvertently, interfered with these four inmates' attempts to exhaust.[1] *See Nuñez v. Duncan*, 591 F.3d 1217, 1225-26 (9th Cir. 2010).

The Court concludes that in the unique circumstances of this case, the grievance appeal procedure was not available to Plaintiffs Russell, Judd, Bryant, or Ford-Bridges. Therefore, they may proceed on their civil rights claims notwithstanding their failure to fully exhaust administrative remedies.

### 3.   Plaintiffs Peterson and Castillon

Unlike Plaintiffs Russell, Judd, Bryant, and Ford-Bridges, Plaintiff Peterson was not told that outside sources could be used to pursue compensation for his injuries. Peterson argues that he should nonetheless be excused from appealing the denial of his grievance because he was Plaintiff Judd's cellmate, read Judd's response from Koosman, and therefore learned of Koosman's "outside sources" statement second-hand. (Peterson

---

[1] The Court finds unpersuasive Defendant's argument that because Plaintiff Jordan appealed his grievance denial despite also receiving an "outside sources" response from Koosman and Kessler, the appeal procedure was also available to Plaintiffs Russell, Judd, Bryant, and Ford-Bridges. That one Plaintiff interpreted the response differently does not render the other four Plaintiffs' interpretation unreasonable.

**MEMORANDUM DECISION AND ORDER - 20**

Decl., Dkt. 34, ¶13.)

Having seen Judd's grievance response from Kessler—which appeared to allow litigation without further exhaustion—Peterson believed that he didn't have to appeal his grievance denial either. But the Ninth Circuit does not recognize an inmate's subjective belief that administrative remedies are unavailable as grounds to excuse exhaustion under the PLRA. Rather, Peterson must show that Defendant affirmatively interfered in his efforts to exhaust or that he took reasonable steps to discover the proper grievance procedures yet was unsuccessful. *See Albino*, 697 F.3d at 1033 ("Because Albino has not shown (1) that jail staff affirmatively interfered with his ability to exhaust administrative remedies or (2) that the remedies were unknowable, he has not met his burden of showing that the jail grievance procedure was 'unavailable.'"). Prison staff did not inform Peterson that he was allowed to use outside sources to pursue his compensation claim as they did with other Plaintiffs, and Peterson took no steps to determine whether Koosman's and Kessler's statement to Judd applied to his own claims. Therefore, Peterson has failed to show that the grievance appeal procedure was unavailable to him, and Koosman's and Kessler's statements to other Plaintiffs do not excuse Peterson's failure to exhaust.

As noted above, Plaintiff Castillon submitted a grievance form regarding the attack but did not attach a copy of a concern form. When the grievance was returned to him without being processed because of the deficiency, Castillon did nothing to remedy the error or otherwise complete the grievance procedure. (*Id.* at ¶44; Att. T.)

Plaintiffs Peterson and Castillon argue that they should be excused from

**MEMORANDUM DECISION AND ORDER - 21**

exhaustion on the ground that Plaintiffs Jordan and Knight exhausted their § 1983 claims on behalf of all Plaintiffs. In *Chandler v. Crosby*, 379 F.3d 1278, 1282-83 (11th Cir. 2004), a certified class of death-row inmates claimed that high temperatures in their cells constituted cruel and unusual punishment. The Eleventh Circuit determined that because at least one class member "exhausted his administrative remedies with respect to each claim raised by the class," the entire class satisfied the exhaustion requirement through a theory of "vicarious exhaustion." *Id.* at 1287 (internal quotation marks omitted).

Even if vicarious exhaustion is sometimes permissible, it most certainly does not apply in this case, which is not a class action. Each individual Plaintiff was required to exhaust. 42 U.S.C. § 1997e ("No action shall be brought . . . *by a prisoner* . . . until such administrative remedies as are available are exhausted." (emphasis added)). Peterson and Castillon failed to do so. Therefore, their claims will be dismissed without prejudice.

## ORDER

**IT IS ORDERED:**

1.  Defendant's Motion to Dismiss (Dkt. 19) is GRANTED IN PART and DENIED IN PART. All claims asserted by Plaintiffs Peterson and Castillon are DISMISSED without prejudice.

2.  Plaintiff's Motion to Seal (Dkt. 35) is GRANTED. The Exhibits to Mr. Angstman's Affidavit in Response to Defendant's Motion to Dismiss (Dkt. 36) is hereby ordered SEALED.

**MEMORANDUM DECISION AND ORDER - 22**

SO ORDERED.

DATED:  **June 4, 2013**

Honorable Edward J. Lodge
U. S. District Judge