UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OMAR CASTILLON, DUSTY KNIGHT, JUSTIN PETERSON, LEON RUSSELL, CHRISTOPHER JORDAN, JACOB JUDD, MICHAEL FORD-BRIDGES, AND RAYMOND BRYANT,<br><br>                    Plaintiffs,<br><br>v.<br><br>CORRECTIONS CORPORATION OF AMERICA, INC.,<br><br>                    Defendant. | Case No. 1:12-cv-00559-EJL-CWD<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiffs bring this civil rights action against Corrections Corporation of America, Inc. (CCA), alleging one count for violation of their Eighth Amendment rights prohibiting the imposition of cruel and unusual punishment, and the corresponding duty of the prison to protect prisoners from violence at the hands of other prisoners. The lawsuit arises out of a tragic inmate gang attack on Plaintiffs that occurred on May 5, 2012, at the Idaho Correctional Center.

**REPORT AND RECOMMENDATION  - 1**

Plaintiffs assert liability under the standards articulated in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). CCA's position is the undisputed facts do not establish CCA had a deliberately indifferent custom or policy that was the moving force behind a violation of Plaintiffs' constitutional rights. *See Stover v. CCA*, No. 1:12–cv–00393–EJL, 2015 WL 874288 at *9 (D. Idaho Feb. 27, 2015) (citing *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110 (9th Cir. 2001)); *Monell*, 436 U.S. at 690-94.

Currently pending before the Court is CCA's motion for summary judgment, (Dkt. 166), and three evidentiary motions. Plaintiffs move to strike the affidavit of W. Ken Katsaris (Dkt. 161), and the affidavit of Kevin Myers (Dkt. 189), while CCA moves to exclude the testimony of Plaintiffs' experts John Hepburn and Pam Sonnen (Dkt. 165).

The Court conducted a hearing on August 27, 2015, and at its conclusion, took the motions under advisement. Having carefully considered the record, the parties' arguments, and otherwise being fully advised, the Court enters the following report and recommendation with respect to CCA's motion for summary judgment, and an order regarding the evidentiary motions as they relate to the pending summary judgment motion.

## FACTS

### 1.     General Background

Plaintiffs[1] Dusty Knight, Leon Russell, Christopher Jordan, Jacob Judd, Michael Ford-Bridges, and Raymond Bryant are prisoners in the custody of the Idaho Department of Correction ("IDOC") and at all relevant times were incarcerated at the Idaho Correctional Center ("ICC"), a private prison which, at the time of the attack, was operated by Defendant CCA under contract with IDOC. First Am. Compl. (Dkt. 14, ¶ 15.)[2] On May 4, 2012, Plaintiffs were moved into a housing unit at ICC known as F-pod or Pod F1, in the DEF Unit. According to the complaint, Plaintiffs claim they were afraid to move because the pod was heavily populated by members of two gangs, the Aryan Knights and the Severely Violent Criminals. (*Id.* ¶¶ 49- 55.)

Plaintiffs allege CCA has a policy of housing individuals with the same gang affiliation in the same housing unit, which creates a gang-controlled "walk." (*Id.* ¶¶ 30-34.) Plaintiffs claim also that CCA intentionally uses prison gang members to control other inmates, "includes gang leadership in prison management decisions," and "refus[es] to hold gang members accountable for misconduct," all in an effort to increase its profit margin and reduce staff. (*Id.* ¶¶ 45-48; 70.)

Plaintiffs' complaint alleges also that CCA employed a "ghost worker" scheme, and did not fill shifts or fully staff posts. (*Id.* ¶¶ 70-71.) Mandatory overtime due to understaffing allegedly left correctional officers exhausted and unable to perform their

---

[1] Plaintiffs Omar Castillon and  Justin Peterson were dismissed from this action on June 4, 2013. (Dkt. 54.)
[2] Further references to the First Amended Complaint will simply refer to the complaint.

**REPORT AND RECOMMENDATION  - 3**

duties at optimum levels. *Id.* Plaintiffs seek injunctive relief, and compensatory and punitive damages against CCA. (*Id.* ¶ 82.)

Plaintiffs' allegations therefore center upon CCA's alleged policy of housing members of a gang along the same walk, and of deliberately understaffing the prison. The Court, in response to CCA's motion to dismiss, concluded Plaintiffs stated a *Monell* claim by alleging CCA maintained a policy or custom of  (1) participating in a "ghost worker" scheme resulting in fewer correctional officers and thus contributing to danger in the prison, and (2) housing prison gang members together in the same housing unit. Mem. Dec. and Ord. at 6-7 (Dkt. 54.) Against that backdrop, the Court finds the following facts material and undisputed for purposes of determining the motion for summary judgment.[3]

## 2. Applicable Policies

Upon arriving at an IDOC prison, inmates are assigned a custody level and IDOC determines the inmate's housing facility based upon his classification as minimum custody, medium custody, or close custody. Aff. of Myers ¶ 16[4] (Dkt. 169 at 5-6.) Close custody facilities are designed to house high risk inmates, either because they have escaped or have displayed dangerous behavior while incarcerated. *Id.* ¶ 17 (Dkt. 169 at 6.) An offender classified as "close custody" does not live in the general population within the prison, but is instead confined within a secure perimeter and under 24 hour

---

[3] The following facts are undisputed unless otherwise indicated. When the facts are disputed, they are taken in the light most favorable to Plaintiffs, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).
[4] Paragraphs 16 – 23 of the Affidavit of Kevin Myers are not subject to Plaintiffs' motion to strike.

**REPORT AND RECOMMENDATION  - 4**

staff supervision. *Id.* ¶ 18 (Dkt. 169 at 6.) Movement of close custody offenders within the institution is limited. *Id.*

ICC is divided into 31 housing units equipped to house medium and close custody offenders, and was the only facility within the IDOC system that had a dedicated unit for offenders classified as close custody – the DEF Unit. *Id.* ¶ 19 (Dkt. 169 at 6.) The DEF Unit opened in July of 2009, and was specifically designed for close custody inmates that had been transferred to ICC from Idaho's Maximum Security Institution. *Id.* ¶ 19 (Dkt. 169 at 6.) The DEF Unit housed a high percentage of Security Threat Groups (STGs), which are defined as "a group of two or more offenders who have been determined to be acting in concert so as to pose a significant threat to the safety, security, and orderly operation of any Idaho Department of Correction" facility. *Id.* ¶ 20 (Dkt. 169 at 6-7.)

ICC had several policies governing close custody inmates, including the design and operation of the DEF Unit itself. The DEF Unit has six pods, or tiers—Delta 1, Delta 2, Echo 1, Echo 2, Fox 1 and Fox 2. SOF ¶ 31; Anderson testimony, Tr. at 342 (Dkt. 167-2 at 4.) Each tier, or pod, was divided into fourths, and a specific gang, grouped together in a "walk," was housed in each one of these areas. Higgins Tr. at 28 (Dkt. 159-2 at 4.) For example, the Aryan Knights would occupy one walk, the Severely Violent Criminals another, and the Norteños yet another walk. Higgins Tr. at 28 (Dkt. 159-2 at 4.) Sixteen inmates were housed together in a walk. Aff. of Sharp ¶ 8 (Dkt. 183-1 at 9.)

With regard to operations, ICC's STG housing policy, approved by Chief of Operations Kevin Kempf, indicates that while suspected members of specific STGs will

**REPORT AND RECOMMENDATION - 5**

not be allowed to concentrate in any housing unit or correctional facility, "in close custody…managers may be forced to have a higher concentration of STG members but the basic management strategy of keeping them disbursed can still be followed." SOP 504.02.01.002 at 4 (Dkt. 170-3 at 5.) STGs were to be kept "off balance by frequently moving the known leaders of the various affiliations." *Id.* This could be accomplished by changing housing units, changing facilities, or housing gang leaders in another state where they had little or no power. *Id.* Other management alternatives included placement of STG leaders involved in violent behavior in long-term administrative segregation when needed to disrupt STG activity. *Id.* The policy indicated also that STG members' behavior should be "closely monitored," and tracking should be accomplished by keeping track of STG housing assignments within the facility; participating in facility move decisions to prevent suspected STG members from concentrating in any one housing unit; generating a population report by STG affiliation; generating an STG conflict report; conducting monthly random inspections of cells of STG members to look for STG paraphernalia; and, closely monitoring offenders for STG involvement. *Id.* at 5-6.

ICC policy 10-103, dated July 1, 2009, and approved by Warden Phillip Valdez, provided for additional operational management of close custody inmates. SOF 12; Ex. 22d (Dkt. 170-4 at 3.) Inmates housed in the close custody unit received one hour of exercise per day, five days per week, outside their cells. SOF 14; Ex. 22d (Dkt. 170-4 at 3.) Close custody inmates also were given one hour per day of dayroom time to shower, clean their cells, or attend to other personal business. SOF ¶ 15; Aff. of Myers ¶ 28 (Dkt. 169 at 15.)  Inmates were secured in their cells before meals were served. Ex. 22d (Dkt.

170-4 at 4.) And inmates from different housing pods, or walks, were not allowed to recreate together. SOF ¶ 14; Aff. of Myers ¶ 27 (Dkt. 169 at 8.) In other words, only one group of inmates assigned to a particular walk was allowed out of their cells together for the same recreation or dayroom break. SOF ¶ 18; Rodriguez Depo. at 53-53, 76-77 (Dkt. 168-5.)  All of these operational policies ensured that close custody inmates in the DEF Unit were confined to their cells 22 hours per day Monday – Friday, and 24 hours per day on weekends. SOF ¶ 15; Aff. of Myers ¶ 29 (Dkt. 169 at 9.) Although confined, inmates occupying the same walk could hear each other and talk to each other through the doors. Rodriguez Depo. at 77 (Dkt. 168-5 at 12.)

ICC Post Order 106, approved by Warden Tim Wengler on September 11, 2011, and applicable to close custody correctional officers (DEF Unit), indicated that, at the end of a shift, officers were not to leave their post for any reason unless properly relieved by an assigned officer or the Shift Supervisor. Ex. 22f ¶ IV (Dkt. 170-6 at 6.) The same policy includes dayroom procedures and movement procedures. To release an inmate from his cell for dayroom access, the officer must be posted at the door to the inmate's cell, contact pod control via radio, and be visually recognized by the pod control officer prior to opening the door. Ex. 22f ¶3.F (Dkt. 170-6 at 3.) The inmate then has five minutes to obtain property from his cell that he wishes to take into the dayroom. *Id.* The officer must search the dayroom prior to allowing another group of inmates into the dayroom area. *Id.* Officers must monitor all movement in and out of cells during movement time. Ex. 22f ¶ III.E (Dkt. 170-6 at 3.) Every tier has a floor officer posted at all times when inmates are in the dayroom to ensure no unusual and/or unauthorized

activities are taking place, and the officer must personally observe all inmates on the assigned tier. Ex. 22f ¶ III.B (Dkt. 170-6 at 3.)

Post Order PO-00, effective October 12, 2009, and approved by the director of security, the Chief Corrections Officer, and Warden Tim Wengler, required correctional officers to conduct informal counts to verify all inmates are present or accounted for. Ex. 22e (Dkt. 170-5 at 5.) Inmates outside of their cells must have their ID badges visible, so they may be checked and identified. *Id.* (Dkt. 170-5 at 12.) According to ICC PO-100, which policy was approved by Warden Tim Wengler, the Housing Unit Pod Control officer is responsible for controlling access in and out of the housing unit by visual and verbal identification of individuals entering or leaving any security door, and asking individuals to identify themselves via their ID badge. Ex. 22g (Dkt. 170-7 at 3.) The Pod Control Officer is required also to verify all inmates being released from the unit. *Id.* (Dkt. 170-7 at 3.)

### 3. The Decision to Move Plaintiffs on May 4, 2012

Unit Manager Norma Rodriguez was the housing unit manager for DEF Unit. SOF ¶ 20; Rodriguez Depo. at 53 (Dkt. 168-5 at 3.) Rodriguez had been the DEF Unit Manager since June of 2011, and she reported to Chief of Unit Manager Koozman, who in turn reported to Warden Kessler. (Dkt. 1-1 at 1, 2.)[5] Rodriguez was responsible for all moves that took place into a housing unit, and ensured inmates' safety prior to moving them into an area. *Id.* at 60 (Dkt. 168-5 at 6.) Although Rodriguez was not the warden

---

[5] Plaintiffs cite to the Interview Summary of Norma Rodriguez, which interview occurred on May 25, 2012, in paragraph 48 of their statement of disputed facts.

and did not have a level of authority commensurate with the warden, Rodriguez was allegedly regarded as "the mini warden" over the unit. (Dkt. 188-2 at 52.) However, Rodriguez's level of authority "doesn't extend and allow [her] to do things, all the things a warden can do." *Id.*[6] Once the decision to move inmates was made, the unit manager presented the move sheet to Warden Kessler for review and approval. (Dkt. 188-2 at 29.) Kessler had not ever had a unit manager tell him that a move was unacceptable, because if the unit manager "was not good with the move, they would not present the move sheet to him for review." *Id. See also* Pls.' Stmt. of Disputed Facts ¶ 54. (Dkt. 188—1 at 17.)[7]

When Rodriguez considered inmate moves to DEF Unit, compatibility of offenders was an issue. Offenders in DEF

> actually live 22 to 23 hours together, and it's very difficult to live with someone for that period of time. So it was very important to us that they could get along with one another, because they are cellmates. So any offender that was being looked at getting moved would receive an interview by one of the staff, sometimes to include me, so we could ensure everybody's safety. At any point in time when an offender said no, they didn't feel safe, we would not move them. If they felt it was all right, they would get moved.

---

[6] Rodriguez was asked, "Now, your level of authority though doesn't extend and allow you to do things, all the things a warden can do; right?" Rodriguez answered, "Correct."

[7] Officer Skogsberg in his affidavit states that "Rodriguez and Assistant Warden Kessler, had knowledge of the acute danger posed to the Plaintiffs by moving them into the F1 tier because several correctional officers, including myself, reported this." Skogsberg Aff. ¶ 13 (Dkt. 188-2 at 8.) In all of the reams of material submitted, this is the only statement that suggests Kessler had some sort of vague knowledge of some unidentified danger posed to Plaintiffs if they moved to F1 Pod. However, there is no other evidence in the record regarding what Skogsberg reported, what type of danger Plaintiffs might be exposed to, when he informed Kessler or Rodriguez, and no other documentation in the written case notes, deposition testimony, or other records that Skosberg reported such information. Instead, Plaintiffs in their statement of facts cite to Kessler's actual deposition testimony, which makes no reference to receiving a report from anyone of any danger posed to Plaintiffs as a result of the move. The Court therefore does not consider Skogsberg's vague reference to a report of some unspecified nature to be a material fact.

**REPORT AND RECOMMENDATION  - 9**

Rodriguez Depo. at 61 (Dkt. 168-5 at 7.)[8]

Unit Manager Rodriguez was concerned that intake inmates, or new arrivals, were being housed in F1 Pod and that they might be recruited into a STG or prison gang, or become subject to extortion by such gang members; she therefore wanted to put new inmates in F1 Pod who were not vulnerable to that type of pressure from other inmates. SOF ¶ 19; Rodriguez Depo. at 53-54, 70 (Dkt. 168-5 at 3-4, 8.) At the time of the May 4, 2012 move, there were inmates already in the F1 Pod, assigned to a different walk or tier, who were members of STGs such as the Aryan Knights ("AK"), Severely Violent Criminals ("SVC"), or Sureños. SOF ¶ 19; Rodriguez Depo. at 54-55 (Dkt. 168-5 at 4-5.)

The various factors Rodriguez considered before making the decision to move Plaintiffs and other inmates into F1 Pod on May 4th included:

> [W]hether they had any enemies, how well they all got along with one another. These offenders were out in general population at one point. And some of the staff that I worked with at that point had known some of them from out in general population. So I received recommendations from case management teams, sergeants, or whomever it may be, I received information and the names from them, any safety issues…Safety issues, whether they get along well with other people on that walk that they are going to be on with. Enemies, again, if they have enemies amongst themselves….anybody that I was putting on the specific walk that I had emptied. I had emptied so many cells, so everybody that I was putting in that walk I wanted to ensure that they all got along fine, there was no safety issues amongst them, they had no previous history amongst themselves.

Ex. 13, Rodriguez Depo. at 81-82 (Dkt. 168-5 at 13-14.)[9]

---

[8] Plaintiffs "partially dispute" paragraph 17 of the SOF, which references this portion of Rodriguez's deposition that is quoted verbatim here. However, Plaintiffs' dispute is with how the Plaintiffs' move was handled, not with Rodriguez's general statement about how she conducted moves in general. Plaintiffs do not dispute the statement of fact that they were interviewed prior to the move.

**REPORT AND RECOMMENDATION - 10**

Rodriguez typically did not ask or interview offenders already in the pod about safety issues. Ex. 13 Rodriguez Depo. at 82-83 (Dkt. 168-5 at 14-15.) However, IDOC's serious incident review report, prepared May 21, 2012, indicates "the Unit Manager and some of the other unit supervisors were consulting suspected leaders of STG groups, in essence getting their approval before making moves." (Dkt. 14-5 at 3.) The report does not indicate the name of the interviewer or the persons who reported that information, or whether such a consultation occurred prior to moving Plaintiffs. The report further indicates Rodriguez had been using STG leadership counsel in regards to moves of STG offenders, and she "admitted that she talked to a leader of the YFS in regards to making moves." (Dkt. 14-6 at 2.) According to Rodriguez, however, the makeup of the pod was a concern. For example, if the inmate to be moved has "an enemy in AK or SVC or Sureño, anybody that was on there. If they had anybody that maybe they had a history with, maybe a fight in the past that lived on that unit, it was always a concern. But if the offender says: No, we have no problems, we are going to be fine, we are separated, then you make the move." Ex. 13 Rodriguez Depo. at 82 (Dkt. 168-5 at 14.)

At a Team Case Management meeting on May 3, 2012, Unit Manager Rodriguez raised the topic of transitioning a group of inmates into the recently vacated "C Walk" (upper tier) of the F1 Pod. SOF ¶ 20; Rodriguez Depo. at 73-74 (Dkt. 168-5 at 9-10.) The

---

[9] Plaintiffs cite the deposition testimony of Rodriguez to support their assertion Rodriguez had a requirement that anyone in F-1 pod "must get along with the Aryan Nights." *See* Pls.' Statement of Disputed Facts ¶ 48, citing to Aff. of Angstman Ex. 6 at 59-60 (Dkt. 188-2 at 48). However, review of the record indicates that the question was asked on page 59, and page 60 of Rodriguez's deposition containing the answer to the question is not in the record. Plaintiffs cite also to the DOC's interview summary of Rodriguez after the incident to support their assertion that Rodriguez knew if she put a non-affiliated offender into the DEF Unit with the STG clusters, they would be attacked. Response at 5 (Dkt. 188 at 5.) However, review of the interview summary at Dkt. 1-1, 1-2, and 1-3 does not support such a statement.

**REPORT AND RECOMMENDATION  - 11**

record for the meeting states in relevant part: "Still working on transitioning offenders into F-1. Would like to have a group of offenders that get along well with one another without concern that AK or SVC will either force or manipulate them into turning SVC or AK. The offender group that hangs with Nune[s] appears to be pretty strong and a good choice for transitioning into F-1…Payton agrees that moving STG offenders around helps deter their criminal activity. Lt. Watkins agrees that YFS and associates would be a better idea than Intake. Officer Niecko reports offenders previously discussed for move are wanting to go to F-1. Will get final decision on Friday." Ex. 16, 5/03/2012 Team Case Management Record (Dkt. 168-8 at 2); Ex. 13, Rodriguez Depo. at 83 (Dkt. 168-5 at 15).[10]

Case notes written by Case Manager Moore indicate all eight Plaintiffs were interviewed prior to the May 4, 2012, move to the F1 Pod C-Walk from 8:50 am until 9:26 am on May 4, 2012. Ex. 14, Moore's C-Notes (Dkt. 168-8 at 2.) The interviews were conducted by Case Manager Moore, Case Manager Cavigliano, and Correctional Counselor Carrick, and the notes indicate "Offender * along with associates and affiliates of the YFS agreed to move believing that a walk of their own would benefit them as well as the facility. The Offender's [sic] had been requesting a walk where they could be housed together therefore, when F1 C-walk was emptied out we took the opportunity to put a plan in place moving them in." *Id.*

---

[10] Plaintiffs indicate there were numerous concerns about Plaintiffs' safety, which concerns were allegedly voiced before the move. However, the case management meeting notes belie those assertions, and the evidence Plaintiffs rely upon to make that characterization occurred after the May 5, 2012, assault. *See* SOF ¶54, referenced in SOF ¶17, and discussion at page 15-17, infra..

Rodriguez felt it was positive that Plaintiffs all were friends and got along together, and that they were strong enough as a group that they would not be turned AK or SVC. Ex. 13 Rodriguez Depo. at 83 (Dkt. 168-5 at 15.)

Plaintiff Ford-Bridges did not tell anyone, including ICC staff, that he had a problem with the AK, and only told his group members that "it's not a good idea to do that [to move to F-1]." Ford-Bridges Depo. at 41-42 (Dkt. 167-7 at 3-4.)

The Movement Sheet prepared on May 3, 2012, shows the inmates moved to the C-Walk, F-1 Pod came from other housing units, namely the D1, E2 and F2 pods. Ex. 17A & B, Movement Sheet (5/3/12) (Dkt. 168-9, 168-10.) Plaintiffs Bryant and Russell originally expressed concerns about the move and Case Manager Moore wrote "cancel" on the Movement Sheet next to their names. Ex. 17C (Dkt. 168-11.) Upon learning their inmate friends were making the move to F-1 and they would be housed on the same tier or walk, Bryant and Russell agreed to the move, and the Movement Sheet reflects this change of mind with the word "good" written next to their names. *Id.*

Plaintiff Bryant testified that he and other members of the YFS and their associates had been "trying to get our own – own walk" back in March of 2012, and he agreed to the move to F-1 on May 4th once he found out that all his friends were moving to the same tier. Ex. 15, Bryant Depo. at 53-54, 61-63 (Dkt. 168-7 at 5-6, 7-10.) Plaintiff Bryant did not care for the Aryan Knights (AKs) or skinheads because "they like gays," and he had several fights with AK inmates in the 1990's while incarcerated at a different facility. Bryant Depo. at 59-60 (Dkt. 168-7 at 7-8.) But, Bryant never reported to anybody at IDOC that he needed to be housed separately from AKs. Bryant Depo. at 54,

60 (Dkt. 168-7 at 6, 8.) According to Bryant, he asked if some of the AKs in F1 he was familiar with from the 1990s had been moved out prior to May 4, 2012, and he was assured they had been moved and that the "guys on the right side [of the upper tier] were okay. They weren't going to do anything….later I said, well, is everybody else going? And, I guess, you know, it was one of those things that---so I went. I went with all my friends," who included Jordan, Bridges, Judd, Peterson, Nunez, and Castillon. Bryant Depo. at 60-62 (Dkt. 168-7 at 8-10.)

Plaintiff Russell had submitted a concern form on May 3, 2012, about being moved to F1, indicating: "I have issues with people meaning SVC, AK, skinheads, I can tell you right now if [I'm] moved from F2 to F1 there is going to be a problem, so at that being said I feel comfortable where [I'm] at." Ex. 18 (Dkt. 168-12.) The concern form recorded staff's May 3, 2012 response to Russell's concern: "Deleted off move sheet. Move will not happen." *Id.* The following day (May 4th), Russell's concern form reflected the following: "Carrick advised offender…now interested…placed back on move sheet on…5-4-12." *Id.* Russell testified he submitted the concern form "just to be on the safe side, you know. Write a concern to make sure---let them know that there could be a problem in the situation, you know," but "there was no threats or nothing, no." Ex. 9 Russell Depo. at 61, 61 (Dkt. 168-1 at 8, 9.) Russell had previously asked to be together with other members of the YFS. Russell Depo. at 58 (Dkt. 168-1 at 6.)

Aside from the concern form, Russell believes he talked to either Officer Kessler or Officer Carrick about not wanting to move. Russell Depo. at 59 (Dkt. 168-1 at 6.) But, on May 4, 2012, Russell agreed to the move to F-1 Pod and did not say anything on that

**REPORT AND RECOMMENDATION  - 14**

day about not wanting to move. Russell Depo. at 60 (Dkt. 168-1 at 7.) When Russell was told he and his friends would have their own walk, he said, "'That sounds good sure.' That's--- that's prior to me putting in the concern form, too," and he explained he put in the concern form "just for my safety." Russell Depo. at 60-61 (Dkt. 168-1 at 7-8.)

Plaintiffs contend "none of the plaintiffs felt comfortable with the move into the F1 Pod," but cite to Grievance Forms Plaintiffs submitted after the incident as support for that assertion. *See* Pls.' Statement of Disputed Facts ¶ 17 (Dkt. 188-1) (citing Dkt. 143-3 – 143-8). For example, Bryant submitted a grievance form on May 30, 2012, "believing his rights were violated…I told the staff to make shure [sic] that the check the showers clostests [sic] and laundry carts's [sic]. The next day I got in a big fight and stabbed there on F1 5 times." Bryant Grievance Form (Dkt. 143-3.) Ford-Bridges' grievance form, submitted on May 25, 2012, simply states: "I was attacked as a result of Ms. Rodriguez moving me." (Dkt. 143-4.) Ford-Bridges' second grievance form, submitted on June 1, 2012, indicated the problem was he was stabbed because he was moved, and "was never asked personally if I felt comfortable moving over to F-1." (Dkt. 143-4.)

Jordan's Grievance form, submitted on May 31, 2012, indicates his rights were violated because he was moved "on a teir [sic] with known enemies, AK & SVC. It is in my file that I can not [sic] be on a teir [sic] or in an area where AK/SVC can come after me….I was stabbed [and] staff were told not to due [sic] this move." (Dkt. 143-5.) Judd's Grievance form, submitted May 25, 2012, indicates simply: "U/M Rodriguez moved me and I was attacked as a result of the move." (Dkt. 143-6.) Knight's form, dated May 29, 2012, indicates he was "attacked & stabbed 18 times as a result of my being moved from

**REPORT AND RECOMMENDATION  - 15**

D1 to F1 and never once being asked if I felt safe moving to F1." (Dkt. 143-7.) Finally,

Russell's form, submitted May 24, 2012, indicates, "I feel that my rights have been

violated, you guys should have better judgement." (Dkt. 143-7.) A handwritten

Grievance/Appeal form dated May 23, 2012, adds that "you guys…shouldn't put me in

harms [sic] way." (Dkt. 143-8.)

Plaintiffs cite Rodriguez's interview summary as additional support for their

assertion that Rodriguez spoke to offender Núñez, who "didn't really like the move, he

thought that it might create some issues because of safety issues." (Dkt. 188-1 citing 14-2

at 1-2.) However, the entirety of the interview summary states:

> She talked to offender Nunez. At first he said that he really didn't like the
> move, he thought that it might create some issues because of safety issues
> with them *but with the process and if everyone did their job there shouldn't
> be any problem because all of the walks are separated*. He made mention
> that sometimes you have corrupt staff. She wanted to know what he meant.
> He did not want to say but said sometimes people make mistakes. She told
> him that if he was not comfortable, all she was looking for was a list of
> people that they hang around with and people that they have a strong
> enough bond.

IDOC Interview Summary (Dkt. 14-2 at 1-2.) (emphasis added). Although Plaintiffs rely

upon Núñez's statement to Rodriguez as support for their assertion that Plaintiffs did not

want to move, Plaintiffs contradict themselves later by stating that Núñez is not a plaintiff

in this case and cannot speak for Plaintiffs. Pls.' Statement of Disputed Facts ¶ 18 (Dkt.

188-1.)

Skogsberg's affidavit indicates that, "prior to the Plaintiffs' move into the F1 Pod

within the DEF Unit, it was common knowledge among the staff that the Aryan Knights

(AKs) and the Severely Violent Criminals (SVCs) would try to attack the Plaintiffs if

they were moved into the F1 pod. I personally spoke to a fellow correctional officer and advised against this move." Aff. of Skogsberg ¶ 12 (Dkt. 188-2 at 7.) Skogsberg does not identify who he talked to, instead indicating that Rodriguez and Kessler "had knowledge of the acute danger posed to the Plaintiffs by moving them into the F1 tier because several correctional officers, including myself, reported this." *Id.* ¶ 13 (Dkt. 188-2 at 8.) Skogsberg does not indicate which correctional officers reported this knowledge, to whom, or when, nor is there any evidence in the record either Rodriguez or Kessler received such reports. *See* Note 7, supra.

The only other officer to indicate a concern was, allegedly, Carrick. He indicates he "told Unit Manager Rodriguez that moving the Plaintiffs to F-1 was risky," not because of known threats, but because "the power could go out causing the inmates to be intermixed; somebody could hide in a closet like before; or the frequent door pop problem could allow the AKs or SVCs to attack the Plaintiffs." Aff. of Carrick ¶ 17 (Dkt. 143-15 at 5.)

Counselor Moore was interviewed after the May 5, 2012 incident, and according to Plaintiffs' characterization, she expressed concerns about the move. IDOC Interview Summary (Dkt. 188-2 at 21.) But, the full text of the interview summary indicates that:

> When asked if she knew there were problems between the YFS and AK she answered "yes and no." *She knew that she did not want to mix them. In her mind she thought they were on their own walk, they should be fine. If policy and procedure are followed they should be fine. "Ya there's tensions but we're not mixing them."* They all wanted to be on the same walk. They are younger kids and they just all wanted to be together. So she thought "Why not, we need a use for those beds." …There were a couple off [sic] offenders that told staff that they did not get along with the AK but she explained that they would not be on their walk. She believes there was peer

> pressure amongst their own guys because there were a couple who said if
> they are going they are all going. So when she talked to them they stated
> they were going. A couple of them were really excited because they had
> been asking to get together because they were all spread around.

Interview Summary with Moore (Dkt. 188-2 at 21.) (emphasis added).

Skogsberg, the DEF Unit floor officer on May 5, 2012, indicated he was aware there was a move sheet, but did not notice anything unusual when he first got to F1 on first shift, and heard no type of interaction, such as threats or arguments, among inmates. Skogsberg Tr. at 295 (Dkt. 167-3 at 4.)

## 4.       Staffing and the Events of May 5, 2012

There is some dispute over the minimum staff requirements in the DEF Unit. On Thursday, August 8, 2013, Judge David O. Carter held a show cause hearing in *Kelly v. Wengler*. (Dkt. 167-5.)[11] According to Timothy Higgins, an IDOC corrections officer at ICC, the *Kelly* Settlement Agreement and the contract between IDOC and ICC specified the minimum staffing for the close custody unit (DEF Pod) requried a pod control officer and four floor officers. Tr. at 479 (Dkt. 167- at 13.) In response to questions about the assault in F-Pod on May 5, 2012, Officer Higgins testified that the mandatory staffing according to the contract with IDOC was one pod control officer in close custody and four floor officers.[12] Tr. at 507 (Dkt. 167-5 at 20.) *See also* Aff. of Myers ¶¶ 30 – 33, 36

---

[11] The *Kelly v. Wengler* Settlement Agreement was entered in or about September of 2011, and it required ICC to maintain minimum staffing levels. CCA was to comply with the staffing pattern pursuant to CCA's contract with IDOC, and increase the staffing pattern to include a minimum of three additional correctional officers to be utilized at the discretion of the Warden (called the Warden's Crew) to enhance the overall security of the facility. *Kelly* Settlement Agreement ¶ 4 (Dkt. 14-9 at 1.)

[12] Plaintiffs attempt to create a factual dispute with Carrick's affidavit, wherein he was of the opinion that the DEF Unit was "massively short staffed on May 5, 2012," and was supposed to have 1 pod control officer, 2 sergeants, 4 floor officers, 1 foyer officer, 1 case manager, and 2 recreation officers. Aff. of Carrick ¶8 (Dkt. 143-15). However,

(Dkt. 169 at 9-10) (indicating that Exhibits 22h, 22i, 22j, which comprise the contract between CCA and IDOC, set forth the contractual staffing pattern).[13] Officer Higgins testified during *Kelly* that, "[a]t the time of the incident, what we had was a unit sergeant, a pod control officer, a foyer facility officer, four floor officers and two recreation officers that were present." Tr. at 507-508 (Dkt. 167-5 at 20.)

According to Garth Carrick and Jerry Sharp, who were physically present in DEF Unit at the time of the May 5, 2012 assault, there was one pod-control officer (Clayton), four floor officers (Nordio, Carrick, Skogsberg and Trana), and two recreational officers (Rodriguez and Anderson) on DEF Unit that day, totaling seven individuals who were present at the time the attack commenced. Carrick Decl. ¶ 12 Bates CCA_OC47542 (Dkt. 165-6 at 4); Sharp Aff. ¶ 20 (Dkt. 183-1 at 13.) Jerry Sharp indicated he was working also in the DEF Unit that day. However, although he was working in the DEF Unit, Sharp

---

Carrick cites no document supporting this assumption, and Higgins, as does Myers, refers to the IDOC contract with CCA, which explicitly specifies to the contrary.

[13] Paragraphs 30 – 33 and 36 of the Myers affidavit are not subject to the Plaintiffs' motion to strike. Myers summarizes what the contract requires, and Plaintiffs do not object to this characterization.

was covering a floor post instead of performing his duties as a Sergeant. Sharp Aff. ¶ 16 (Dkt. 183-1 at 12.)[14]

Sharp is of the opinion that the DEF Unit was understaffed on May 5, 2012, because he had to cover a DEF floor post instead of performing his duties as a Sergeant, and therefore could not properly supervise the DEF Unit and ensure the floor officers within the unit were following post orders. Sharp Aff. ¶ 16 (Dkt. 183-1 at 12.) Sharp believed also that the placement of Officer Nordio, who typically worked in General Population, created an added risk because Nordio was unfamiliar with DEF procedures. *Id.* ¶ 17 (Dkt. 183-1 at 12.) Sharp claims that a correctional counselor post should have been filled to assist with inmate concerns, such as passing out candy bars for the Cinco de Mayo holiday treat, and to have allowed the floor officers to concentrate on their duties. *Id.* ¶ 22 (Dkt. 183-1 at 18.)

The events precipitating the assault began with Sharp leaving his post. Sharp and Case Manager Worthington were responsible for the special Cinco De Mayo meal for all of the inmates, and realized during inventory there were not enough candy bars for all inmates. Sharp Aff. ¶ 19 (Dkt. 183-1 at 12.) Sharp realized also that his radio battery had

---

[14] Plaintiffs dispute the number of "contractually mandated" positions to be filled in the DEF Unit, and cite various different documents, including the Unit Plan and the shift roster, to dispute that CCA did not meet contractual mandates required by the IDOC. However, Plaintiffs do not dispute or object to the Myers affidavit, which summarizes what was contractually required. *See* note 13, supra. Plaintiffs contend the Unit Plan requires two sergeants to be posted in the DEF Unit in addition to four floor officers, one pod control officer, one foyer officer, and two recreational officers. However, according to the testimony of Higgins, Carrick and Sharp, there is no dispute that seven individuals were actually present within the DEF Unit at the time of the attack, and an eighth officer, Sergeant Sharp, had stepped away from his post at the time the attack broke out. There is therefore no dispute that, at the very least, seven people were working within the DEF Unit at the time of the attack, and eight individuals were working in the DEF Unit that day. It is unclear who or where the Foyer Facility Officer was, as neither Plaintiffs nor CCA have identified the individual actually filling that post on May 5, 2012. However, according to the incident report interview of Norma Rodriguez, Worthington filled Foyer Officer post. App. A (Dkt. 14-1 at 2.) Rodriguez's testimony is consistent with Sharp's account that he and Worthington were responsible for the inmates' Cinco de Mayo treats that day.

died. *Id.* To provide coverage of his floor post, Sharp asked Foyer Officer Carrick to fill

in on the floor post so that Sharp could leave the DEF Unit to get more candy bars and a

new battery for his radio at Master Control. Sharp Aff. ¶ 19 (Dkt. 183-1 at 12-13.) This

left seven people in posted positions at the time Sharp left the unit. Sharp Aff. ¶ 20 (Dkt.

183-1 at 13.)[15] Plaintiffs do not dispute that, when Sharp left the DEF Unit, seven people

(Clayton, Trana, Skogsberg, Carrick, Nordio, Rodriguez and Anderson) were posted in

the DEF Unit. *Id.* ¶ 20 (Dkt. 183-1 at 13.) *See also* Myers Aff. ¶¶ 37-39 (Dkt. 169 at 10-

11.) (reviewing time detail reports at Ex. 22 M, (Dkt 199-9) and confirming the officers

on duty during first shift May 5, 2012). Rodriguez indicated, however, that when Sharp

stepped out, Foyer Officer Worthington took over the floor. (Dkt. 1-1 at 2; App. A, Dkt.

14-1 at 2.)

     Skogsberg was the floor, or "dayroom," officer posted at F1 Pod on May 5, 2012.

Skogsberg Depo. at 294-296 (Dkt. 167-3 at 3-4.) When Skogsberg arrived at F1 Pod at

approximately 11:30 a.m. on May 5, 2012, he released the inmates from D-Walk for

recreation. Skogsberg Depo. at 296 (Dkt. 167-3 at 4.) At the time Skogsberg released D-

Walk to go to recreation, Officer Anderson was stationed in the recreation yard.

Skogsberg Depo. at 300 (Dkt. 167-3 at 5.) During the release of D-Walk, Skogsberg was

distracted by an inmate on the lower tier of the Pod, allowing six Delta walk inmates the

opportunity to hide in the janitor closet on the upper tier of the Pod. Ex. 1 Video (Dkt.

---

[15] It is not clear from the record when Sharp left the unit, but there is no dispute he was not present at the time of the attack.

167-1)[16]; Skogsberg Depo. at 299 (Dkt. 167-3 at 5.) Shortly after that, Officer Skogsberg performed a security check on the upper floor of the Pod, checking each cell door and the janitor closet door, which was locked. Ex. 1 Video (Dkt. 167-1); Skogsberg Depo. at 301 (Dkt. 167-3 at 5.) Skogsberg did not, however, open the closet door.

After the cell door check, Skogsberg proceeded downstairs to the lower floor of the Pod, and checked the rest of the doors to make sure they were secured Skogsberg Depo. at 296-97 (Dkt. 167-3 at 4.) Skogsberg indicated that, if inmates were not going out to the rec yard, they were supposed to remain in their cells, and Skogsberg would secure all the cell doors. *Id.* Officer Skogsberg then went back upstairs, and radioed in to Pod Control open Charlie walk for their day room access for the next hour. Skogsberg Depo. at 301 (Dkt. 167-3 at 5.) The doors were released, and the inmates from Charlie walk proceeded to the dayroom in the Pod. *Id.* Officer Skogsberg was distracted then by an inmate who wanted toilet paper. Skogsberg Depo. at 302 (Dkt. 167-3 at 5.) According to Skogsberg, that inmate was part of the Delta Walk inmates' plan. *Id.*

About six or seven minutes after the inmates from Charlie walk were let out of their cells into the dayroom, at approximately 11:54 a.m., the six inmates from Delta walk ran out of the janitor closet on the upper floor and charged down the upper walkway towards the eight Charlie walk inmates, using homemade weapons and their fists to attack the Charlie walk inmates. SOF ¶ 1; Ex. 1 Video (Dkt. 167-1); Skogsberg Depo. at 306 (Dkt. 167-3 at 6.) Plaintiffs Bryant, Russell, Judd, Peterson and Castillon were

---

[16] At the hearing, the parties explained that the Pod Control Officer monitors the surveillance cameras, but that there are numerous monitors such that the officer is not focused on any particular monitor at any given time.

**REPORT AND RECOMMENDATION  - 22**

attacked along the upper tier outside of cell door numbers 203, 204, and 205 (the C, or Charlie, walk), and later, a few of the attackers ran down the stairs to the dayroom area and assaulted Plaintiff Ford-Bridges in the dayroom. SOF ¶ 2; Ex 1 Video (Dkt. 167-1).

Officer Skogsberg, who was walking around the Pod just prior to the attack, was the first officer to intervene, radioing a "Code Blue," issuing verbal orders to the inmates, and deploying chemical spray approximately 10 to 17 seconds after the attack began. SOF ¶ 4. Sergeant Carrick arrived on the upper tier approximately 36 to 52 seconds later, and began assisting Skogsberg. Officers Sharp and Anderson arrived later, assisting with the break-up of the attack that had begun on the lower floor in the dayroom. SOF ¶ 4; Ex. 1 Video (Dkt. 167-1); Anderson Tr. at 348 (Dkt. 167-2 at 6.)  Sixteen inmates were involved in the attack on May 5, 2012, and the incident was under control in approximately one and one-half minutes. SOF ¶ 3 (undisputed); SOF ¶ 44; Ex. 23 at 16 (Dkt. 169-14 at 16.)[17]

According to Officer Jacob Mills, who was on duty during second shift on the night before the attack on May 4, 2012, Offender Campos accessed the janitor's closet on the upper floor of the F1 Pod, tampered with the janitor closet lock, and communicated with the Delta walk inmates. Aff. of Mills ¶ 20 (Dkt. 143-9 at 3.) Mills contends the DEF Unit did not have sufficient staff to supervise offenders during the second shift on May 4, 2012, and only three floor officers were posted during that period. Aff. of Mills ¶ 21

---

[17] Plaintiffs dispute paragraph 44 of CCA's SOF. However, the objections Plaintiffs raise to the introduction of Exhibit 23, which is the report prepared for Judge David Carter by Tad Leach, the independent monitor in *Kelly*, do not dispute the physical evidence discussed above from the video surveillance of the attack indicating the length of time it took to subdue the inmates, (*See* SOF Ex. 1, Dkt. 167-1, filed under seal and SOF ¶ 3), nor the number of individuals involved, which are plainly seen on the video footage of the attack.

(Dkt. 143-9 at 4.) Anderson testified the janitor's closet was where cleaning supplies were kept, and it was "supposed to be secured. We tended to leave it open because they continued to get in and need to flush out the chemicals…we only left it open with the janitor when the tier was secure," and it "could only be opened by key." Anderson Tr. at 371-73 (Dkt. 167-2 at 12.) *See also* Disciplinary Offense Report (Dkt. 124 at 4) (Carrick identified Campos tampering with the janitor closet door upon reviewing prior video footage).

On June 14, 2011, a similar attack had occurred. During that incident, a group of Norteño inmates hid in the janitor closet in DEF Pod, and avoided detection of the staff, who believed the Norteño had been re-secured in their cells. Higgins Tr. (Dkt. 188-2 at 73.) When the next walk of inmates was released out into the housing unit, the Norteño inmates sprung from the inside of the janitor closet and attacked the Gangster Disciple inmates with their fists. Higgins Tr. (Dkt. 188-2 at 74.) According to the incident investigation report, dated June 24, 2011, Officer Yehle, the officer posted on the pod, "failed to check all the doors" on the pod to ensure they were secure before letting the next group of inmates out of their cells. (Dkt. 188-2 at 81.) Yehle failed also to check the door to the janitors' closet, which "is supposed to be secured at all times and checked between quads." *Id.* Had Yehle checked the doors, the investigator's concluded, Yehle would have discovered the Norteños hiding in the closet and the incident would have been avoided. *Id.*

An investigation ensued after the May 5, 2012 incident as well. According to the IDOC Serious Incident Review Report, several operating procedures (SOPs) were not

followed. Specifically, SOP 504.02.01.002, STG Management, was not followed, because offenders documented as STGs were housed together in quadrants of the tier. (Dkt. 14-5 at 3.) Second, SOP 317.02.01.001 regarding searches was not followed, as searches were not conducted on offenders leaving their cells. *Id.* Finally, Post Order ICC PO-00 was not followed, because the recreation officer did not conduct an informal count of the offenders as they left the tier after their recreation movement, which would have alerted him that six offenders were unaccounted for, and the officer on the floor did not look in the windows of the cells to verify the inmates had remained in them. *Id.*

Norma Rodriguez was interviewed also after the incident. (Dkt. 1-1, 1-2, and 1-3.) During the interview, she explained that the floor officers should have counted the offenders exiting the pod for recreation, checked the doors of the offenders just released, and opened the closet and looked inside. (Dkt. 1-1 at 2.) After the June 14, 2011, incident, Rodriguez indicated new procedures were written, officers were trained, and the policy was "signed off by Assistant Warden Kessler," and incorporated into post orders. *Id.* at 2. Rodriguez admitted that the gangs, of which there was a higher population in DEF Pod, "claim[ed] they run the pods." (Dkt. 188-2 at 49.) The AK were the most influential. *Id.* at 51. Rodriguez explained also that it was difficult to enforce rules in the DEF Unit, because the offenders would act up by flooding their cells or ignoring staff directives to uncover their cell door windows. (Dkt. 188-2 at 53-54.)[18]

---

[18] Rodriguez explained that, if officers enforced the rule about not blocking cell windows, the inmates would probably "start flooding their cells," because they "just don't want the staff to run their unit." As a result, staff "try to play it safe so that they "don't have escalated incidents."

**REPORT AND RECOMMENDATION  - 25**

However, Warden Wengler indicated the numbers of window covering incidents were decreasing. (Dkt. 188-2 at 61.) And, Rodriguez had been "get[ing] them [the officers] to enforce the rules," as well as writing up offenders breaking rules using the disciplinary process, prior to the May 5th incident. (Dkt. 1-3 at 1.) But, Rodriguez explained that if the officers are not holding offenders accountable, and she had to visit the pod to take care of something, like a rule infraction, offenders will disrespect the officer's authority. (Dkt. 1-3 at 2.) Rodriguez stated during her interview that "the fact that the staff were allowed to become complacent and allowed to ignore certain rules was an eye opener to her," and she required staff and inmates to be held accountable. (Dkt. 1-4 at 1.)[19]

## DISCUSSION

## 1.    Evidentiary Motions

### A.    *Plaintiffs' Motion to Strike Expert Witness Ken Katsaris (Dkt. 161)*

Plaintiffs filed their motion to strike on September 4, 2014, prior to CCA filing its motion for summary judgment on September 15, 2014. Plaintiffs claim Katsaris should be precluded from testifying at trial because: (a) Katsaris relied upon the 2008-2013 Inmate Assault/Battery statistic report from the *Kelly* independent monitor, which report CCA produced on August 26, 2014; and (b) Katsaris's unsworn affidavit fails to meet the requirements of Fed. R. Civ. P. 26(a)(2)(B) because it contains opinions that are not supported by any scientific method or analysis of factual data. Rather, Plaintiffs explain

---

[19] It is not clear from the interview summary what time frame Rodriguez is referring to. It appears she is referring to when she first began working on the DEF Unit.

Katsaris's affidavit is replete with "oath helper" statements, which are statements asserted but not proven by scientific methodology. In response, CCA argues Plaintiffs' conclusory arguments conflate two separate concepts: admissibility and the weight to be given by the jury to Katsaris's opinion. CCA contends Katsaris's opinions are admissible under Fed. R. Evid. 703, and that the issues Plaintiffs raise may be addressed through cross-examination.

The Court previously addressed the timeliness of discovery related to the *Kelly* independent monitor reports, finding them timely submitted within the context of this case. *See* Mem. Decision and Ord. (Dkt. 217.) Plaintiffs' claim of untimeliness is therefore without merit.

Nonetheless, Plaintiffs' motion appears to be premature. CCA did not rely upon Katsaris's expert opinions in support of its motion for summary judgment. There is no reference to Katsaris's opinions in CCA's statement of facts submitted in support of its motion for summary judgment. Accordingly, the motion is not relevant for purposes of deciding CCA's motion for summary judgment, and is premature.

### B.   *Plaintiff's Motion to Strike Affidavit of Kevin Myers (Dkt. 189)*

Kevin Myers has been a Corrections Corporation of America ("CCA") employee for 24 years and currently serves as Managing Director of Operations (Division V), a position he has held since 2005. Ex. 22 at ¶ 2.1 (Dkt. 169.) From April 2010 to July 2014, Myers was responsible for the overall supervision and management of CCA facility operations in Idaho, including the facility formerly known as the Idaho Correctional Center ("ICC") in Kuna, Idaho. *Id*. In this supervisory role, Myers was familiar with

**REPORT AND RECOMMENDATION  - 27**

CCA's contract with the Idaho Department of Corrections, IDOC's monitoring of ICC via its Contract Beds Unit (fka Virtual Prison Program), the classification of offenders by IDOC and restrictions on close custody offenders, the operations and security procedures at ICC, and levels of staffing at the prison facility pursuant to both the IDOC contract and CCA's internal, budgeted staffing requirements. *Id.* at ¶¶ 2-8, 16-41.

Plaintiffs argue that the Affidavit of Kevin Myers, which CCA submitted in support of its motion for summary judgment, fails to satisfy Fed. R. Civ. P. 56(e). Specifically, Plaintiffs argue paragraphs 9-15, 24, 34, 41, and 42-61 and all related attachments should be stricken. The Court will address each paragraph in turn.

### (1)      *Paragraphs 9-15 and Attachment A*

While operated by CCA, ICC achieved American Correctional Association (ACA) accreditation, which Plaintiffs do not dispute. Myers then explains what the ACA is, how it establishes whether a prison meets ACA standards, and the auditing process ICC would go through. Plaintiffs object on the grounds that Myers has not set forth personal knowledge of these statements. The Court finds that, other than the ACA accreditation itself, Myers's additional statements concerning the process ICC undertook to receive ACA accreditation are not relevant for the purposes of resolving CCA's motion for summary judgment.

### (2)      *Paragraph 24*

Mr. Myers explains correctional staff at ICC, including staff assigned to theDEF Unit, received five weeks of pre-service training at the IDOC Correctional Officer Basic Academy, and he describes what that training entails. Plaintiffs argue Myers fails to

establish personal knowledge that ICC staff actually received the training. The Court

finds, due to Myers's supervisory role, he is qualified to testify concerning the training

staff would have received during the course of normal and customary operations.

Nonetheless, for purposes of the motion for summary judgment, staff training is not

relevant. Plaintiffs did not raise a failure to train issue in their complaint.

(3)     *Paragraph 34*

Myers indicates CCA provided a Utility/Foyer officer in DEF Unit, and two

recreation officers to DEF Unit, posts that were not contractually mandated but were

staffed in accordance with CCA's budgeted staffing pattern. Plaintiffs contend this

paragraph is contradictory and misstates the documents Mr. Myers reviewed. However,

the undisputed evidence indicates that the staff on duty on May 5, 2012, consisted of two

recreation officers (Rodriguez and Anderson) and a foyer officer (Worthington) working

during first shift. The Plaintiffs' objection is overruled to the extent that the actual

undisputed facts indicate two recreation officers and a foyer officer were working during

first shift on May 5, 2012.

(4)     *Paragraph 41*

Myers identifies the staff and personnel present during the May 5, 2012 attack in

F1 Pod. Plaintiffs contend Myers lacks personal knowledge of the actual employees

present, and relied upon unreliable shift rosters. However, according to the undisputed

facts discussed above, there is no dispute who was present that day. Sharp, Anderson,

Carrick, Nordio, Trana, Worthington, Skogsberg, Clayton, and Rodriguez were

confirmed by persons actually working that day as being present during first shift in F1 Pod. Plaintiffs' objection is overruled.

    **(5)**    *Paragraphs 42-61*

In these paragraphs, Myers recounts the IDOC's analysis, beginning in August of 2008, and continuing each year through 2012, of inmate-on-inmate violence at ICC. Myers explains that the analysis compared violence rates at ICC and ISCI, and concludes that the claims of rampant violence at ICC are false. Plaintiffs contend these paragraphs constitute undisclosed expert opinion not based upon personal knowledge, and even if admissible, the violence statistics comparing ICC to IDOC's facilities are not relevant.

The Court agrees. The violence statistics reflecting the prison as a whole are not relevant, because the DEF Unit, the unit at issue here, houses close custody inmates on lock down 22 out of 24 hours each weekday (23 on weekends). An entirely different set of concerns would arise with respect to the inmates housed in DEF Unit, given the unit is reserved for housing violent inmates in a secure environment rather than in the general population. Further, the comparison between ICC and ISCI is not relevant for purposes of resolving the motion for summary judgment.

Despite the above findings, the Court did not find it necessary to rely upon any of the objectionable paragraphs to resolve CCA's motion for summary judgment. The Court further finds the violence statistics are not relevant because of the nature of the attack and because the attack occurred in the close custody unit. Neither Plaintiffs nor CCA have presented to the Court any violence statistics concentrating solely upon incidents occurring in the DEF Unit since its opening in 2009.

C.     *CCA's Motion to Exclude the Testimony of John R. Hepburn and Pam Sonnen (Dkt. 165)*

CCA has moved pursuant to Fed. R. Evid. 104, 403, 702, 703, and 704, and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the testimony of Plaintiffs' corrections expert John R. Hepburn, Ph.D., in its entirety; and the opinions of Plaintiffs' second corrections expert, Pam Sonnen, in part, to the extent they relate to understaffing at ICC as a root cause of the May 5, 2012, incident. Plaintiffs retained John Hepburn, a professor of criminology and criminal justice at Arizona State University, and Pam Sonnen, former Chief of Prisons within the Idaho Department of Correction, as expert witnesses to testify regarding Plaintiffs' claims and the correctional practices at ICC at the time of the May 5, 2012 incident. Their expert reports are nearly identical in subject matter, as both opine on issues of staffing, correctional officer qualifications, surveillance and rule enforcement, housing assignments, and gang suppression. Sonnen and Hepburn are of the opinion that CCA's prison was "unsafe," and discuss the understaffing that occurred in general.

CCA's motion to exclude the testimony of Sonnen and Hepburn does not appear relevant to resolving the motion for summary judgment, because Plaintiffs have not relied upon the expert witness testimony or the affidavits of Sonnen and Hepburn in their response to CCA's motion for summary judgment. Further, CCA has cited to the actual evidence indicating the staff present on May 5, 2012.

As discussed below, the Court finds neither Sonnen's nor Hepburn's opinions carry any weight in the context of the motion before the Court. Accordingly, the Court

**REPORT AND RECOMMENDATION  - 31**

will not, for purposes of the motion for summary judgment, exclude their testimony. Rather, the Court will discuss the conclusions in the reports in context in the body of the Court's report to explain why the expert testimony is of little value.

## 2.      Summary Judgment

### A.      *Standard of Review*

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Bahn v. NME Hosp's, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to a *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248. Further, the parties must direct the Court to the portions of the record that support their claims. "Judges are not like pigs, hunting for truffles buried in briefs" or the record. *U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).

The Court must view the evidence in the light most favorable to the nonmoving party, and is not to make credibility findings. *Anderson*, 477 U.S. at 255; *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). Direct testimony of the nonmovant must be believed, however implausible. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Insurance Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

The moving party bears the initial burden of proof. This burden is met through identifying those portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Id*. The facts on which the opponent relies must be admissible at trial, although they need not be presented in admissible form for the purposes of opposing the summary judgment motion. *Id*.

Deference to the non-moving party does have some limit. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**REPORT AND RECOMMENDATION  - 33**

The "mere existence of a scintilla of evidence in support of the plaintiff's position would be insufficient." *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 252 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 248. However, trial courts should act with caution in granting summary judgment, and may deny summary judgment "in a case where there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255.

**B.**    ***Plaintiffs' Eighth Amendment Claim***

Plaintiffs bring their claim under 42 U.S.C. § 1983, the civil rights statute, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States . . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation and internal marks omitted). To state a valid claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

In cases claiming an Eighth Amendment violation "based on a failure to prevent harm," the first, objective component is met if the inmate shows that "he is incarcerated under conditions posing a substantial risk of serious harm." *Clouthier v. County of*

*Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). The second component, punitive intent, is met if the claimant shows that the detention facility official's "state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* This is a subjective test, in that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.; see also Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002) ("If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk.").

Where, as here, inmates claim that a private prison has violated the inmates' constitutional rights, the plaintiffs must meet the test articulated in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (applying *Monell* to private entities performing state functions). *Monell* requires plaintiffs to show that the action causing the plaintiffs' injuries was made pursuant "to official municipal policy of some nature." *Monell*, 436 U.S. at 690.

To meet this test, Plaintiffs must go beyond the respondeat superior theory of liability and demonstrate the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the action of the municipality, not the actions of the employees of the municipality. *See*

**REPORT AND RECOMMENDATION  - 35**

*Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011).[20] The United States Supreme Court has emphasized that, "[w]here a plaintiff claims that the municipality . . . has caused an employee to [violate a plaintiff's constitutional rights], rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). Thus, "a plaintiff seeking to impose liability on a municipality under § 1983" is required "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1232-33 (9th Cir. 2011) (citations and quotation marks omitted). In other words, the policy must have directly contributed to the infliction of the assault upon Plaintiffs and their resulting injuries. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). CCA cannot be held liable under a theory of respondeat superior. *See Hayes v. CCA*, 2012 WL 4481212 *8 n.9; *18 (D. Idaho Sept. 12, 2012) ("All United States Courts of Appeal addressing this issue have determined that the *Monell* rule applies to bar respondeat superior liability where defendants are private entities performing state functions," and CCA "cannot be held liable under a theory of respondeat superior.").

There are three ways a section 1983 plaintiff may establish municipal liability. *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1155 (9th Cir. 2007). First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom

---

[20] For purposes of the analysis and for readability, the Court refers to the generally accepted test applicable to municipalities. However, under *Tsao*, *Monell* applies to private entities performing state functions. Thus, where the term municipality is used, the Court intends for the reference to apply to CCA.

**REPORT AND RECOMMENDATION  - 36**

"which constitutes the standard operating procedure of the local governmental entity."
*Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). Second, the plaintiff may
establish that the individual who committed the constitutional tort was an official "with
final policy-making authority" and that the challenged action itself thus constituted an act
of official government policy. *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469,
480-80 (1986)). And finally, the plaintiff may prove that an official with final policy-
making authority ratified a subordinate's unconstitutional decision or action and the basis
for it. *Id.* at 1346-67 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-24 (1988)).
The case law makes clear, however, that the unconstitutional discretionary actions of
municipal employees generally are not chargeable to the municipality under Section
1983. *Id.* at 1347.

Under the first theory, there are two types of official municipal policies: "those
that result in the municipality itself violating someone's constitutional rights or
instructing its employees to do so, and those that result, through omission, in municipal
responsibility 'for a constitutional violation committed by one of its employees, even
though the municipality's policies were facially constitutional, the municipality did not
direct the employee to take the unconstitutional action, and the municipality did not have
the state of mind required to prove the underlying violation.'" *Tsao v. Desert Palace,
Inc.,* 698 F.3d 1128, 1143(9th Cir. Cir 2012). The United States Court of Appeals for the
Ninth Circuit refers to the two types of policies as policies of action or inaction. *Tsao*,
698 F.3d at 1143.

**REPORT AND RECOMMENDATION  - 37**

A policy of action focuses on the municipality's policy statement, or decision officially adopted and promulgated by the municipality, which affirmatively directs its employee to commit a constitutional violation. *Tsao*, 698 F.3d at 1144. For instance, a county policy that directs employees to place aggressive and passive homosexuals in the same jail cell would be in violation of the passive homosexual's right to personal security. *Gibson v. County of Washoe, Nev*., 290 F.3d 1175, 1185-86 (9th Cir. 2002).

A policy of omission, in contrast, may be based on a failure to implement procedural safeguards to prevent constitutional violations. *Tsao*, 698 F.3d at 1143. *See also Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) ("[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights."). A plaintiff can allege that, through its omissions, the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation. *Gibson*, 290 F.3d at 1186 (citing *City of Canton v. Harris*, 489 U.S. 378, 387–89 (1989)). However, because *Monell* held that a municipality may not be held liable under a theory of respondeat superior, a plaintiff must show that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation. *Id*.

To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional

violation. *Id.* in other words, to prove the policy caused the violation, the plaintiff must show "that the [municipality] could have prevented the violation with an appropriate policy.'" *Tsao*, 698 F.3d at 1143. Compared to the more direct route to municipal liability based upon a policy of action, "much more difficult problems of proof" are presented in a case where a city employee acting under a constitutionally valid policy violated someone's rights. *Gibson*, 290 F.3d at 1186.

Holding municipalities liable in the absence of a formal governmental policy (a *Monell* claim based upon an omission) appears interchangeable with cases finding liability based upon a custom or practice. In cases discussing custom or practice, a plaintiff may establish a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404 (citing *Monell*, 436 U.S. at 690-91); *Thomas v. Baca*, 514 F.Supp.2d 1201, 1206 (C.D. Cal. 2007).

The custom must be the "moving force" behind a plaintiff's constitutional injuries, which requires the plaintiff to establish that the custom is "closely related to the ultimate injury," and that the injury "would have been avoided had proper policies been implemented." *Thomas*, 514 F.Supp.2d at 1206 (quoting *Long v. County of L.A.*, 442 F.3d 1178, 1190 (9th Cir. 2006)). Even so, liability for an allegedly improper custom may not be predicated upon isolated or sporadic events; rather, "it must be founded upon practices

of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Under the second theory, municipal liability may be imposed for a single decision by a municipal policy maker under appropriate circumstances. *Pembaur*, 475 U.S. at 480. In such a case, a single decision by a policy-maker constitutes an act of official government policy. *Id.* However, not every decision by a municipal officer automatically subjects the municipality to section 1983 liability. *Id.* at 481. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. *Id.* "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Id.* at 481-83.

"[W]hether a particular official has 'final policymaking authority' is a question of state law." *Praprotnik*, 485 U.S. at 123.  And, it is the Court's responsibility to identify those officials whose decisions represent the official policy of the local governmental unit. *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737 (1989). Thus, municipal liability under Section 1983 attaches only if a deliberate choice to follow a course of action from among various alternatives is exercised by the official or officials responsible for establishing final policy with respect to the subject matter in question. *Pembaur*, 475 U.S. at 483 (finding municipal liability attached when the county prosecutor made a

decision and directed the officers to forcibly enter the petitioner's clinic, causing a violation of petitioner's Fourth Amendment rights).[21]

Finally, under the ratification doctrine, a single decision by a municipal policy maker that ratifies unconstitutional conduct may be sufficient to trigger municipal liability under Section 1983. *Praprotnick*, 485 U.S. at 127. Here, it does not appear Plaintiffs argue the ratification theory. Rather, they contend the policies adopted by CCA regarding staffing and gang clustering, or the decision of a policy maker with regard to implementation of the gang clustering policy, caused the constitutional deprivations at issue. Accordingly, the staffing and housing policies will be examined in turn under the above standards.

### (1)     *Staffing*

Knowledge of prison under-staffing and a decision not to increase the number of guards on duty may amount to deliberate indifference to the safety and well-being of prison inmates, in violation of the Eighth Amendment. *See Edwards v. Gilbert*, 867 F.2d 1271 (11th Cir. 1989). Understaffing of correctional officers increases the risk of inmate on inmate violence. *Miles v. Wilkinson*, 2013 WL 55922412 (W.D. La. 2013). To prevail, Plaintiffs must prove CCA had a policy of deliberate indifference to the risk of understaffing and that this policy caused their injuries. *Greason v. Kemp*, 891 F.2d 829, 838 11th Cir. 1990). When understaffing appears to have contributed to a violation of an

---

[21] However, contrast the example where county employment policy set by a board or commission is carried out by the Sheriff, who exercises discretion to hire and fire employees. In that example, only the board or commission could set employment policy. But the act of the Sheriff, who may exercise his or her discretion in an unconstitutional manner, would not subject the board to liability under *Monell* if the policy set by the board was otherwise constitutional. *Pembaur*, 475 U.S. at 483 n.12.

inmate's Eighth Amendment rights, a causal link exists between that violation and the prison's policy if officials are aware of the staffing problem but fail to take corrective action. *See Greason v. Kemp*, 891 F.2d 829, 837 n.18 (11th Cir. 1990). But, evidence of understaffing, without more, is not proof of official policy. *Anderson v. City of Atlanta*, 778 F.2d 678, 687 (11th Cir. 1985).

Generally, prison staffing is understood in concert with overcrowding, and a corresponding increase in inmate violence. For example, if there is an increase in population without a corresponding increase in staff, "it is inevitable that some violence will occur because there are too few officers to observe and protect too many inmates." *Capps v. Atiyey*, 559 F. Supp. 894, 904 (D. Or. 1983). Courts generally look at the level of violence, and whether it is high enough to warrant an inference that the state (or here, CCA) is deliberately indifferent to inmate safety when understaffing is an issue. *Capps*, 559 F. Supp. at 904. *See also Balla v. Idaho State Bd. Of Corrections*, 595 F. Supp. 1558, 1573 (D. Idaho 1984) (finding understaffing along with overcrowding one of the principal causes of violence at ISCI).

Plaintiffs first state their lawsuit has never hinged upon whether the DEF Unit was actually understaffed on May 5, 2012, and seek to rely upon the pervasive understaffing within ICC in the years leading up to the May 5, 2012 attack, which was resolved by virtue of the *Kelly* settlement. Pls.'s Response to Def.'s Mot. to Exclude (Dkt. 183 at 13.) Plaintiffs argue CCA was on notice of widespread staffing problems as evidenced by the *Kelly* settlement, which ultimately led to a finding of contempt on September 16, 2013, when staffing levels failed to meet the settlement requirements adopted in *Kelly*. *Kelly v.*

**REPORT AND RECOMMENDATION  - 42**

*Wengler*, No. 1:11-cv-185-EJL, Dkt. 76 (D. Idaho Sept. 16, 2013).[22] Further, Plaintiffs contend that the 2010 nickname of ICC as the "gladiator school" placed CCA upon notice that violence related to staffing levels was an issue at the prison.

However, even assuming these facts against the backdrop of *Kelly*, which conditions existed in 2010, 2011, and the first half of 2012,[23] Plaintiffs fail to explain how the actual staffing pattern on May 5, 2012, in the DEF Unit caused Plaintiffs' injuries, other than speculating that more staff or a different makeup of staff would have prevented it. Additionally, although there is statistical evidence in the record about the level of violence occurring at ICC during those years, Plaintiffs argued, and the Court agreed, that the statistical evidence introduced via the affidavit of Kevin Myers was irrelevant. The violence statistics analyzed the prison as a whole, and compared the level of violence at ICC to ISCI, an entirely different environment than the one existing at ICC. Further, there was no statistical analysis concentrating on the DEF Unit itself, which is a close custody unit having completely different conditions than ICC's general population. Thus, reliance upon the violence statistics which were prepared and reviewed in the context of *Kelly* is unpersuasive here.

---

[22] In light of the oversight provided by Judge Carter in *Kelly*, and the sanctions imposed, it is difficult for the Court to understand why Plaintiffs would be entitled to injunctive relief here regarding staffing issues. It would appear that Judge Carter in the context of *Kelly* would be the appropriate venue to address understaffing concerns.

[23] For instance, Plaintiffs cite to Kevin Myers's admission that in July of 2010, almost two years prior to the incident here, CCA was aware that excessive overtime was an issue. Myers Depo. at 42 (Dkt. 188-2 at 70.) Plaintiffs cite also to Shane Jepsen's testimony that, during 2008 – 2013, there was insufficient staff in general, but Mr. Jepsen does not testify specifically as to staffing requirements in the DEF Unit. Jepsen Aff. ¶¶ 5, 13,  (Dkt. 143-16 at 2) (indicating that "in general" it was common in 2010, 2011 and 2012 that 17 positions could not be filled, but failing to identify which positions and where; indicating that in 2010 and 2011, IDOC contract monitors "expressed concern" about the level of staffing, but failing to set forth specific facts.). And finally, Plaintiffs refer to an email between Kevin Myers and Mr. Conry wherein Mr. Myers requested an "additional 15-20 full time staff members" for ICC, and that the DEF Unit needed more staff. Myers testified, however, that this email was sent in May of 2010, two years prior to the incident here. Myers Depo. at 30 (Dkt. 188-2 at 69.) The temporal disconnect and lack of specifics renders proof of causation impossible.

**REPORT AND RECOMMENDATION  - 43**

Furthermore, Plaintiffs' use of the understaffing findings in *Kelly* in an apparent attempt to establish a necessary element of their own claims is questionable. *Burningham v. CCA*, No. 1:13-cv-443-EJL-REB, slip op. at 18 n.9 (D. Idaho Aug. 18, 2015) (explaining plaintiff's use of another case to establish his Eighth Amendment failure to protect claim was improper and insufficient to create a triable issue of fact, which is centered on how the alleged violence caused him personal injury and harm.). This is especially apparent when the Court examines the allegations in *Kelly* and compares them to the allegations in this matter, and reviews the timing of events.

The *Kelly* complaint, filed on February 21, 2011, focused on the violence occurring at ICC during the five years *prior* to the filing of the complaint in 2011. The allegations concerned the level of violence in the west and north wings of the prison, where the general population was housed. The complaint alleged that CCA staffed the North Wing, which housed 250 inmates, with two guards and the West Wing, which housed 350 inmates, with two guards. In contrast, the DEF Pod houses close custody inmates on lock down twenty-two out of twenty-four hours each weekday.

Next, the settlement in *Kelly* was reached on September 20, 2011. In contrast, the DEF Pod did not begin operations until 2009, and the attack against Plaintiffs occurred on May 5, 2012, after the *Kelly* settlement had been approved and the Court began monitoring conditions at ICC in an attempt to rectify the violence. Thus, the comparison is not only factually distinct, there is a temporal disconnect between the violence that existed prior to the filing of the *Kelly* complaint and the attack that occurred here. Plaintiffs' reliance upon *Kelly* and its findings regarding violence in the general

**REPORT AND RECOMMENDATION - 44**

population is therefore improper and insufficient to create a triable issue of fact in this matter.

Next, Plaintiffs' expert testimony[24] related to staffing is extremely weak. "Assuming without deciding that expert testimony could provide an adequate factual basis to meet the *Farmer* standards of deliberate indifference," the Court finds it inadequate. *Giron v. CCA*, 14 F.Supp.2d 1252, 1258 (D. N.M. 1998). Pam Sonnen's expert report contains several assumptions regarding staffing at ICC. (Dkt. 165-4). First, she makes the assumption that the DEF Unit is "required to have eight staff" in the housing unit, but that on the day of the incident, the unit was down "two staff," because the Sergeants (Sharp and Carrick) took "floor" positions instead of their usual sergeant positions.[25] Second, Sonnen is of the opinion that "in the years leading up to the incident," there were "frequent periods of understaffing," which lead to a "breakdown of institutional control."

In Sonnen's opinion, "inconsistent staffing" patterns allow inmates to plan and execute violence because they may exploit the situation. Sonnen makes the assumption that, in a "properly managed prison there are an adequate number of trained staff," who enforce prison rules. Sonnen concludes that the "persistent understaffing" and resultant "lack of institutional control" in the years leading up to the May 5, 2012 attack created a situation that invited violence, and CCA's failure to correct the institutional problems

---

[24] Although CCA has raised numerous objections to the Court's consideration of Sonnen's and Hepburn's reports, the Court will not expressly address them. The expert testimony, relied upon by Plaintiffs, is inadequate to create a genuine issue of material fact.
[25] Her conclusory statement directly contradicts the facts, as explained below, that there were eight staff present in DEF Unit during first shift, and upon Sharp's departure to acquire candy bars, seven remained at the time of the incident.

was deliberate. Similarly, Hepburn concludes staff turnover, and the loss of experienced staff, resulted in the loss of staff's ability to maintain security and control of the prison.

Sonnen's and Hepburn's conclusory statements that inconsistent staffing patterns, staff turnover, and periods of understaffing, which would not be present in a "properly managed" prison, do not meet the "heavy burden" of establishing that CCA knew of and disregarded a substantial risk of serious harm to inmate health or safety under the facts here. *Giron*, 14 F.Supp.2d at 1258-59. *See also Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) (finding expert's conclusory assertions about the failure of staff to communicate effectively insufficient to avoid summary judgment).

Plaintiffs next attempt to characterize the staff present on May 5, 2012, as inadequate under various contractual theories. However, even if the DEF Unit was theoretically consistently understaffed as a contractual matter, Plaintiffs fail to explain how a breach of contract unequivocally constitutes a constitutional violation. Plaintiffs' disagreement with CCA's contractual staffing requirements is insufficient to meet their burden of creating a genuine issue of material fact as to whether CCA was deliberately indifferent to Plaintiffs' constitutional rights. *Batista v. Columbia County*, 2013 WL 5675214 *5 (D. Or. Oct. 17, 2013).

Further, Plaintiffs' contractual theory utterly fails to pass muster under the facts. Plaintiffs do not dispute that the minimum staffing requirements required by the IDOC's contract with CCA included one pod control officer and four floor officers. Yet, CCA had more staff than required during first shift on May 5, 2012. The facts establish that eight staff members were on duty in F1 Pod the day of the attack, and at the precise time of the

attack, seven staff members were present due to the absence of Sergeant Sharp, who left the Pod for Master Control to obtain more candy bars. Plaintiffs have failed to articulate how CCA's alleged policy of understaffing, when CCA on the day of the attack had more officers than the one pod control and four floor officers contractually required, caused the injuries of which they now complain. *See Batista*, 2013 WL 5675214 * 5 (denying summary judgment on a *Monell* understaffing claim when the evidence indicated that, at the time of the attack, the jail's staffing and inmate supervision exceeded minimum standards set forth under jail policy).

Plaintiffs then segue into the alleged understaffing on the day prior to the attack, May 4, 2012, which under Plaintiffs' theory, allowed an inmate to rig the lock on the janitor closet door. Plaintiffs argue that Campos, the inmate who rigged the door, was "unsupervised," suggesting staffing should be a 1:1 ratio for all inmates to be "supervised." The Constitution does not require "supervision" of that nature. But, assuming the DEF Unit was understaffed on May 4, 2012, Plaintiffs cannot overcome the uncontroverted facts of May 5, 2012. The abundance of staff on May 5, 2012, more than alleviates the prior day's alleged understaffing that somehow allowed Campos to rig the closet door.

Further, the type of attack at issue here undermines Plaintiffs' theory. Six inmates let out for recreation, part of a sixteen inmate walk, were able to hide in the janitor's closet in plain view of the surveillance cameras after Officer Skogsberg was distracted. The video surveillance shows Officer Skogsberg just prior to the attack checking the janitor closet door, but failing to actually open it. Officer Skogsberg also did not check

whether any inmates from Delta walk actually remained in their cells. The recreation officer failed to count the inmates who left the dayroom for recreation. Then, Skogsberg let the Charlie walk inmates out for dayroom time.

Plaintiffs' injuries result from these critical errors rather than from understaffing, and Plaintiffs have not differentiated their claim of understaffing from the above incidents of correctional officers not performing their jobs correctly. CCA cannot be held liable for isolated acts of negligence or misconduct. *Anderson v. City of Atlanta*, 778 F.2d 678, 685 (11th Cir. 1985). Plaintiffs offer nothing more than conjecture on the part of prison employees, such as Higgins, Carrick, and Sharp, who complain they were unable to perform their duties because the DEF Unit was "understaffed," needed more staff to be safe, and there should have been another person to help hand out candy bars that day.[26] But, despite their complaints that, because of understaffing, officers could not perform their required duties, the video surveillance footage depicts Skogsberg actually performing the required door and cell checks, albeit inadequately, with enough time to check the closet door and the cell doors before the Charlie walk inmates were released from their cells. Put simply, there is a disconnect between what actually occurred and the understaffing claims.

---

[26] For instance, Plaintiffs argue that the strain on the employees of ICC as a result of lack of staff caused a decrease in job performance and an inability to enforce rules, such as prohibiting inmates from covering their cell windows. SOF ¶ 55 (Dkt. 188-1 at 17.) However, Warden Wengler testified that the officers working in DEF had adequate time and resources to address problems with inmates covering their windows prior to May of 2012, because the number of incidents was decreasing. Wengler Depo. at 230 (Dkt. 188-2 at 61.) Further, Rodriguez testified she was attempting to reverse the trend of officers not enforcing the rules, and officers should have been opening the janitor closet door, not just checking to see if it was locked.

**REPORT AND RECOMMENDATION  - 48**

And finally, Plaintiffs argue the attack that occurred eleven months earlier evidences their claim of understaffing. However, Plaintiffs do not rely upon any policy other than their claim that the prison as a whole was understaffed to explain why such an incident occurred again. Plaintiffs contend that understaffing meant officers lacked sufficient time to complete their duties, such as counting prisoners, or checking cells. But the video surveillance just prior to the attack belies their assertion. Officer Skogsberg had sufficient time to check the janitor closet door and the cells from which the Delta walk inmates exited prior to giving the signal for the release of the Charlie walk inmates. Anderson is posted at the recreation door to allow the Delta walk inmates to exit the pod, and fails to notice that six out of sixteen inmates are missing. Thus, although similar to a prior incident, the May 5, 2012 attack appears to be an isolated incident (albeit a second one) that takes advantage of Officer Skogsberg's negligence that day in allowing himself to be distracted twice by two inmates, failing to check the janitor closet door adequately by opening it, and Anderson's failure to account for six of sixteen inmates let out for recreation.

Having ten officers, or even twenty officers, within F1-Pod would not have reversed the critical errors by the two officers responsible for the movement of the sixteen Delta walk inmates for recreation on the morning of May 5, 2012. Nor would the persistent understaffing that Plaintiffs claim existed in the years leading up to the May 5, 2012 attack have changed or altered the mistakes made by the officers responsible for prisoner movement on May 5, 2012. And finally, a generalized claim of understaffing, the prison being unsafe, or that guards were scared to be posted in DEF Unit, does not

alter the undisputed fact that seven (possibly eight, depending upon where Worthington was stationed) officers were posted in F1 Pod at the time of the attack, and those eight officers were responsible for only sixteen inmates released from their cells. *See Doe v. Sullivan County, Tennessee*, 956 F.2d 545, 550 (6th Cir. 1992) (declining to conclude that evidence presented of overcrowding, the need for more jailers, and the lack of security checks conducted every thirty minutes caused the assault upon plaintiff; "more is required than plaintiff's naked assertion that the assault would not have occurred but for the offensive conditions," and upholding district court's determination that there was no causal relationship between injuries and alleged overcrowding); *Cotta v. County of Kings*, 2015 WL 106362 *22 (E.D. Cal. Jan. 7, 2015) (reviewing jail's staffing policy at time of attack, and finding no evidence that the need to remedy the staffing policy was "so obvious" and the policy so inadequate so as to result in the violation of constitutional rights); *Miles v. Wilkinson*, 2013 WL 5592412 (W.D. La. 2013) (failure to provide evidence of a policy of understaffing, coupled with failure to prove that the prison was not properly staffed on *the day of* the attack, was fatal to the plaintiff's eighth amendment failure to protect claim); *Gachett v. Rogers*, 2009 WL 2905609 *8-9 (M.D. Ala. Sept. 4, 2009) ("occasional isolated attacks by one prisoner on another may not constitute cruel and unusual punishment"); *compare Anderson v. Wilkerson*, 2009 WL 774451 4 (W.D. La. Mar. 24, 2009) (denying summary judgment on plaintiff's understaffing claim where, on the night of the attack, two correctional officers were in charge of eight tiers of inmates housed in dormitories consisting of 352 inmates).

**REPORT AND RECOMMENDATION  - 50**

Even if the Court assumes all of Plaintiffs' allegations are true, Plaintiffs have not described the "kind of obvious and horrible conditions from which inferences can lead to inescapable liability" given the attack involved an isolated incident of violence in a close custody unit. *See Giron v. CCA,* 14 F.Supp.2d 1252, 1258 (D. N.M. 1998) (granting summary judgment to defendant when prison inmate alleged her assault was caused by understaffing in the segregation unit of the prison). The conditions complained of in a generalized sense, that the prison was understaffed and officers could not do their jobs, do not equate to a policy, and "simply do not compare with the level of dangerousness contained in the caselaw that has been found to mandate liability." *Giron*, 14 F.Supp.2d at 1258 (citing *Hutto v. Finey*, 437 U.S. 678 (1978), *reh. den.* 1979 (prison conditions included extreme overcrowding, rampant violence, insufficient food and unsanitary conditions.)).

Plaintiffs' conclusory statements that more staff, additional sergeants, or other types of officers, such as counselors, should have been present to thwart the attack, do not create a material issue of fact to defeat summary judgment. From the record, it is plain CCA maintained an overall 2:1 ratio of prisoners to staff in F1 Pod on the day of the attack. On a more granular level, two officers were responsible for the movement of sixteen inmates who were otherwise locked in their cells. The Court cannot conclude that a different configuration of staff, whether it be more Sergeants or less floor officers, the presence of yet more staff, or some other permutation of staff, of which CCA should have been aware, constituted an objectively inhumane prison condition that was the moving force, or cause, of the May 5 attack.

**REPORT AND RECOMMENDATION  - 51**

(2)     *Gang Clustering*

There is no dispute that prison gangs or groups of friendly inmates, like the

Plaintiffs, were grouped together in their own walks within the DEF Unit, and the

practice of the housing manager, Norma Rodriguez, to house friendly gang members or

friendly inmates together was likely occurring in contravention of established prison

policy regarding STGs. However, even assuming CCA knew of this practice in

contravention of its written policies, Plaintiffs have failed to address how the housing

practice itself caused Plaintiffs' injuries, or to distinguish persuasive authority from other

courts holding that a policy of grouping gangs together is not a per se Eighth Amendment

violation. Plaintiffs' theory of gang clustering suffers also from a lack of clarity.

Although Plaintiffs allude to different theories upon which their gang clustering claim is

based, their submission in opposition to CCA's motion for summary judgment fails to

address in a succinct way the three distinct methods upon which a Section 1983 plaintiff

may establish municipal liability. Accordingly, the Court will analyze each theory

separately.

(a)     *Formal Policy*

Whether a municipality's policies violate an individual's rights "does not hinge

on whether County policymakers knew that the County's policies would pose a

substantial risk of serious harm to [the plaintiff] in particular. As long as a jury can infer

that the policymakers knew that their policy … would pose a risk to someone in [the

plaintiff's] situation," summary judgment should not be granted to the municipality.

*Gibson*, 390 F.3d at 1191. Thus, what Rodriguez knew about Plaintiffs' gang affiliation,

or their individual histories with the AKs in F1 Pod, is not relevant to the Court's determination under a formal policy theory.[27] Instead, Plaintiffs must show the policy itself constitutes deliberate indifference, not Rodriguez's determination that Plaintiffs were specifically at risk if they moved to F1 Pod. *Stover*, 2015 WL 874288 at *9-10 (considering housing policy issue with respect to CCA's liability, and the failure to protect claims against defendants Wengler and Kerr as to their subjective knowledge, separately). Accordingly, the minutia of Rodriguez's decision to move Plaintiffs to F1 Pod is not relevant under this theory. *See Farmer*, 511 U.S. at 843-44 ("it does not matter…whether a prisoner faces an excessive risk…for reasons personal to him or because all prisoners in his situation face such a risk" and when prison officials know of rampant inmate rape and do nothing about it, "it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.").

*Stover v. CCA*, 2015 WL 874288 *9 (D. Idaho Feb. 27, 2015), illustrates the application of the rule, and explains why Rodriguez's particularized knowledge about Plaintiffs' gang affiliation is irrelevant under the official policy theory. In *Stover*, the Court considered whether CCA's policy of housing all sex offenders together in the same unit constituted deliberate indifference when a male-to-female transgender prisoner was placed in an open dorm setting pursuant to such policy with 58 other male sex offenders. *Stover*, 2015 WL 874288 at *9. The Court considered separately the failure to protect claims asserted against individual defendants Wengler and Kerr.[28] The question about the

---

[27] This is because Plaintiffs have not sued any individuals, as explained later in the Court's Report.

[28] Plaintiffs here do not assert claims against any individually named defendants.

**REPORT AND RECOMMENDATION  - 53**

constitutional infirmity of the policy was not related to Wengler's and Kerr's actual knowledge, such as the letters plaintiff had written to Wengler that did not give Wengler or Kerr any specific information about threats directed at plaintiff by other inmates. In other words, the particularized knowledge that the plaintiff imparted, or in that case failed to impart, to Wengler and Kerr was not relevant to the policy based inquiry.

Instead, the plaintiff's claim was viewed through the lens of the policy Wengler and Kerr implemented, which required all sex offenders to be housed together in the same unit. *Id.* at *10. Wengler and Kerr were both aware that the plaintiff was a transgender prisoner, and she was housed in an open dorm with up to 58 other male sex offenders. *Id.* The Court considered only those facts, which related to the housing policy itself and not to any particularized knowledge about the plaintiff actually being threatened by others in the dormitory.

The Court concluded the evidence in *Stover* established that, by virtue of the policy itself and a transgender female's feminine characteristics among a group of male sex offenders, a jury could reasonably conclude that Wengler and Kerr subjectively drew the inference that the plaintiff faced a substantial risk of serious harm at the hand of the other sex offenders, yet Wengler and Kerr deliberately disregarded that risk. *Id.* at *10. The Court concluded disputed and genuine issues of fact existed as to whether subjecting a male-to-female transgender prisoner to such a policy amounted to deliberate indifference to the safety of the transgender prisoner, and that a jury could reasonably conclude that the housing policy itself was the moving force behind the alleged violation of the plaintiff's constitutional rights. *Id.* at *9.

**REPORT AND RECOMMENDATION  - 54**

Here, Plaintiffs must show that the practice of allowing inmates to choose "walks" and of grouping friendly gang members together in gang controlled walks in DEF Unit was the moving force behind the alleged violation of Plaintiffs' constitutional rights. Plaintiffs must prove that a jury could reasonably conclude ICC's practice of housing friendly gang members or groups of inmates together in DEF Unit amounted to deliberate indifference and was the moving force behind Plaintiffs' injuries. *See Id.* at *9.

Plaintiffs' gang clustering theory, as set forth in their brief, centers around the high concentration of SVC and AK gang members housed in DEF Unit, and the integration of non-affiliated offenders into DEF Unit who refused to associate with the SVC or AK gangs. According to Plaintiffs' theory, the gang clustering occurring in the DEF Unit meant there was a risk to non-affiliated members housed in the Unit, because they might be recruited or attacked if they refused to associate with the SVC or AK gang members.

There are several legal impediments to Plaintiffs' theory. Persuasive authority exists that a jury cannot reasonably conclude Rodriguez's practice of allowing inmates to be grouped together amounts to deliberate indifference. Plaintiff's first argument appears centered around allowing inmates to choose their bunk mates, because such a practice creates gang clustering in the DEF Unit. But, in a case involving an explicit policy allowing inmates to choose their bunk assignments, the Court of Appeals for the Seventh Circuit in *Washington v. LaPorte County Sheriff's Dept.*, 306 F.3d 515, 518 (7th Cir. 2002), found the assertion of the plaintiff's claim did not satisfy the subjective nature of a deliberate indifference inquiry under *Farmer v. Brennan*, 511 U.S. 825 (1994). In *LaPorte*, the plaintiff alleged that allowing inmates to choose their own bunks created a

high probability of inmate-on-inmate assault. The court explained *Farmer* requires

"actual knowledge of the risk," a subjective inquiry, showing that prison guards were

aware of a substantial risk that the plaintiff might be harmed as a result of

implementation of the policy. *Washington*, 306 F.3d at 518. The court held the jail policy

allowing inmates to choose their bunk mates did not present such an obvious risk such

that actual knowledge on the part of prison officials could be inferred. *Washington*, 306

F.3d at 519.

Similarly, in *Cotta v. County of Kings*, 79 F.Supp.3d 1148 (E.D. Cal. 2015), the

court considered a claim brought against the county and county jail officials alleging

inadequate safety at the jail violated the inmate's constitutional rights when he was killed

by his cellmate. There, prison officials housed the decedent and his co-defendant together

in a cell. The decedent had made multiple requests to be housed with his co-defendant,

and both inmates made it clear to jail officials they were friends and wanted to be housed

together. Prison officials reviewed the inmates' files, and lacking any knowledge that

there had been any altercations between the two, the officials made the move. Although

jail policy generally discouraged co-defendants from being housed together, neither did it

prohibit housing co-defendants together. Later, one bunk mate testified against his co-

defendant at trial, and between their conviction and sentencing, the testifying defendant

was killed by his bunkmate and co-defendant.

Plaintiff alleged the jail lacked a policy to affirmatively gather evidence and

information concerning co-defendants' legal proceedings that may bear on the jail's

decision to house co-defendants together, and the jail lacked a policy to ensure

communication of such information to housing authorities. The court in *Cotta* held that the housing of co-defendants together did not per se constitute deliberate indifference to inmates' security. 79 F.Supp.3d at 1174. The court further found there was no evidence, such as a general history of violence among co-defendants housed together at the jail, to place the county on notice that lack of a policy requiring jail officials to proactively gather evidence concerning co-defendants' legal proceedings presented a risk so obvious that ignoring it amounted to deliberate indifference. *Id.*

Based upon *LaPorte* and *Cotta*, the risk of injury posed by allowing inmates to choose their housing assignments is not such an obvious risk that prison officials here should have recognized the harm posed by implementation of such a practice.

The next theory Plaintiffs advance is that Rodriguez's practice of housing inmates in DEF Unit resulted in placing non-affiliated offenders into DEF Unit with STG clusters, or gangs. However, such a policy was expressly considered by the United States Court of Appeals for the Ninth Circuit, and the plaintiff's constitutional claims rejected. In an unpublished Ninth Circuit case, the court had occasion to consider whether a formal housing policy that segregated gangs from each other violated the Eighth Amendment. *Nesbit v. Dept. of Public Safety*, 283 Fed. Appx. 531, 2008 WL 2490440 (9th Cir. 2008). There, the plaintiff alleged the Halawa Correctional Facility's housing policy violated his Fourteenth Amendment right to equal protection by segregating rival gangs from each other but affording no separation to unaffiliated inmates.

The court in *Nesbit* held prison officials could rationally believe housing segregated prison gangs with unaffiliated inmates would be an effective way to reduce

gang-related violence. 283 Fed. Appx. at 534. As to the Eight Amendment claim, the

court held plaintiff failed to demonstrate the housing policy itself amounted to deliberate

indifference, because nothing indicated unaffiliated inmates were at a significantly

greater risk of assault when housed with separated gang members. 283 Fed. Appx. at 534.

The court therefore held summary judgment was properly granted as to the named

defendants. *Id.*

Similarly, in *Labatad v. CCA*, 714 F.3d 1155, 1160 (9th Cir. 2013), the Ninth

Circuit discussed the plaintiff's claims that actions taken by correctional officials at the

Saguaro Correctional Center violated his Eighth Amendment rights when he was

assaulted by a member of a rival prison gang, with whom he was temporarily assigned to

share a cell. Plaintiff sued CCA and various other employees of the prison, challenging

both the decision to house him in the same cell with a rival gang member, and the general

policy that allowed rival gang members to be housed together. There, the prison did not

have a policy of separating rival gang members in cell assignments. Instead, gang

affiliation was but one factor in the case-by-case evaluations used to make cell

assignments. The plaintiff sought to change CCA policies to require separation of

inmates by gang affiliation, exactly what Plaintiffs suggest here is improper.

The Ninth Circuit upheld the district court's conclusion that the prison's policy

permitting members of different gangs to be housed together was not itself an Eighth

Amendment violation. *Labatad*, 714 F.3d at 1160. If the prison was required to separate

gang members by gang affiliation, "among other problems, '[t]he number of gang

members housed…and the high representation of certain gangs would place an

unmanageable burden on prison administrators were they required to separate inmates by gangs.'" *Id.* (quoting *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001)). *See also Ellington v. E.S. Alameida*, 2010 WL 2650632 *14 (E.D. Cal. July 1, 2010) (holding "plaintiff has failed to present evidence or cite any authority establishing that housing a non-affiliated inmate in the same cell as a gang-affiliated inmate will inherently present 'a substantial risk' that the non-affiliated inmate will be physically assaulted or harmed…Without more, plaintiff's conclusory assertions regarding the 'substantial danger' of housing gang-affiliated and non-affiliated inmates in a cell together do not satisfy the objective component of *Farmer.*"). The court addressed separately whether individual prison officials were deliberately indifferent to a substantial risk that the plaintiff would be assaulted if housed in the same cell. *Labatad*, 714 F.3d at 1161.

Considering *Nesbit* and *Labatad* as persuasive authority, the Court here cannot conclude that housing gang members and non-affiliated groups together in the DEF Unit the way Rodriguez did—into groups separated into 16-inmate walks—inherently presented a substantial risk that a non-affiliated inmate would be physically assaulted or harmed as a consequence of the practice itself. This is true given the physical layout and control over inmates in the DEF Unit—groups of 16 inmates were separated by walks and not allowed to intermingle either during their dayroom or recreation time, in contrast to the inmates in *Labatad*, who actually shared a cell. The physical layout and movement pattern of inmates housed in the DEF Unit was such that inmate assaults of the nature experienced by Plaintiffs would be all but impossible, unless someone hid in the closet or the shower. Further, because of the nature of the attack, Plaintiffs' housing policy

**REPORT AND RECOMMENDATION  - 59**

argument is inappropriately premised upon two instances of gang versus gang violence where inmates from one walk took advantage of a correctional officer's mistake, and hid in a closet to attack another set of inmates. It cannot be said that Rodriguez's practice of separating rival gang members into walks caused the harm to Plaintiffs.

Rodriguez's practice of housing gang members on a separate walk within the DEF Unit does not amount to deliberate indifference, because there was nothing inherent in the practice that indicated one walk of friendly inmates housed together was at any greater risk because another walk of inmates with a different gang affiliation was also housed on another, secured walk within the DEF Unit. Rodriguez's practice actually accounted for the risk of housing targeted inmates with members of a vengeful prison gang, and separated them by housing them on secured walks where there was to be no interaction between the walks. Plaintiffs point only to their own assault, and that eleven months earlier, a similar attack occurred in the DEF Unit. But these facts do not demonstrate anything more than two isolated incidents of inmate-on-inmate violence in the context of the DEF Unit, which housed a higher percentage of STGs and gang members in close custody.[29] Thus, although the assault that occurred is tragic, it cannot reasonably be said that Rodriguez's practice was the cause, or moving force, behind the assault.

The Court has been careful to characterize Rodriguez's decision to place Plaintiffs in the DEF Unit on their own walk as a practice she employed, because CCA actually had

---

[29] Plaintiffs presented no violence statistics pertinent to DEF Unit, and objected to the violence statistics offered by CCA as irrelevant.

**REPORT AND RECOMMENDATION  - 60**

a written policy requiring STGs to be disbursed throughout the prison. In other words, CCA had a contrary, written policy directing staff to disburse suspected members of specific STGs and not concentrate them in any housing unit, although the written policy gave some leeway to close custody units where one would expect a higher percentage of STGs.[30] Thus, if Plaintiffs argue Rodriguez's practice was deficient because gangs should have been disbursed, Plaintiffs essentially argue CCA could have prevented the violation if Rodriguez had followed written CCA policy. However, if Plaintiffs advance that argument, liability is premised upon Rodriguez's negligent failure to follow policy—a respondeat superior argument—which is not tenable. *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (municipal liability must rest on the action of the municipality, not the actions of the employees of the municipality).

Perhaps not realizing the nuances of the policy argument Plaintiffs advanced, Plaintiffs explained at the hearing that Rodriguez's actual decision to place Plaintiffs in the DEF Unit was deficient. In other words, Plaintiffs explained they were not asserting either CCA's written policy, or Rodriguez's contrary practice to group offenders together by gang affiliation, were per se violations of the Eighth Amendment. Rather, Plaintiffs argued Rodriguez knew it was dangerous to place anyone, including Plaintiffs, in the DEF Unit because of the high concentration of AKs and SVCs housed there and the general environment the AKs and SVCs were fostering at the time.

---

[30] At the hearing, Plaintiffs stressed that Rodriguez was not following written CCA policy, because it was a violation of ICC policy to cluster gangs, and instead asserted Rodriguez had implemented her own practice of clustering gangs in DEF Unit.

**REPORT AND RECOMMENDATION  - 61**

IDOC's summary of Rodriguez's interview shortly after the May 5, 2012 assault supports the inference that Rodriguez had particularized knowledge the AKs and SVCs were actively recruiting on the tier, and it was imperative to place a group of inmates on the tier that would not turn AK, SVC, or Sureño. (Dkt. 1-2 at 1.) Once the YFS Plaintiffs were identified as "solid," meaning they would not be subject to gang recruitment, Rodriguez went through the process of re-housing them by meeting with the team responsible for implementing inmate moves. At that point, Rodriguez's particularized knowledge becomes important, as do the grievance forms, interviews with inmates, and what staff allegedly did or did not know about the specific risk to Plaintiffs posed by the AKs and SVC gang members housed in DEF Unit.

The inherent, fatal problem with Plaintiffs' argument is Plaintiffs did not sue Rodriguez or any other decision maker, including Assistant Warden Kessler, individually. And, Plaintiffs argue that, by *not* following applicable ICC written policies, Rodriguez and others knowingly placed Plaintiffs in harm's way. Plaintiffs' argument unambiguously rests upon a respondeat superior theory of liability. The argument and the facts advanced to support it improperly focus upon Rodriguez's individual decision to place Plaintiffs in the DEF Unit, which is not a policy-based claim against CCA either as framed or as argued. *See Burningham v. CCA*, No. 1:13–CV–00443–EJL–REB, 2015 WL 5460601 (D. Idaho Sept. 10, 2015) (granting CCA's motion for summary judgment when the crux of the plaintiff's claim was ICC staff members did not do what they were

supposed to do, and failed to follow policy; plaintiff's failure to sue the individual

defendants was similarly fatal).[31]

The Court's decision in *Hayes v. CCA*, No. 1:09–cv–00122–BLW, 2012 WL

4481212 (D. Idaho Sept. 28, 2012), illustrates how a plaintiff may be successful against

individual tortfeasors, but have his or her claims dismissed against the entity. In *Hayes,*

Plaintiff sued CCA, as well as its employees, for failure to protect him from harm under

the Eighth Amendment. Plaintiff alleged that ICC housing pods ABC and JKL within the

prison had notorious reputations for assaults against inmates convicted of sex crimes, and

having committed a sex crime, plaintiff was improperly housed in A and K Pods. Plaintiff

established he was threatened four times in a seven-month period when he was housed in

the so-called "Gladiator Pods," and reported those incidents in writing, yet ICC staff

denied the plaintiff's request for protective custody. The Court found genuine issues of

material fact existed to preclude the individual defendants involved in deciding the

plaintiff's housing placement from obtaining summary judgment. 2012 WL 4481212 at

*16.

But, as against CCA, the Court held the plaintiff failed to establish causation

because, despite the potential liability of the individual defendants, CCA could not be

held liable under a theory of respondeat superior. *Id.* at *18. Because the plaintiff had not

sufficiently alleged CCA executed an official policy or unofficial custom which inflicted

---

[31] Interestingly, in *Burningham*, plaintiff made allegations similar to the ones Plaintiffs allege here---that CCA had allowed and fostered a reputation in its operation of ICC allowing prisoner-on-prisoner violence; it was known as the Gladiator School; and that CCA's unwritten standards and practices had become so widespread and persistent as to constitute a policy or custom. 2015 WL 5460601 at *11. Even considering the plaintiff's allegations constituted a "policy," the Court found Plaintiff's general arguments concerning an alleged policy or custom at CCA that fostered his injuries to be "conclusory and, therefore, lacking." *Id.* at *12.

the injury of which the plaintiff complained, CCA was entitled to summary judgment. *Id.* The Court rejected the plaintiff's allegation that ICC staff were failing to "protect the health and safety of offenders by their policies and procedures and are only feeding one class of offenders to the wolves in their den as if they were raw meat." *Id.*

Here, too, Plaintiffs rely upon the characterization of ICC as the Gladiator School, and assert gangs were running the tier in F1-Pod. Plaintiffs argue vehemently that the decision to place them on F1-Pod was not safe. But, such allegations, directed at the individual decision-makers, do not establish CCA's liability. Plaintiffs advance the argument that, had Rodriguez followed CCA's actual, written policies, this incident would not have occurred. Plaintiffs' argument is not a policy based argument, and CCA cannot be held liable for the actions of the individuals involved in Plaintiffs' housing placement.

(b)   *Policy Maker*

Although not fleshed out, Plaintiffs assert the decision to place Plaintiffs in F1 Pod was an act by an official with policymaking authority. Pls.' Response at 7. (Dkt. 188.) However, the only fact Plaintiffs have to support their assertion is Rodriguez's statement that her position as housing unit manager operated as a "mini warden" over her unit. SOF ¶ 48. Plaintiffs assert numerous facts to buttress their argument, such as the knowledge Rodriguez had prior to the move imparted by Carrick, the dangerous conditions presented by the AK's and SVC gangs housed in DEF Unit, and gang recruitment activity.

Even assuming all of these facts as true, Plaintiffs have not established, as a matter of law, Rodriguez's policymaking authority. *Pembaur* requires the policymaker to have

final authority to establish municipal policy with respect to the action ordered. Mere exercise of discretion carrying out a particular function does not, however, give rise to municipal liability.

There is no evidence in the record Rodriguez possessed policy making authority, either under state law, or by virtue of CCA's own internal operating procedures. The policies applicable at ICC and contained in the record indicate their approval and adoption by one or more of the following individuals: Warden Tim Wengler; Kevin Kempf, Chief of Operations; Warden Valdez; the Chief Corrections Officer; and the Director of Security. According to the record before the Court, Rodriguez had no authority to establish official policy, even if she personally felt she had some level of authority to do so. Rodriguez confirmed she could not do all the things a warden can do, meaning she could not establish official policy. Under *Pembaur*, there is simply no evidence to support a conclusion Rodriguez was responsible for establishing policy, or that she was formally delegated policy making authority by the Warden or another CCA official. The existence of written policies adopted by others supports the Court's finding. Thus, the most that can be said was Rodriguez possessed discretion to house inmates and implement decisions to move them among different housing units in the prison.

Furthermore, examining the decision Rodriguez implemented on a more granular level indicates she did not exercise her authority to place Plaintiffs in F1 Pod in a vacuum. Her customary course of action required her to consult with members of a team and other staff. For instance, Rodriguez on May 3, 2012, participated in a Team Case Management meeting wherein several team members in addition to Rodriguez met to

**REPORT AND RECOMMENDATION  - 65**

discuss transitioning a group of offenders into F1 Pod. According to the meeting notes,

Payton, Lieutenant Watkins, Officer Niecko, Rodriguez, and Moore were members of the

team who met to discuss the move. Additionally, on May 4, 2012, Moore, Cavigliano,

and Carrick (the same Carrick who allegedly voiced concerns to Rodriguez about the

"dangerousness" of the move), interviewed the prospective group of offenders moving to

F1 Pod to inquire about any concerns they had with other inmates housed there, or the

move in general.

  None of the offenders within Plaintiffs' group expressed concrete concerns about

the move prior to May 5, 2012. Plaintiffs' attempt to infer that CCA had advanced

knowledge Plaintiffs did not feel comfortable with the move is misplaced, because every

single concern form Plaintiffs refer to in their statement of disputed facts at paragraph 17

to support their assertion was submitted <u>after</u> May 5, 2012. Prior to the move, only

Plaintiff Russell submitted a written concern form, which expressed vague concerns

about "issues with people meaning SVC, AK," but he did not identify any specific threats

he had received during his incarceration at ICC. Russell simply submitted the written

concern form prophylactically, "just for my safety." Upon receipt of the concern form,

Russell was "deleted off move sheet."

  Similarly, Bryant verbally expressed vague concerns, and he, too, was "cancelled"

off the move sheet. Later on May 4, 2012, when all Plaintiffs learned they would be

getting a walk of their own together, which they had wanted for some time and which

desire had been expressed to prison staff, all Plaintiffs agreed to the move. Thus, despite

unsubstantiated assertions by prison staff cited by Plaintiffs, the record is devoid of a

single Plaintiff actually opposed to the move. Indeed, during the first shift on May 5, 2012, Skogsberg noticed nothing unusual—no threats, arguments, or any type of interaction indicative of a safety issue.

Although Plaintiffs criticize Rodriguez for consulting Nunez, another inmate, about the move, Plaintiffs similarly mischaracterize the interview summary. Nunez at first indicated that he "really didn't like the move," voicing vague and unspecific safety issues, but qualified the statement, that "if everyone did their job there shouldn't be any problem because all of the walks were separated." In other words, because sixteen offenders were grouped together in a walk, and were locked down for 22 hours each day, kept separated at all times from other groups of offenders (such as the AKs, SVCs, and Surenos), and did not recreate or use the dayroom with other groups of offenders, there should be no problem. Counselor Moore buttressed this statement, as she, too, indicated so long as Plaintiffs were not mixed with the AKs, "they should be fine. If policy and procedure are followed they should be fine."

The record therefore refutes the assertion Rodriguez was a policymaker. There is no evidence Rodriguez had final policy making authority. Plaintiffs' contention to the contrary, and the evidence submitted in support of their assertion that prison officials "knew the move was dangerous" for one reason or another, misconstrues the theory of municipal liability. Plaintiffs essentially argue that Rodriguez, by authorizing the move of Plaintiffs to F1 Pod, made a policy decision to place Plaintiffs in harm's way. Yet, Rodriguez's decision as to how to manage the inmate population, and to place groups of inmates in F1 Pod, involved her professional judgment and discretion, not policy making

authority related to the overall safety of prisoners. Her decision thus does not trigger liability under Section 1983, and Plaintiffs have not established Rodriguez, or any other participant in the decision to move Plaintiffs to F1 Pod, were final policy makers.

(c)    *Ratification*

Plaintiffs did not argue a policy maker ratified Rodriguez's decision to move Plaintiffs. For the sake of completeness, however, the Court briefly addresses the issue.

For the ratification theory to apply, Plaintiffs must establish Rodriguez's decision to move Plaintiffs constituted a constitutional tort—that her policy-making actions resulted in deliberate indifference to Plaintiffs' safety. Assuming the truth of that assertion, there is no evidence in the record the Warden, or anyone else with authority within CCA, affirmatively approved of and endorsed Rodriguez's decision to move Plaintiffs to F1 Pod.

Rodriguez reported to Koozman, who in turn reported to Kessler. Kessler reviewed move sheets presented by the unit manager. However, Kessler indicated his authority in that regard was simply to acquiesce in the decision by the unit manager, because he knew the unit manager would not present the move sheet if "everybody wasn't good with the move." (Dkt. 188-2 at 29.) Mere acquiescence, however, in the decision to move Plaintiffs to F1 Pod merely amounts to inaction that fails to establish ratification under *Pembaur* and *Praprotnik. Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992).

After the May 5, 2012 attack, an investigation ensued. Ratification of a constitutional violation after the fact can support municipal liability. *Tubar v. Clift*, No.

C05-1154-JCC, 2008 WL 5142932 (W.D. Wash. Dec. 5, 2008) (finding police chief's exoneration of an officer's use of deadly force could expose the city to liability under the ratification doctrine). Here, however, IDOC's serious incident review report, prepared May 21, 2012, expressly found Rodriguez had not followed SOP 504.02.01.002, regarding management of STGs within ICC. In light of the disapproval of Rodriguez's actions, there is no evidence of ratification upon which to base municipal liability.

## CONCLUSION

The Court does not minimize the assault, the individual actions and missteps that took place, or CCA's responsibility to ensure ICC met constitutional standards. However, the test is whether a reasonable jury could conclude CCA was aware that its staffing policy, or its housing policy or the practice or custom employed presented a substantial risk of serious harm to inmates housed in the DEF Unit. The Court concludes no reasonable jury, on this record, could so conclude, and therefore recommends CCA's motion for summary judgment be granted.

As the ancillary evidentiary motions filed by both CCA and Plaintiffs were not material to the Court's recommendation, the Court will order they be denied as moot.

Further, Plaintiffs filed a motion for sanctions requesting an adverse inference jury instruction based upon CCA's alleged spoliation of evidence. (Dkt. 224.) Given the Court's recommendation, it too, will be denied as moot.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1)      Defendant's Motion for Summary Judgment (Dkt. 166) be **GRANTED**.

Written objections to this Report and Recommendation must be filed within fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

DATED: December 3, 2015

Honorable Candy W. Dale
United States Magistrate Judge

**REPORT AND RECOMMENDATION  - 70**

## ORDER

Consistent with the Report and Recommendation recommending Defendant's Motion for Summary Judgment be granted, **IT IS HEREBY ORDERED:**

1)      Plaintiffs' Motion to Strike Expert Witness (Dkt. 161) is **DENIED as MOOT**.

2)      Defendants' Motion to Exclude the Testimony of John R. Hepburn and Pam Sonnen (Dkt. 165) is **DENIED as MOOT.**

3)      Plaintiffs' Motion to Strike the Affidavit of Kevin Myers (Dkt. 189) is **DENIED as MOOT.**

4)      Plaintiffs' Motion for Sanctions Based Upon Spoliation of Evidence (Dkt. 224) is **DENIED as MOOT**, as it requests sanctions in the form of an adverse jury instruction.



DATED: December 3, 2015

_____
Honorable Candy W. Dale
United States Magistrate Judge