UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OMAR CASTILLON, DUSTY KNIGHT, JUSTIN PETERSON, LEON RUSSELL, CHRISTOHPER JORDAN, JACOB JUDD, MICHAEL FORD-BRIDGES, AND RAYMOND BRYANT, | Case No. 1:12-CV-00559-EJL **ORDER ON REPORT AND RECOMMENDATION** |

                Plaintiffs,

    v.

CORRECTIONS CORPORATION OF AMERICA, INC.,

            Defendant.

On December 3, 2015, United States Magistrate Judge Candy W. Dale ("Judge Dale") issued a Report and Recommendation ("Report"), recommending Defendant's Motion for Summary Judgment be granted (Dkt. 231). Plaintiffs filed objections to the Report (Dkt. 233), and Defendant responded (Dkt. 235). The Court has considered the parties' contentions and adopts in part and rejects in part the Report's findings.

## STANDARD OF REVIEW[1]

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the Magistrate Judge. Where the parties object to a report and recommendation, this Court shall make a *de novo* determination of those portions of the report to which objection is made.  *Id.*  Where, however, no objections are made, arguments to the contrary are waived.  *Id.*; *see also* Fed. R. Civ. Proc. 72.  "When no timely objection is filed, the Court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  Advisory Committee Notes to Fed. R. Civ. Proc. 72 (citing *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir. 1974)).

The Court has reviewed the entire Report and the record in this matter and finds no clear error on the face of the record.  In this case, only Plaintiffs filed objections to the Report.  The Court has conducted a *de novo* review of the portions of the Report to which Plaintiffs object and finds as follows.

## BACKGROUND

This case involves a brutal inmate gang attack that occurred on May 5, 2012, at the Idaho Correctional Center ("ICC").  Plaintiffs Dusty Knight, Leon Russell, Christopher Jordan, Jacob Judd, Michael Ford-Bridges, and Raymond Bryant

---

[1] Plaintiffs do not object to the summary judgment standard of review cited in the Report.  The Court incorporates by reference and adopts the Report's standard of review with respect to summary judgment.  (Dkt. 231, pp. 32-34.)

("Plaintiffs") are prisoners in the custody of the Idaho Department of Correction

("IDOC").  At all relevant times, Plaintiffs were incarcerated at the ICC, a private prison

which, at the time of the attack, was operated by Defendant Corrections Corporation of

America, Inc. ("CCA" or "Defendant"), under contract with IDOC.[2]

On May 4, 2012, Plaintiffs were moved into a housing unit at ICC known as F-pod

or Pod F1, in the DEF unit.  The DEF unit is the only unit within the IDOC system that is

dedicated for offenders classified as close custody.  (Dkt. 169, p. 6.)  Close custody

facilities are designed to house high risk inmates, either because they have escaped, have

a serious institutional disciplinary history, or have displayed dangerous behavior while

incarcerated.  (*Id.*, pp. 5-6.)  The DEF unit houses a high percentage of Security Threat

Groups ("STGs"), defined as "a group of two or more offenders who have been

determined to be acting in concert so as to pose a significant threat to the safety, security,

and orderly operation of any [IDOC] facility."  (*Id.*, pp. 6-7.)

An offender classified as "close custody" does not live within the general

population of the prison, but is instead confined within a secure perimeter and under 24

hour staff supervision.  (*Id.*, p. 6.)  Movement of close custody offenders in the institution

is limited.  Specifically, close custody offenders are only allowed out of their cells for

one hour of exercise, five days per week, and one hour per day of dayroom time, five

---

[2] CCA operated ICC for approximately fourteen years, from 2000 to June 2014.
(Dkt. 169, p. 3.)  In July 2014, IDOC assumed operations of ICC and renamed it the
Idaho State Correctional Center.  *Id.*

days per week.  (*Id*., p. 8.)  Close custody inmates thus spend 22 hours per day in their cells during the week, and 24 hours on weekends.

The DEF unit had six pods, or tiers—Delta 1, Delta 2, Echo 1, Echo 2, Fox 1 and Fox 2.  (Dkt. 167, ¶ 31.)  Each tier, or pod, was divided into fourths, and a specific gang, grouped together in a "walk" was housed in each of these areas.  (Dkt. 159-2, p. 4.)  For example, the Aryan Knights would occupy one walk, the Severely Violent Criminals another, the Sureños another, and the Norteños yet another walk. Inmates from different walks were not allowed to recreate together.  (Dkt. 169, p. 8.)  In other words, only one group of inmates assigned to a particular walk was allowed out of their cells together for the same recreation or dayroom break.  (Dkt. 167, ¶ 14.)

Given the high percentage of STGs within the DEF unit, moving new arrivals into the unit posed difficulties.  For instance, DEF Unit Manager Norma Rodriguez was concerned that moving new individuals into the F1 pod might cause such individuals to be recruited into a STG, or become subject to extortion by gang members.  (Dkt. 168-5, pp. 3-4, 8.)  Rodriguez thus wanted to put new inmates in the F1 pod who were not vulnerable to that type of pressure from other inmates.  (*Id*.)  At the time Rodriguez moved Plaintiffs into F1, there were already inmates living in the F1 pod, assigned to a different walk, who were members of STGs such as the Aryan Knights, Severely Violent Criminals ("SVC"), and Sureños.  (*Id*., pp. 4-5.)  Rodriguez thought Plaintiffs were good

candidates to move into F1 because they were all friends who believed a walk of their own would benefit them as well as the facility.[3]  (Dkt. 168-8, p. 2.)

On May 5, 2012, the day after they were moved into the F1 pod, Plaintiffs were attacked when six members of the Aryan Knights did not return to their cells after they were let out for recreation.  Instead, the gang members hid in a janitor's closet that should have been locked, and then burst out of the closet and attacked Plaintiffs with homemade weapons and their fists when Plaintiffs were subsequently released for their recreation. The attackers seriously injured all of the Plaintiffs, one of whom was stabbed 18 times.

Plaintiffs allege CCA had deliberate policies of understaffing and of housing individuals within the same gang affiliation together, and claim both of these policies caused the May 5, 2012 attack.  CCA filed a Motion for Summary Judgment arguing the undisputed facts do not establish it had a deliberately indifferent custom or policy that was the moving force behind a violation of Plaintiffs' constitutional rights.  After considering CCA's motion and conducting a hearing, Judge Dale issued the instant Report recommending summary judgment be granted in favor of CCA.  (Dkt. 231.)

The factual background of this matter is meticulously detailed in the Report and is not objected to by the parties.[4]  As such, the Report's recitation of the general

---

[3] Although the intricacies of the move and Plaintiffs' feelings about it are detailed in the Report, such facts are not relevant to Plaintiffs' objections and are not further recounted here.

[4] While Plaintiffs do not object to the general factual background provided in the Report, they do object to several of the Report's conclusions regarding such facts.  Where relevant, the Court will highlight and discuss such objections.

background of this case (Dkt. 231, pp. 1-26) is incorporated by reference and hereby adopted.

## DISCUSSION

Plaintiffs object to the Report on two general grounds: (1) that it "fundamentally misconstrues Eighth Amendment jurisprudence and ignores the Law of the Case Doctrine"; (2) that the record demonstrates Plaintiffs have proven all four elements of a claim under *Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978).[5] (Dkt. 233, pp. 2-3.) The Court will address Plaintiffs' objections in turn.  Before doing so, a review of the appropriate legal framework for Plaintiffs' claim is necessary.

Plaintiffs bring their claim under 42 U.S.C. § 1983, the civil rights statute, which provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

42 U.S.C. § 1983.

"Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by

---

[5] Plaintiffs initially categorize four major challenges to the Report: (1) that it misconstrues Eighth Amendment jurisprudence and ignores the Law of the Case Doctrine; (2) that it contains numerous mistakes of fact; (3) that it fails to take into account eye-witness testimony of understaffing on May 4 and May 5, 2012; and (4) that it fails to construe the evidence in the light most favorable to Plaintiffs.  (Dkt. 233, pp. 2-3.) Because Plaintiffs' second, third, and fourth challenges each involve their ability to successfully establish a § 1983 claim, the Court will consider them together.

state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citing *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 978 (9th Cir. 2004)).  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights."  *Id*. (citation omitted).  To state a valid claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law.  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

Plaintiffs here allege an Eighth Amendment violation based on a failure to prevent harm.  The Eighth Amendment prohibition against "cruel and unusual punishment" imposes duties on prison officials to "take reasonable measures to guarantee the safety of inmates."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  In particular, "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'"  *Id*. at 833 (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).  While prison conditions may be "restrictive and even harsh. . . gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency."  *Farmer* at 833 (internal quotation marks, bracket and citations omitted).  Put simply, being violently assaulted in prison is not "'part of the penalty that criminal offenders pay for their offenses against society.'"  *Id*. (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

However, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for a victim's safety.

7

*Id*. at 834.  For an inmate to succeed on a claim based on a failure to prevent harm, he must show (1) that he was incarcerated under conditions posing a substantial risk of serious harm; and (2) that the prison official was "deliberately indifferent" to inmate health or safety.  *Id*.  The first element of the test is objective.  *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834).  The second element, deliberate indifference, is a subjective test in that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Id*. at 838.  Thus, if a "person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk."  *Gibson v. Cnty. of Washoe, Nev*., 290 F.3d 1175, 1188 (9th Cir. 2002) (citation omitted).  "But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's . . . needs on the basis of either his action or his inaction."  *Id*. (citing *Farmer*, 511 U.S. at 842).

Where, as here, an inmate claims a private prison has violated the inmate's constitutional rights, the plaintiff must also meet the test articulated in *Monell v. Dep't of Soc. Services*, 436 U.S. 658, 691-94 (1978).  *See also Tsao v. Desert Palace, Inc*., 698 F.3d 1128, 1138-39 (9th Cir. 2012) (applying *Monell* to private entities performing state functions).  Under *Monell*, a municipality is subject to liability under § 1983 if it is alleged "to have caused a constitutional tort through 'a policy, statement, ordinance,

regulation, or decision officially adopted and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik*. 485 U.S. 112, 121 (1988) (quoting *Monell*, 436 U.S. at 690). To meet this test, Plaintiffs must go beyond the respondeat superior theory of liability and demonstrate the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the action of the municipality, and not on the actions of the employees of the municipality.[6] *See Connick v. Thompson*, 536 U.S. 51, 60 (2011).  The Supreme Court has emphasized that "[w]here a plaintiff claims that the municipality . . . has caused an employee to [violate a plaintiff's constitutional rights], rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

"Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 536 U.S. at 61.  Absent a formal governmental policy, a plaintiff must show a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  "[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a

---

[6] Like the Report, the Court here refers to the generally accepted test for municipalities or "local governmental entities" for purposes of the analysis and readability.  Although CCA is not a municipality, *Monell* applies to it as a private entity performing state functions.  *Tsao*, 698 F.3d at 1138.  Thus, where the term municipality is used, the Court intends for the reference to apply to CCA.

municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Brown*, 520 U.S. at 404 (citing *Monell*, 436 U.S. at 690-91.)  In addition, a policy of inaction may be a municipal policy within the meaning of *Monell*. *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) ("[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights.").  However, liability of an allegedly improper custom or policy may not be predicated upon isolated or sporadic events; rather, "it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918 (citations omitted).

In sum, the requisite elements of a § 1983 policy-based claim against a municipality are the following: (1) the plaintiff was deprived of a constitutional right[7]; (2) the defendant had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001) (citing *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835

---

[7] The first element incorporates the test for an Eighth Amendment failure to prevent harm claim.  In other words, in order to show they were deprived of their constitutional right against cruel and unusual punishment, Plaintiffs must show (1) that they were incarcerated under conditions posing a substantial risk of serious harm (the "objective" element); and (2) that prison officials were deliberately indifferent to a substantial risk of serious harm (the "subjective" element).  *Farmer*, 511 U.S. at 834.

(9th Cir. 1996)).  With this framework in mind, the Court turns to Plaintiffs' objections to the Report.

### 1.  Eighth Amendment Jurisprudence and Law of the Case

Plaintiffs first fault the Report for purportedly ignoring this Court's decision denying Defendant's Motion to Dismiss at an earlier stage of this proceeding.  (Dkt. 233, pp. 5-8.)  Shortly after Plaintiffs filed their First Amended Complaint (Dkt. 14) in 2013, Defendant filed a Motion to Dismiss for Failure to State a Claim and Failure to Exhaust Administrative Remedies.[8]  (Dkt. 19.)  In denying Defendant's Motion to Dismiss for Failure to State a Claim, this Court held Plaintiffs had sufficiently stated a plausible *Monell* claim by alleging that Defendant maintained a policy or custom of (1) participating in a "ghost worker" scheme resulting in fewer correctional officers and thus contributing to danger in the prison, and (2) housing prison gang members together in the same unit.  (Dkt. 54, pp. 6-7.)

In so holding, this Court cited *Farmer* for the proposition that a prison official may not ignore a threat of violence even if he does not perceive it as likely.  (Dkt. 54, p. 8) (citing *Farmer*, 511 U.S. at 833) ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the claimant was especially likely to be

---

[8] Although the exhaustion element of Defendant's Motion to Dismiss was successful with respect to former Plaintiffs Omar Castillon and Justin Peterson, it is not relevant to either the Report or Plaintiffs' objections and will not be further discussed here.

assaulted by a specific prisoner who eventually committed the assault.").  This Court also

concluded evidence of a longstanding custom may be introduced to support Plaintiffs'

claim, including evidence of understaffing and gang clustering dating back to 2008,

noting:  "Although Defendant contends that Plaintiffs' attack in May 2012 is too far

removed from the IDOC's 2008 investigation, the allegation that gang members were still

being housed on the same walk at the time of the attack raises a plausible inference that

CCA had not resolved the problems identified by the IDOC years earlier."  (Dkt. 54, p.

8.)  This Court also held the attackers' actions should not be construed as a superseding

cause, and the allegations that CCA had been indifferent to the mere threat of violence

can constitute a proper *Monell* claim, stating:

> Defendant appears to suggest that however dangerous the pod might have been,
> the attackers' independent actions constituted a superseding cause eliminating any
> § 1983 claim.  This argument illustrates a fundamental misunderstanding of
> § 1983 jurisprudence.  Claims that a prison policy amounts to deliberate
> indifference 'to the threat of serious harm of injury' by one prisoner against
> another are cognizable under § 1983.

(Dkt. 54, p. 11) (quoting *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986)).

Plaintiffs criticize the Report for purportedly departing from the aforementioned

analysis and holding, "[p]laintiffs fail to explain how the actual staffing pattern on May 5,

2012, in the DEF unit caused Plaintiff's injuries[.]" (Dkt 231, p. 43.)  Plaintiffs argue the

"threat" of serious harm or injury is enough to claim an Eighth Amendment violation

under *Farmer* and this Court's order denying Defendant's Motion to Dismiss, and that

they thus need not explain how the staffing pattern on the date of their attack caused their

injuries.  (Dkt. 233, p. 6.)  As such, Plaintiffs claim the Report violates the "law of the

case" doctrine, which provides a "court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 146 F.3d 1088, 1093 (9th Cir. 1998) (internal quotation marks and citation omitted).

Plaintiffs' argument is unavailing. First, the law of the case doctrine does not apply where, as here, two different standards of review apply to the relevant Court orders. *See, e.g., Stagl v. Delta Airlines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997) (law of the case does not apply where the procedural posture changes the nature of the issue). Specifically, at the motion to dismiss stage, the parties had yet to present evidence and this Court was confined to the allegations in Plaintiffs' complaint. The issue before this Court at the motion to dismiss stage was solely whether Plaintiffs' complaint, accepted as true, contained sufficient factual matter to "state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). By contrast, at the summary judgment stage, Judge Dale was charged with applying the law to the facts and evidence to determine whether Plaintiffs established a genuine issue of material fact sufficient to withstand summary judgment. In finding the facts and evidence failed to establish a genuine dispute of material fact, Judge Dale did not contradict this Court's holding with respect to Plaintiffs' ability to satisfy the lesser standard required for stating a plausible claim at the pleading stage.

Second, the Report did not depart from this Court's recitation of the law with respect to a successful § 1983 claim. The Report's explanation of the law is consistent with, but more detailed than, this Court's analysis of the law in the order denying the

Motion to Dismiss.  Both this Court and Judge Dale highlighted that a successful *Monell* claim requires a plaintiff to prove "the policy or custom is a moving force behind the constitutional violation."  (*Compare* Dkt. 54, pp. 5-6 *with* Dkt. 231, pp. 39, 41-42, 46-49, 55.)  Although this Court held Plaintiffs' theory that Defendant created a substantial risk of serious harm by instituting and maintaining a policy or custom of placing too few guards on duty and of housing prison gang members in the same area was plausible, Judge Dale determined the evidence did not establish such alleged policies were the moving force behind Plaintiffs' injury.  Although, as will be further discussed, this Court disagrees with some of Judge Dale's factual findings regarding causation, the Report's legal analysis is consistent with both this Court's decision denying the Motion to Dismiss and with cases interpreting the *Monell* causation element.  *See, e.g., Mabe*, 237 F.3d at 1110-11; *Thomas v. Baca*, 514 F.Supp.2d 1201, 1206 (C.D. Cal. 2007) (noting that the custom must be the "moving force" behind a plaintiff's constitutional injuries, which requires the plaintiff to establish that the custom is "closely related to the ultimate injury," and that the injury "would have been avoided had proper policies been implemented."); *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006).

Similarly, Plaintiffs claim the Report contradicts itself because it holds both that the "first objective component of an Eighth Amendment violation is met if the inmate shows that 'he is incarcerated under conditions posing a substantial risk of serious harm…" and that "Plaintiffs fail to explain how the actual staffing pattern on May 5, 2012 in the DEF unit caused Plaintiffs' injuries…."  (Dkt. 233, p. 6) (internal brackets, quotation marks and emphasis omitted) (citing Dkt. 231, pp. 34, 43.)  Plaintiffs posit,

14

"[i]f the Plaintiffs only need to demonstrate conditions posing a substantial risk of serious harm, then the Plaintiffs do not need to explain how the staffing pattern on a particular date caused their injuries.  The 'threat' of serious harm or injury is enough to claim an Eighth Amendment violation."  (*Id.*)  In making this argument, Plaintiffs conflate the test for an Eighth Amendment violation with that of a successful *Monell* claim.  To establish liability under *Monell*, a causal link between the alleged constitutional violation and the policy or custom is necessary.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.").  The Report did not err in so holding.

Finally, Plaintiffs challenge the Report's reliance on *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010) when this Court determined *Clouthier* was inapposite in deciding the Motion to Dismiss.  As Defendant notes, Plaintiffs misconstrue this Court's order, which simply found *Clouthier*—an appeal from summary judgment— immaterial at the motion to dismiss stage.  (Dkt. 235, pp. 3-4.)  *Clouthier* remains good law for purposes of summary judgment and the Report.[9]

_____

[9] In the Order denying Defendant's Motion to Dismiss, this Court also distinguished *Clouthier* because "Plaintiffs do not base their claims solely on their allegation that a final policymaker approved the decision to move them into the gang-controlled walk.  They also assert that their constitutional rights were violated pursuant to 'an expressly adopted official policy [or] a long-standing practice or custom' of housing members of a gang together in the same walk, which made that housing unit particularly dangerous." (Dkt. 54, p. 10) (citing *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013)).  However, as will be further discussed, *infra*, given the evidence considered by Judge Dale and Plaintiffs' inability on summary judgment to distinguish (Continued)

### 2.  Plaintiffs' Ability to Meet Four Elements of the *Monell* Test

Plaintiffs claim Defendant's alleged policies of understaffing and clustering gang members together both satisfy the four-prong *Monell* test used to evaluate Plaintiff's Eighth Amendment claims.  The Court finds genuine issues of disputed material fact preclude summary judgment with respect to Plaintiffs' understaffing claim, but agrees with the Report's grant of summary judgment with respect to the gang clustering claim.

### a.  Understaffing

Knowledge of prison understaffing and a decision not to increase the number of guards on duty may amount to deliberate indifference to the safety and well-being of prison inmates, in violation of the Eighth Amendment.  *Edwards v. Gilbert*, 867 F.2d 1271, 1277 (11th Cir. 1989); *Anderson v. City of Atlanta*, 778 F.2d 678, 685 (11th Cir. 1985).  Understaffing of correctional officers increases the risk of inmate on inmate violence.  *Miles v. Wilkinson*, 2013 WL 5592412, at *5 (W.D. La. 2013).  To prevail, Plaintiffs must prove Defendant had a policy of deliberate indifference to the risk of understaffing and that this policy caused their injuries.  *Greason v. Kemp*, 891 F.2d 829, 838 (11th Cir. 1990).  When understaffing appears to have contributed to a violation of an inmate's Eighth Amendment rights, a causal link exists between that violation and the

---

persuasive authority finding gang clustering does not establish a per se Eighth Amendment violation, the Court agrees with the Report's holding with respect to Plaintiffs' gang clustering theory, and finds summary judgment was appropriate with respect to this claim.

prison's policy if officials are aware of the staffing problem but fail to take corrective action.  *Id*. at 837 n. 18.

As the Report noted, prison staffing is generally understood in concert with overcrowding, and a corresponding increase in inmate violence.  (Dkt. 231, p. 42.)  For example, if there is an increase in population without a corresponding increase in staff, "it is inevitable that some violence will occur because there are too few officers to observe and protect too many inmates."  *Capps v. Atiyeh*, 559 F.Supp. 894, 904 (D. Or. 1983). The State is "deliberately indifferent to inmate safety if it crowds more inmates into an institution than it can adequately supervise."  *Id*. at 903.  Courts generally look at the level of violence, and whether it is high enough to warrant an inference that the state, or here, CCA, is deliberately indifferent to inmate safety when understaffing is an issue. *Id*. at 904; *Balla v. Idaho State Bd. of Corrections*, 595 F.Supp. 1558, 1578 (D. Idaho 1984) (finding understaffing and overcrowding to be one of the principal causes of violence at the Idaho State Correctional Institution).

Plaintiffs contend CCA had a policy of understaffing that amounted to deliberate indifference to their constitutional rights, and that this policy or custom was the moving force behind the violent attack on May 5, 2012.  To establish a deliberately indifferent policy of understaffing, Plaintiffs highlight a settlement agreement entered into in *Kelly et al v. Wengler et al*, 1:11-cv-00185-EJL, in September of 2011.  Plaintiffs in the *Kelly* case alleged constitutional violations at ICC because of high levels of inmate-on-inmate violence, inadequate staffing and training, inadequate investigation of assaults, and various other defaults.  Among other things, the *Kelly* Settlement Agreement (hereinafter

"*Kelly* Agreement") required ICC to maintain minimum staffing levels. CCA was to comply with the staffing pattern pursuant to CCA's contract with IDOC, and increase the staffing pattern to include a minimum of three additional correctional officers to be utilized at the discretion of the Warden to enhance the overall security of the facility. (Dkt. 14-9, p. 1.)

Two years after the *Kelly* Agreement was entered into, Judge David O. Carter[10] held a show cause hearing to determine whether CCA had breached it. The show cause hearing was held after CCA issued a press release, on April 11, 2013, announcing that it had "concluded an extensive internal investigation" and found there were "some inaccuracies" in staffing records over a seven-month period. (*Kelly v. Wengler*, 1:11-cv-185-EJL, Dkt. 76, p. 3.) Specifically, CCA determined there were approximately 4,800 hours from April through October 2012 where records indicated a correctional officer was staffing a security post but the post was actually vacant. (*Id*.)

After conducting the contempt hearing, Judge Carter held CCA and ICC Warden Timothy Wengler in civil contempt and breach of the *Kelly* Agreement. (*Id.*, p. 23.) In so holding, Judge Carter made a number of findings regarding understaffing at ICC, including that CCA and Warden Wengler had "ample" notice of several signs of staffing shortages during the period of time between the September 2011 *Kelly* Agreement and

---

[10] Judge Carter sits in Idaho by special designation and the *Kelly* case was referred to him for the purpose of conducting a settlement conference. (1:11-cv-185-EJL, Dkt. 16.) By virtue of the *Kelly* Agreement, Judge Carter was given authority to resolve disputes about compliance with the Agreement in his capacity as a federal district court judge.

2013 show cause hearing.  (*Id.*, p. 10.)  For instance, Warden Wengler testified at the contempt hearing that using supervisors and case managers as floor officers—a practice flagged in the *Kelly* Agreement as "unacceptable"—had to be done two to three times per week following the settlement.[11]  (*Id.*)  Judge Carter found CCA "regularly fell short of their obligation to staff positions that are mandatory under their contract with [IDOC]." (*Id.*, p. 2.)

Further, Judge Carter noted the 4,800 missing hour tally CCA reported only reflected an examination of night shift records, and not numbers from any review of the day shift.  (*Id.*, p. 7.)  According to testimony from CCA's assistant general counsel during the contempt hearing, hundreds of additional undocumented hours were found during day shifts within the seven month period.  (*Id.*, p. 11.)  Judge Carter also recounted testimony from two former ICC employees stating mandatory posts were regularly unmanned, and that such violations were frequently raised to supervisors, including to ICC Assistant Warden Thomas Kessler.  For example, former ICC corrections supervisor Annette Mullen, who worked at times in the DEF unit, "testified credibly that she saw regular, glaring absences in 2012, and complained frequently to her superiors to try to fix the problem."  (*Id.*, p. 12.)  Mullen testified that she went up the chain of command when submitting her complaints, including to assistant warden

---

[11] Using supervisors and case managers as floor officers posed a security problem because the former were not trained as correctional officers and were more likely to have a social work background and education.  (*Id.*, at 8, n. 7.)  Case managers were also likely to have other duties that would distract them from following security protocol.  (*Id.* at 8); *see also* 1:12-cv-00559-EJL, Dkt. 188-2, ¶ 8.)

Kesller.  (*Id*.)  Mullen stated staffing shortages were common knowledge at the prison.

(*Id*.)

Judge Carter also highlighted evidence establishing "[f]acility senior management,

including the Warden and Assistant Wardens, were aware of acute personnel shortages in

the spring, summer and fall of 2012."  (*Id*., p. 15.)  When questioned during the show

cause hearing whether he met the expectations of his job when it came to filling

mandatory staffing posts, Warden Wengler responded, "to the extent of going back and

checking more often on the people that were responsible for it, no."[12]  (*Id*.)  Plaintiffs

suggest Judge Carter's order finding CCA in contempt of the *Kelly* Agreement is

evidence of a policy of understaffing the Report failed to credit.  (Dkt. 233, p. 9.)

The Report determined Plaintiffs' reliance on *Kelly* and its findings was improper

and insufficient to create a triable issue of fact.  (Dkt. 231, pp. 44-45.)  Judge Dale held

the evidence in *Kelly* was unpersuasive both because it involved violence in the North

and West wings of ICC, as opposed to the close-security DEF unit, and because it

focused on violence occurring at ICC during the five years prior to the filing of the *Kelly*

complaint in February 2011.  Judge Dale explained:

> [T]he settlement in *Kelly* was reached on September 20, 2011.  In contrast, the
> DEF pod did not begin operations until 2009, and the attack on Plaintiffs occurred
> on May 5, 2012, after the *Kelly* [Agreement] had been approved and the Court
> began monitoring conditions at ICC in an attempt to rectify the violence.  Thus,
> the comparison is not only factually distinct, there is a temporal disconnect

---

[12] In other portions of his testimony, Warden Wengler admitted that he bore a
portion of the responsibility for staffing shortages.  (*Id*., p. 15, n. 21.)

between the violence that existed prior to the filing of the *Kelly* complaint and the attack that occurred here.

(*Id.*)

Although the Court agrees the evidence used to support understaffing in the *Kelly* complaint is questionable given the timing of the complaint and generality of allegations involving ICC as a whole, rather than the DEF unit, it finds the evidence highlighted by Judge Carter in his Order finding CCA and Warden Wengler in civil contempt of the *Kelly* Agreement creates a triable issue of fact in this matter. Significantly, the evidence of massive understaffing CCA itself reported in April 2013 involved the specific time period of the attack on Plaintiffs.  Between April and October of 2012, CCA identified nearly 4,800 unmanned hours at ICC during night shifts alone. As will be further discussed, Plaintiffs allege their attack was possible because an offender was left unsupervised during the night shift on May 4, 2012.  Due to insufficient staff on May 4, 2012, Plaintiffs allege Offender Campos was able to rig the janitor's closet door and then communicate with the aggressors. (Dkt. 233, p. 13.)  There is no temporal disconnect between the violence that existed at the time of Judge Carter's contempt order and the attack that occurred in this case.

The Report also faults Plaintiffs for relying on violence statistics used by plaintiffs in *Kelly*, noting such statistics are unpersuasive here because they involved the prison as a whole, and did not concentrate on the DEF unit itself, a close custody unit with completely different conditions than ICC's general population.  (Dkt. 231, p. 43.) However, Plaintiffs cite evidence in the record suggesting DEF had a history of being

twice as violent as the rest of the prison.  (Dkt. 188-1, ¶ 40.)  In February 2012, CCA's

violence goal was to reduce violence in the DEF unit to 44.1 violent incidents per year,

almost 300% higher than any other unit.  (*Id*.; *see also* Dkt. 190, p. 46.)[13]  The Report's

conclusion that there is no statistical analysis concentrating on violence in the DEF unit

itself does not address such evidence.  (Dkt. 233, p. 43.)  There is also testimony from

multiple witnesses in this case regarding prolific violence and inability to enforce rules

within the DEF unit.  (*See, e.g*., Dkt. 188-2, Ex. 1, ¶¶ 8-10, 19-20, 25-26; Ex. 2, ¶8; Ex. 5,

p. 41; Ex. 6, pp. 53-54.)

Evidence from the *Kelly* contempt proceedings involves the specific time period

and, in some cases, unit, of Plaintiffs' assault and is relevant to Plaintiffs' understaffing

claim.  In light of Judge Carter's finding of pervasive understaffing in the years following

---

[13] This citation is to notes from an ICC February 1, 2012 Weekly Captain/Unit
Management Meeting.  ICC had monthly meetings with all managerial staff, including
unit managers, the warden, assistant wardens, and managers of other departments in the
facility.  (Dkt. 188-2, pp. 44-45.)  In the February 2012 notes, unit managers are
encourage to share the following violent incident per year goal numbers with their staff:

BC unit/goal 9.9

JKL unit/goal 17.81

DEF unit/goal 44.1

GHI unit/goal 5.85

PIE unit/goal 3.6

M-R unit/goal 12.6

S-X unit/goal 17.55

(Dkt. 190, p. 46.)

the *Kelly* settlement, especially during the specific time period of the instant attack, the Court cannot agree with the Report's conclusion that understaffing at ICC was resolved by virtue of the *Kelly* settlement.  (Dkt. 231, p. 42.)  In addition, Plaintiffs do not rely entirely on the *Kelly* evidence to support their claim that CCA had a pervasive policy of understaffing.

In support of their understaffing claim, Plaintiffs also cite sworn testimony from ICC's former Chief of Security Shane Jepsen ("Jepsen").  (Dkt. 233, p. 9) (citing Dkt. 143-16.)  Jepsen worked at the ICC facility from 2008 to 2013.  (Dkt. 143-16, ¶ 2.)  Jepsen stated that throughout 2010, 2011 and 2012, there was a constant staffing shortage at ICC, and that it was common that as many as 17 positions on a daily schedule could not be filled in advance due to an insufficient number of employees.  (*Id.*, ¶¶ 5-6.)  Jepsen noted:

> Around May 2012, it became widely known at ICC that the administration had difficulties in staffing positions when the staffing schedule came out one week in advance due to the number of vacancies on the staffing roster.  This was widely known because ICC/CCA had to institute mandatory overtime….  Daily requests to work overtime often turned into directives given at the last minute, frequently with the threat that refusing to work overtime would result in a Problem Solving Notice (PSN), which was essentially a disciplinary action for staff.  Warden Wengler and Assistant Warden Kessler even instituted an overtime policy requiring that staff trained for security posts, but were not assigned to a housing unit, to give up one of their two days off each week to work overtime.  The overtime policy was very unpopular with staff…. Typically correctional officers were being required to work 16 hour shifts rather than the 12 hours they were scheduled.

(*Id.*, ¶¶ 11-12.)

Jepsen also testified that he informed CCA Managing Director Kevin Myers and Warden Wengler in September 2011 that there were not enough staff to fill the gaps in

shift rosters that occurred daily at the ICC facility.  Jespsen stated Myers responded that he had "heard enough about staffing issues," and that Jepsen should just "deal with it" because staffing would not be increased.  (*Id.*, ¶ 33.)

The Report addressed Jepsen's testimony, but concluded it was insufficient to create a triable issue of material fact because Jepsen did not testify as to the specific staffing of the DEF unit.  (Dkt. 231, p. 43 n. 23) (noting Jepsen indicated that "in general" it was common in 2010, 2011, and 2012 that 17 positions could not be filled, but failed to identify which positions and where, and that Jepsen indicated that in 2010 and 2011 IDOC contract monitors "expressed concern" about the level of staffing, but failed to set forth specific facts.)  However, Jepsen's testimony is also corroborated by various employees who specifically worked in the DEF unit during the time of the attack.  In addition, the Report does not address Jepsen's claim that he repeatedly advised Wengler and CCA's Managing Director Kevin Myers that there were not enough staff to fill daily gaps in shift rosters at ICC, and that he was told that staffing would not be increased despite such gaps.  (Dkt. 143-16, ¶ 33.)  Although not alone sufficient to create a triable issue of fact, the Court finds Jepsen's testimony supports Plaintiffs' claim of a policy of understaffing at ICC.

Jerry Sharp served as Shift Sergeant in the DEF unit from September of 2011 until his termination in January of 2014.  (Dkt. 183-1, p. 9, ¶ 6.)  Sharp submitted a sworn affidavit stating during his time as Shift Sergeant in DEF, his detail "was consistently understaffed to the point where staff were not properly supervised and often had to take unnecessary risks in order to do their job properly."  (*Id.*, ¶ 7.)  Sharp indicated he

informed Assistant Warden Kessler on multiple occasions between September of 2011 and June of 2012 that not enough staff was being allocated to DEF to properly fill that unit's posts.  (*Id.*, p. 11, ¶ 13.)  Like Jepsen, Sharp states he was advised to just do what he could with the resources he had.  (*Id.*)

In addition, DEF Pod Control Officer Jacob Mills submitted sworn testimony affirming CCA frequently used "ghost officers" to cover shift vacancies within the facility.  (Dkt. 143-9, ¶ 9.)  Mills stated the term "officer ghost" and "ghost officer" were used by CCA employees to refer to a post that was unoccupied due to a shift vacancy, and that, on numerous occasions throughout his employment, CCA employees informed him that "officer ghost" had been assigned to watch the crash gates within the facility or to cover other vacancies.  (*Id.*, ¶¶ 10-12.)

Similarly, Sergeant Garth Carrick, the first responder when the May 5, 2012 attack occurred, submitted an affidavit stating it was "common occurrence during 2010, 2011 and 2012" for multiple posts to be left vacant in the prison and specifically in the DEF unit.  (Dkt. 143-15, ¶¶ 11, 16.)  Carrick stated this "regular understaffing required the security staff that was present to abandon important security protocol just to keep up with the schedule.  Essentially many of the ICC employees were required to do the work of two or more people."  (*Id.*, ¶ 16.)  Like Jepsen and Mills, Carrick stated understaffing was common knowledge amongst administrative staff, including Warden Wengler, and that he was just told to make it work when he reported understaffing.  (*Id.*, ¶¶ 20, 21.)

Correctional officer Dustyn Skogsberg, the only officer present in the F1 pod when Plaintiffs were attacked, submitted an affidavit stating, "[t]he correctional officers I

worked with did the best they could with the resources they had, but these resources were

simply insufficient.  The correctional officers were typically very tired because of

mandatory overtime.  I made these problems known to my supervisors, but no changes

were made in the level of staffing."  (Dkt. 188-2, Ex. 1, ¶ 10).  Skogsberg further

testified:

> I often worked nights on DEF and the prison was always understaffed after 9:30
> pm (and often earlier) making it difficult to supervise offenders working as
> janitors.  Correctional officers were often extremely tired due to the mandatory
> overtime meaning that the posts that were 'manned' were not always manned by
> correctional officers that were alert and prepared for the risks that existed in a
> prison environment.
>
> Although I frequently worked the night shift within the DEF unit, I never observed
> a cell search conducted during the night shift.  The DEF Unit would typically have
> four and sometimes fewer officers on duty during the night shift.  This low
> number of staff scheduled to work the DEF night shift would make it impossible
> to conduct a proper cell search at night.  This was exacerbated by the fact that
> many other posts within the prison were left vacant at night.  For instance the
> utility posts were often vacant.  Correctional officers within DEF would be called
> off the unit to man the crash gates within the prison if a movement of inmates was
> taking place.  During these times, there was nobody to relieve me from my post, so
> even fewer correctional officers were present much of the time.  Similar vacancies
> were caused by lunch or bathroom breaks, also without any relief for correctional
> officers who left posts for these reasons.  This also occurred during day shifts.

(Dkt. 188-2, Ex. 2, ¶¶ 22-23.)

Finally, Plaintiffs also argued on summary judgment that an identical attack which

occurred eleven months earlier in the DEF unit evidenced a policy of understaffing and

deliberate indifference on the part of prison officials.  Specifically, on June 14, 2011, a

group of Norteño gang members hid in the janitor closet in DEF pod and avoided

detection by staff, who believed the Norteños had been re-secured in their cells.  (Dkt.

188-2, Ex. 11, p. 73.)  When the next walk of inmates was released out into the housing

unit, the Norteño inmates sprung from inside the janitor's closet and attacked "Gangster Disciple" inmates with their fists.  (*Id.*, p. 74.)

In conjunction with the evidence of pervasive understaffing at the time of the attack and of Warden Wengler and Assistant Warden Kessler's knowledge of such understaffing cited in the *Kelly* contempt hearing, and throughout the record in this case, as well as officials' refusal to correct the problem despite: (1) repeated complaints by staff; (2) violence within the DEF unit; and (3) the June 14, 2011 attack, the Court finds Plaintiffs have established an Eighth Amendment violation for purposes of summary judgment with respect to their understaffing claim.  The evidence is sufficient to find Plaintiffs were incarcerated under conditions imposing a substantial risk of harm, and that Defendant was both objectively and subjectively aware of this risk but chose not to alleviate understaffing.

The evidence is also sufficient to create a triable issue with respect to municipal liability, as a policy of omission may be based on a failure to implement procedural safeguards to prevent constitutional violations.  *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (citing *City of Canton v. Harris*, 489 U.S. 378, 396 (1989)).  In *Canton*, the Court recognized "a high degree of fault on the part of city officials" is required "before an omission that is not itself unconstitutional can support liability as a municipal policy under *Monell*."  489 U.S. at 396.  However, the Court determined when a § 1983 plaintiff "can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied."

*Id.* For it is only then that it "can be said that the municipality has made "'a deliberate choice to follow a course of action…among various alternatives.'" [14] *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484 (1986)). CCA's persistent understaffing, its awareness that such policy was insufficient to protect inmates due to repeated warnings by various employees, violence within the DEF unit, and a similar inmate attack mere months before the attack on Plaintiffs, its contractual agreement to change its policies in *Kelly*, and CCA's blatant failure to address the problem despite such circumstances, establishes for purposes of summary judgment that CCA had a policy of deliberate indifference to the safety and well-being of prison inmates, in violation of the Eight Amendment. In sum, the Court finds Plaintiffs submitted sufficient evidence to withstand summary judgment on the first through third elements of a *Monell* claim. [15]

---

[14] Plaintiffs claim subjective knowledge is not necessary to establish an Eighth Amendment violation, and argue *Canton* holds only actual or constructive notice is required. (Dkt. 233, p. 7.) As the Court in *Farmer* was careful to highlight, *Canton's* test for deliberate indifference involved whether a municipality can be subject to *Monell* liability based on a policy of omission, such as failure to train. 511 U.S. at 840 (citing *Canton*, 489 U.S. at 390). As the *Farmer* Court held, "*Canton's* objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment…. Section 1983, which merely provides a cause of action, 'contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right.'" *Id.* at 841. While the "deliberate indifference" required to establish an Eighth Amendment violation is both objective and subjective, the "deliberate indifference" required to establish municipal liability requires only actual or constructive knowledge. *Id.*

[15] Plaintiffs also suggest a letter from the State of Idaho put CCA on notice of understaffing at ICC in 2010. (Dkt. 233, p. 9) (citing Dkt. 110-5). Specifically, a security staffing assessment was conducted at ICC to determine contract compliance. (Dkt. 110-5, p. 1.) The assessment reviewed daily schedules between June and August 2010, and revealed repeated instances where officers were posted to multiple posts at the (Continued)

### 1. Causation

After considering Plaintiffs' evidence of understaffing, the Report holds, even crediting such evidence, "Plaintiffs fail to explain how the actual staffing pattern on May 5, 2012 in the DEF unit caused Plaintiffs' injuries, other than speculating that more staff or a different makeup of staff would have prevented it." (Dkt. 231, p. 43.) Critically, despite the evidence of frequent understaffing in DEF, the facts established the unit had more officers than contractually required during the May 5, 2012 attack on Plaintiffs. (*Id.*, pp. 46-47.) According to IDOC Deputy Warden Tim Higgins, the contract between IDOC and ICC specified the minimum staffing for the DEF pod required a pod control officer and four floor officers. Eight staff members were on duty in the DEF unit the day of the attack, and at the precise time of the attack, seven staff members were present. (Dkt. 231, pp. 46-47.) In light of such staffing, the Report concluded, "Plaintiffs have failed to articulate how CCA's alleged policy of understaffing, when CCA on the day of the attack had more officers than the one pod control and four floor officers contractually required, caused the injuries of which they now complain." (*Id.*, p. 47) (citing *Batista v. Columbia Cnty.*, 2013 WL 5675214, *5 (D. Or. 2013) (denying summary judgment on a

---

same time, demonstrating mandatory security staff requirements were not fulfilled. The assessment also revealed eleven instances where a post in the DEF pod was not filled during the night shift. (*Id.*, p. 2.) Although the Report does not specifically address this letter, the Court finds, like the evidence filed in support of the *Kelly* complaint (as opposed to the evidence in support of the *Kelly* contempt order) that evidence of understaffing in 2010 is too far removed from Plaintiffs' claim to establish a genuine issue of material fact.

*Monell* understaffing claim when the evidence indicated that, at time of attack, the jail's

staffing exceeded minimum standards set forth under jail policy).

Plaintiffs dispute several of the Report's factual findings with respect to the

number of staff on duty at the time of the attack, and also contend the contractually

mandated minimum number of staff was insufficient to protect Plaintiffs' constitutional

rights given the pervasively dangerous conditions in the DEF unit.  (Dkt. 233, pp. 10-11,

14-15.)  The Court need not address such arguments because it finds there is sufficient

evidence to withstand summary judgment on Plaintiffs' claim that understaffing on May

4, 2012 was the moving force behind the attack.

Plaintiffs allege understaffing on the day prior to the attack, May 4, 2012, allowed

an inmate to rig the lock on the janitor closet door.  The Report discounts this theory,

stating, "Plaintiffs argue that Campos, the inmate who rigged the door, was

'unsupervised,' suggesting staffing should be a 1:1 ratio for all inmates to be

'supervised.'  The Constitution does not require 'supervision' of that nature."  (Dkt. 231,

p. 47.)  However, as Plaintiffs respond, IDOC mandated a "Direct Supervision" model,

which required that when an inmate was out of his cell, a correctional officer must be in

the same room as the inmate.  (Dkt. 233, p. 13.)  Plaintiffs offer eyewitness testimony to

support their claim that understaffing the night before the attack prevented the direct

supervision of Offender Campos, thus allowing him to rig the janitor's closet.

For instance, Sergeant Carrick viewed footage from the F1 pod the night of May 4,

2012 and created a Disciplinary Offense Report for Offender Campos for rigging the

30

janitor closet door.[16]  (Dkt. 124, p. 4.)  Upon viewing such footage, Carrick noted

Campos could be seen rigging the door and then communicating with the aggressors the

night before the attack, and concluded Campos' actions were "designed to support and

enable the violent actions the next day."  (*Id.*)  Carrick also stated Campos was "a

verified member of the STG group Sureños, which has a long documented history of

working with the Aryan Knights."  (*Id.*)

Officer Mills, who was posted to work Pod Control within the DEF unit on the

night of May 4, 2012, stated he had to leave his post in DEF Pod Control throughout his

shift to cover other DEF posts.  (Dkt. 143-9, ¶ 14.)  Mills confirmed, "neither I, nor any

other officers on duty during the second shift on May 4, 2012, directly supervised

Offender Campos when he accessed the janitor's closet on the F1 pod."  (*Id.*, ¶ 20.)  Mills

also stated, "I recall DEF did not have enough staff to provide uninterrupted and direct

supervision of offenders during the second shift on May 4, 2012.  DEF only had enough

staff to conduct the watch tours, but not enough staff to supervise the housing units.  The

three floor officers posted within DEF during the second shift on May 4, 2012 could not

adequately provide enough supervision of the unit."  (*Id.*, ¶ 21.)  A reasonable juror could

conclude the lack of staffing on the night of May 4, 2012 was the "moving force" behind

Plaintiffs' attack.  The testimony of Carrick and Mills regarding the lack of supervision

the night of May 4, 2012, particularly when coupled with all of the evidence of frequent

---

[16] CCA did not preserve this video footage after determining it was not relevant to
an investigation.

understaffing in the DEF unit in May of 2012, especially during the night shift, is sufficient to establish causation at the summary judgment stage.

The Report ultimately concluded that, even if the DEF unit was understaffed on May 4, 2012, the "abundance of staff on May 5, 2012, more than alleviates the prior day's alleged understaffing that somehow allowed Campos to rig the closet door."  (Dkt. 231, p. 47.)  The Report makes this finding because the video surveillance from the day of the attack purportedly shows the officers on duty in the F1 pod at the time of the attack negligently fulfilling their duties.  Specifically, Skogsberg checked the cell doors from which the aggressors exited, as well as the janitor's closet door, to ensure they were locked before allowing Plaintiffs out of their cells.  However, Skogsberg failed to actually open the doors to ensure all of the Delta walk inmates (the Aryan Knight attackers) had exited the building before signaling the release of the Charlie walk inmates (Plaintiffs).  In addition, Officer Blake Anderson, who was supervising the Delta walk inmates while they were outside in the recreation yard, failed to notice that six of the sixteen Delta walk inmates were missing.  (Dkt. 231, pp. 48-49.)  The Report concluded no amount of officers would "have reversed the critical errors made by the two officers responsible for the movement of the sixteen Delta walk inmates on the morning of May 5, 2012.  Nor would the persistent understaffing that Plaintiffs claim existed in the years leading up to the May 5, 2012 attack have changed or altered the mistakes made by the officers responsible for prisoner movement on May 5, 2012."  (*Id.*, p. 49.)

The Court respectfully disagrees given the evidence Plaintiffs have submitted of understaffing on May 4, 2012, when Offender Campos rigged the janitor's closet door.

Such evidence is at least sufficient to create a genuine issue of material fact.  A reasonable juror could find Campos' ability to rig the door due to a policy of understaffing—which allowed the Delta walk inmates to hide on May 5, 2012—was the moving force behind Plaintiffs' attack, regardless of any supposed negligence on behalf of Officers Skogsberg and Anderson.[17]  In ruling on summary judgment motions, all inferences must be drawn in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 253 (1986).  As the Ninth Circuit has held, if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  Absent Offender Campos' closet rigging on May 4, 2012, a reasonable juror could conclude the assailants would not have been able to attack Plaintiffs on the morning of May 5, 2012.  The Court accordingly rejects the Report's recommendation with respect to Plaintiffs' understaffing claim, and denies CCA's motion for summary judgment on this claim.

### b.  Gang clustering

There is no dispute that prison gangs or group of friendly inmates, like the Plaintiffs, were grouped together in their own walks within the DEF Unit.  However, the Report held Plaintiffs failed to address how the housing practice itself caused their

---

[17] The Court notes there is evidence in the record to suggest Anderson and Skogsberg were not negligent, but simply unable to perform all of their required duties due to persistent understaffing.  (*See, e.g.*, Dkts. 143-9; 143-15; 143-16; 188-2, Exhibit 1; 188-2, Exhibit 2.)

injuries, and also failed to distinguish persuasive authority of courts holding a policy of grouping gangs together is not a per se Eighth Amendment violation.  (Dkt. 231, p. 52.) The Report also held Plaintiffs' theory of gang clustering suffered from a lack of clarity, as, on summary judgment, Plaintiffs failed to address the succinct theory upon which they rested their claim for municipal liability.  (*Id*.)  The Report accordingly addressed each potential source of municipal liability: formal policy, policy maker, and ratification. (*Id*., pp. 52-69.)  The Report ultimately concluded Plaintiffs failed to establish municipal liability under any of the aforementioned avenues.

In their objections, Plaintiffs claim CCA had a longstanding custom of clustering gangs dating back to 2008, and that such custom explicitly violated IDOC's policy of dispersing gang members.  (Dkt. 233, pp. 9, 16-19.)  Plaintiffs note CCA's managing director knew about the gang clustering as early as 2010.  Plaintiffs point to a number of statements from CCA employees regarding the apparent "common knowledge" amongst staff that the Aryan Knights would try to attack Plaintiffs if they were moved into the F1 pod, as well as to a prison-wide survey which purportedly put CCA officials on notice of the impending danger faced by Plaintiffs as a result of their move into DEF.  (*Id*., pp. 12, 19.)  Plaintiffs also fault the Report for finding gang clustering was implemented by housing manager Norma Rodriguez, and instead claim the "record in fact demonstrates that gang clustering was implemented before Rodriguez became the Unit Manager for DEF."  (*Id*., p. 17.)

The aforementioned objections are each directed to the Report's finding with respect to the second through fourth elements of the *Monell* test for municipal liability.

However, Plaintiffs fail to address the first, crucial element of both *Monell* and of the Report's holding: Plaintiffs failed to establish a policy of gang clustering resulted in a violation of their Eighth Amendment rights.  (Dkt. 231, pp. 52, 55, 57-60.)  As the Report held, Plaintiffs' theory fails under several cases finding various housing policies, including policies of allowing inmates to choose their cell mates, of segregating gang members, or of allowing non-affiliated inmates to be housed with gang members, do not amount to deliberate indifference under the Eighth Amendment.

In *Washington v. LaPorte County Sheriff's Dept.*, 306 F.3d 515, 518 (7th Cir. 2002), the Seventh Circuit found an explicit policy allowing inmates to choose their cell mates did not satisfy the subjective nature of the deliberate indifference inquiry required under *Farmer*, 511 U.S. 825.  In *LaPorte*, 306 F.3d at 518, the plaintiff alleged allowing inmates to choose their cell mates created a high probability of inmate-on-inmate assault. The *LaPorte* court explained *Farmer* requires "actual knowledge of the risk," showing that prison guards were subjectively aware of a substantial risk that inmates might be harmed as a result of implementation of the policy.  *Id*.  The court held jail policy allowing inmates to choose their cell mates did not present such an obvious risk such that actual knowledge on the part of prison officials could be inferred. *Id*. at 519.

Similarly, in *Cotta v. County of Kings*, 79 F.Supp.3d 1148 (E.D. Cal. 2015), the court considered a claim involving a prisoner who was murdered when he was housed together with his co-defendant in a cell.  Although jail policy generally discouraged co-defendants from being housed together, neither did it prohibit housing co-defendants together.  Plaintiff alleged the jail lacked a policy to affirmatively gather evidence and

35

information concerning co-defendants' legal proceedings that may bear on the decision to house co-defendants together, and the jail lacked a policy to ensure communication of such information to housing authorities.  The *Cotta* court held housing co-defendants together did not in and of itself constitute deliberate indifference to inmates' security.  *Id.* at 1174.  Based on *LaPorte* and *Cotta*, the risk of injury posed by allowing inmates to choose their housing assignments is not such an obvious risk that CCA should have recognized the harm posed by implementation through such practice.

Moreover, the Ninth Circuit has explicitly rejected Eighth Amendment claims targeting prison policies related to housing rival gang members.  In *Nesbit v. Dept. of Public Safety*, 283 Fed.Appx. 531, 2008 WL 2490440 (9th Cir. 2008), like here, plaintiffs alleged their attacks were a foreseeable result of a prison housing policy that separated rival gang members from each other but housed unaffiliated inmates with gangs.  In an unpublished decision, the *Nesbit* court held Plaintiffs failed to demonstrate the housing policy itself amounted to deliberate indifference, "because nothing indicates that unaffiliated inmates were at a significantly greater risk of assault when housed with separated gang members."  283 Fed.Appx. at 534.  Although, as discussed above, there is evidence in the record to suggest there was more violence in the DEF unit than other units of the prison, there is insufficient evidence to establish such increased risk of violence was related to the unofficial policy of housing gang members together.  As the Report highlighted:

> [T]he Court here cannot conclude that housing gang members and non-affiliated groups together in the DEF Unit…inherently presented a substantial risk that a non-affiliated inmate would be physically assaulted or harmed as a consequence of

36

> the practice itself.  This is true given the physical layout and control over inmates in the DEF Unit—groups of 16 inmates were separated by walks and not allowed to intermingle either during their dayroom or recreation time…. The physical layout and movement pattern of inmates housed in the DEF Unit was such that inmate assaults of the nature experienced by Plaintiffs would be all but impossible, unless someone hid in the closet or the shower.

(Dkt. 231, p. 59.)

In *Labatad v. CCA*, 714 F.3d 1155, 1160 (9th Cir. 2013), plaintiff challenged both the prison's decision to house him in the same cell with a rival gang member, and the general policy that allowed rival gang members to be housed together.  In *Labatad*, the prison did not have a policy of segregating rival gang members in cell assignments, but instead considered gang affiliation as one factor in the case-by-case evaluations used to make cell assignments.  The Ninth Circuit upheld the district court's conclusion that the prison's policy permitting members of different gangs to be housed together was not itself an Eighth Amendment violation.  In so holding, the Court noted if the prison was required to separate gang members by gang affiliation, "among other problems, '[t]he number of gang members housed…and the high representation of certain gangs would place an unmanageable burden on prison administrators were they required to separate inmates by gangs."  *Id*. (quoting *Mayoral v. Sheahan*, 245 F.3d 934, 939 (7th Cir. 2001)). *See also Ellington v. E.S. Alameida*, 2010 WL 2650632, *14 (E.D. Cal. 2010) (holding "plaintiff has failed to present evidence or cite any authority establishing that housing a non-affiliated inmate in the same cell as a gang-affiliated inmate will inherently present 'a substantial risk' that the non-affiliated inmate will be physically assaulted or harmed…Without more, plaintiff's conclusory assertions regarding the 'substantial

danger' of housing gang-affiliated and non-affiliated inmates in a cell together do not satisfy the objective component of *Farmer*.").

In their objections, Plaintiffs attempt to distinguish *Labatad* because the policy there allowed rival gang members and unaffiliated members to be housed together, while the policy here clustered rival gang members together in their own walks.  (Dkt. 233, p. 20.)  Plaintiffs miss the point—*Labatad* and the aforementioned cases stand for the proposition that, without more, a policy of housing certain prisoners together, apart, or in accordance with prisoners' choices, does not amount to an Eighth Amendment violation. Although they present evidence that gang clustering was against CCA policy and that officials knew about and sought to change the practice of clustering gangs together, Plaintiffs fail to show that they were incarcerated under conditions posing a "substantial risk of serious harm" due to gang clustering.  *Farmer*, 511 U.S. at 834.  Absent such showing, Plaintiffs cannot establish CCA's practice of housing friendly gang members or groups of inmates together in the DEF unit amounted to an Eighth Amendment violation.

Finally, even assuming Plaintiffs could establish the practice of gang clustering amounted to deliberate indifference, their gang clustering claim fails for a lack of causation.  While there is evidence to suggest the attack was possible due to understaffing and the failure to supervise Offender Campos, Plaintiffs have not shown the practice of allowing inmates to choose their own walks and grouping gang members together was the moving force behind the alleged violation of their constitutional rights.  Although Plaintiffs suggest the earlier, June 14, 2011, inmate attack supports both their understaffing and gang clustering claim, the Court finds the earlier attack relevant only to

the understaffing claim.  That is, while there is evidence to suggest both the prior and

instant attack were possible due to pervasive understaffing, there is nothing to suggest

either attack was caused by the policy of clustering gang members together.  Even if

gangs had been disbursed, rival gang members could have attacked each other as they did

in June 2011 and May 2012 due to staffing shortages.

### c.  Expert Reports

Plaintiffs ask the Court to take their expert reports into account when determining

whether to adopt the Report.  (Dkt. 233, p. 20.)  However, as CCA notes, Plaintiffs did

not rely on—or cite to—their expert reports in responding to CCA's Motion for

Summary Judgment.  Because the expert reports were not relevant to resolving the

motion for summary judgment, the Court will not exercise its discretion to consider them

here.  *Brown v. Roe*, 279 F.3d 742, 744 (9th Cir. 2002).

### ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED**:

1.  The Report (Dkt. 231) is **REJECTED** in part and **ADOPTED** in part.

2.  The portions of the Report which granted Defendant summary judgment with

     respect to Plaintiffs' § 1983 understaffing claim is **REJECTED**, summary

     judgment is **DENIED** with respect to Plaintiffs' § 1983 understaffing claim;

3.  The Report is **ADOPTED** in all other respects;

SO ORDERED.

DATED: July 7, 2016

Edward J. Lodge
United States District Judge