Kirtlan G. Naylor         ISB 3569
NAYLOR & HALES, P.C.
950 W. Bannock Street, Suite 610
Boise, Idaho 83702
Telephone: (208) 383-9511
Fax: (208) 383-9516
kirt@naylorhales.com

Daniel P. Struck         AZB 012377
*(Pro Hac Vice)*
Tara B. Zoellner         AZB 027364
*(Pro Hac Vice)*
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1695
dstruck@swlfirm.com,
tzoellner@swlfirm.com

Attorneys for Defendant Corrections
Corporation of America, Inc.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| OMAR CASTILLON, DUSTY KNIGHT, JUSTIN PETERSON, LEON RUSSELL, CHRISTOPHER JORDAN, JACOB JUDD, MICHAEL FORD-BRIDGES AND RAYMOND BRYANT,<br><br>                      Plaintiffs,<br><br>v.<br><br>CORRECTIONS CORPORATION OF AMERICA, INC.<br><br>                      Defendant. | Case No. 1:12-cv-00559-EJL-CWD<br><br>**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]** |

Plaintiffs complain about the loss of digital surveillance footage from a fixed-position camera that would not have captured anything more than what CCA has never

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

**1**

denied – that an inmate was disciplined for rigging the door of a janitor's closet on the evening of May 4, 2012.  Plaintiffs' attempt to pursue the spoliation argument is merely a diversion to avoid addressing the actual staffing evidence, which shows that DEF unit was fully staffed on the night of May 4, when an inmate janitor allegedly rigged the janitor's closet door so that Plaintiffs' assailants were able to hide in it prior to the attack the following day.[1]  Plaintiffs' Motion for Sanctions Based Upon Spoliation of Evidence (Dkt. 224) should be denied.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     FACTUAL BACKGROUND

In their First Amended Complaint, Plaintiffs allege that on May 5, 2012 (the date of the assault), "employees were being placed on the shift schedule who were not present within the building or who were actually working in other areas and in some cases were no longer employees of CCA."  Dkt. 14, ¶ 70.  They further allege that because of staffing discrepancies at the Idaho Correctional Center ("ICC"), "It [was] impossible for ICC to provide prisoners with adequate protection from assault – or to timely intervene when an assault has commenced – with as few guards as ICC ha[d] on its staff."  Dkt. 14 at ¶¶ 72.  Plaintiffs assert general statements about staffing documentation discrepancies at ICC and the alleged "Ghost Worker scheme," but nowhere do they allege that ICC was understaffed on the night of May 4, 2012 – the night preceding the assault.  *See* Dkt. 14, ¶¶ 70-72.  That theory of the case emerged only as the evidence showed there were no staffing discrepancies on May 5, 2012 and after the Idaho Department of Correction warden in charge of monitoring contract facilities, acknowledged that the staff response

---

[1] Surveillance footage of the assailants hiding and of the subsequent assault and staff response was preserved.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

to the May 5 incident was appropriate.  *See* Ex. 1, IDOC 30(b)(6) Depo. Testimony, at 135:9-23.

Now, desperate to concoct evidence to support their ***unpled*** understaffing claim with respect to May 4, Plaintiffs have resorted to alleging that CCA intentionally "destroyed" a digital recording that "CCA used to support the discipline of [non-party] Offender Campos" purportedly showing "that the DEF unit was understaffed during the night shift" on May 4.  Dkt. 224-1 at 11.  Moreover, Plaintiffs contend that non-party inmate Campos "had cause for litigation himself" and thus, on that basis, the video should have been saved.  *Id.* at 7.  It is unclear what Campos's "cause for litigation" could be, or how that relates to Plaintiffs' claims, except that Plaintiffs seem to be implying that for every disciplinary report that is issued to an inmate – no matter how routine, any potential surveillance footage should be saved.

The circumstances surrounding the digital recording as Plaintiffs present them are misleading and, in many respects, false.  Not only did CCA preserve all of the footage of the actual May 5 assault itself that appeared at the time to be relevant to the assault and investigation, including footage of the staff response and the inmate escorts, but CCA also disciplined inmate Campos for rigging the janitor's closet door.  In other words, the fact that Campos did this is not disputed.  CCA did not intentionally destroy the digital recording as part of a cover-up to insulate itself from liability; rather, multiple staff viewed it, as well as investigators from the Ada County Sheriff's Office, and determined that it had no additional evidentiary value as to the May 5 incident.  Ultimately, what Plaintiffs hope the digital recording could have shown with respect to staffing – that there was no staff member "directly" supervising inmate Campos – is improbable, highly speculative, contrary to verifiable evidence, and/or irrelevant to their claims.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

3

**Staffing on May 4, 2012.**  During second shift on May 4, 2012, ICC's contract mandated a total of four officers in DEF – one pod control officer and three floor officers. *See* Dec. of K. Myers, Dkt. 129-01, ¶ 11.  At the start of second shift, DEF was staffed with one pod control officer, four floor officers, one utility/foyer officer, and two recreation officers, for a total of eight officers (four officers *more* than mandated under CCA's contract with IDOC).  *Id.*, ¶ 12.  The supervisor on duty was not posted in any other position. *Id.*, ¶ 14.

A review of the Time Detail for the officers listed on the shift roster indicates that Officer Mills was on shift from 5:30 PM to 5:45 AM; Officer Kelley was on shift from 5:31 PM (5/4) to 5:48 AM (5/5); Officer Aivles was on shift from 5:32 PM (5/4) to 5:43 AM (5/5); Officer Coombs was on shift from 5:30 PM (5/4) to 7:43 AM (5/5); Officer Chase was on shift from 5:31 PM (5/4) to 7:56 AM (5/5); Officer Goodman was on shift from 5:08 PM (5/4) to 7:43 AM (5/5); Officer R. Anderson was on shift from 7:33 AM to 7:47 PM (5/4); and Officer Rodriguez was on shift from 7:29 AM to 7:47 PM (5/4). *Id.*, ¶ 15.

To prevent complacency, it is normal procedure for the officers on duty to rotate from their positions approximately every four hours during the shift. *Id.*, ¶ 16.  This is not reflected in the night shift roster, which, at the time of the incident, was treated as a guide that changed throughout the shift. *Id.*  Thus, the May 4, 2012 shift roster is akin to a snapshot of the staffing at the beginning of the shift. *Id.*

Consequently, staffing evidence in the form of logbooks and employee time detail reports, compared with shift rosters,[2] shows that DEF was fully staffed throughout

---

[2] Despite Plaintiffs' insinuation, there is no evidence that facility logbooks or employee time detail records were tampered with at any time.  The only documentation discrepancies uncovered during the multiple staffing investigations at ICC were with shift rosters being filled out in a deceptive manner.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

second shift between May 4 and May 5, 2012. *Id.*, ¶ 17. Officers Mills, Aivles, Coombs, Goodman, Kelley, Chase, filled the three floor positions and pod control, in turn, at the beginning of the shift. *Id.* Officer Chase was reassigned to G floor in another unit at approximately 8:38 PM, and Goodman was reassigned to movement/utility post. *Id.* The exact time of this transition is not noted in the log book, however it is noted on the shift roster that Goodman replaced Officer Becker who, according to Time Detail Reports, departed the facility at 10:46 PM. *Id.* Therefore, Goodman departed the DEF assignment at some point subsequent to 10:00 PM. *Id.* Officers Anderson and Rodriguez assisted in the DEF Recreation posts until approximately 7:30 PM when recreation was completed for DEF. *Id.*

During the time period that Plaintiffs allege the janitor's closet was tampered with, it is apparent from the logbooks that Officer Kelley relieved Officer Coombs in pod control. *Id.*, ¶ 18. Coombs joined Aivles and Mills on the DEF floor. Officer Goodman was also on this post for a portion of this time; thus maintaining four officers in DEF in accordance with CCA's contract with IDOC. *Id.* As CCA's contract with IDOC required three floor officers and one pod control officer during second shift, and between three and four officers were on the floor in DEF at any given time between 9:30 PM and 11:00 PM, Plaintiffs' assertion that DEF was understaffed during the second shift on May 4, is faulty. *Id.*, ¶ 19.

**The Security Monitoring System.** The assault at issue in this case took place in the F1 pod of the DEF Unit of ICC on the morning of May 5, 2012. At the time of the incident, DEF was a close-custody unit monitored by surveillance cameras 24 hours a day, 7 days a week.[3] Two fixed-position cameras monitored the pod. *See* Dec. of T.

---

[3] In July 2014, the Idaho Department of Corrections assumed management of ICC and renamed it the Idaho State Correctional Center.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

5

Johnson, attached as Ex. 2, ¶ 4.  The surveillance cameras were connected to a Digital Video Recorder ("DVR"), which recorded activity from the cameras connected to it, 24 hours a day, 7 days a week.  *Id.*, ¶ 5.  DVR recording capacity varies based on the amount of activity being recorded, the resolution of the recorded images, and the size of the hard drive.  Given these variables, the time span that the DVR retains may vary.  *Id.*, ¶ 6.  Once the DVR's hard drive reaches its maximum storage space, the DVR loops and begins to record over the oldest activity recorded on the DVR (the earliest recorded activity).  *Id*, ¶ 7.  If the surveillance footage is deemed relevant to an investigation or is requested by law enforcement, so long as the footage has not been overwritten, it can be saved to a DVD.  *Id.*, ¶ 8.

At the time of the incident, the storage capacity of the DVR in DEF ranged from seven days to 90 days, depending on the resolution setting and activity in the pod.  *Id.*, ¶ 9.  According to the facility investigator at the time, the DVR connected to the DEF cameras held, on average, 30 days' worth of footage.  *Id.*  The only way to review surveillance footage was from a facility computer, unless the footage had been saved to a DVD.  *Id.*, ¶ 10.

After the May 5, 2012 incident, as part of their investigation, the facility investigator and STG Coordinator reviewed surveillance footage of DEF from second shift on May 4, 2012.  Neither saw any suspicious activity directly related to the May 5, 2012 incident or anything with investigative or outside value in the May 4, 2012 DEF surveillance footage, and therefore did not believe it needed to be saved off the DVR. *Id.*, ¶¶ 11-12; Dec. of J. Watkins, attached as Ex. 3, ¶ 12.

CCA's own investigators were not the only ones involved in reviewing the surveillance footage and investigating the May 5 incident.  Immediately following the

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

incident, "three representatives from the Ada County Sheriff['s Office were] on the scene helping to investigate the incident. That included a deputy sheriff, the criminal investigator, and [one other]. . . . But there were three people there who have much more skills in crime preservation and keeping evidence than I do, which is why we rely on them and ask them to come in and assist us." *See* CCA 30(b)(6) Depo. Testimony, attached as Ex. 4, at 230:9-20. Had they seen value in the May 4 surveillance footage and asked that it be saved, CCA would have obliged. At the time of the investigation, however, Ada County only requested footage from the actual incident on May 5. Because no other surveillance footage was independently saved, it was not "destroyed," but would have been overwritten after it became the oldest/earliest footage on the DVR – likely within 30 days. *See* Ex. 2, ¶ 13; Ex. 3, ¶ 13.

Even if the footage had been saved, Plaintiffs are incorrect in assuming that the footage would have shown whether inmate Campos was being "directly" supervised when he rigged the janitor's closet door. *See* Ex. 4 at 230:22-234:16.

## II.     CCA SHOULD NOT BE SANCTIONED

The spoliation inference is an adverse inference that permits a jury to infer that "destroyed evidence might or would have been unfavorable to the position of the offending party." *Scott v. IBM Corp.,* 196 F.R.D. 233, 248 (D.N.J. 2000). An adverse inference instruction based on the destruction of evidence is appropriate when: (1) the party having control over the evidence had an obligation to preserve it *at the time it was destroyed*; (2) the records were destroyed with a culpable state of mind; and (3) the evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Apple Inc. v. Samsung Elecs. Co., Inc.*, 888 F.Supp. 2d 976, 997 (N.D. Cal. 2012) (citing *Residential Funding Corp. v.*

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

*DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002))*; Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (citing *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011) ("it is well established that the 'duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.'").  A party's destruction of evidence need not be in "bad faith" to warrant a court's imposition of sanctions. *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir. 1993); *Akiona v. U.S.,* 938 F.2d 158, 161 (9th Cir. 1991).  A court may also impose sanctions against a party that had notice the destroyed evidence was potentially relevant to litigation.  *See Glover,* 6 F.3d at 1329; *Akiona,* 938 F.2d at 161; *cf. Unigard,* 982 F.2d at 368 n. 2 (sanctions may be imposed for "willfulness or fault by the offending party").  A party's motive or degree of fault in destroying evidence, however, is relevant to what sanction, if any, is imposed. *Baliotis v. McNeil,* 870 F.Supp. 1285, 1291 (M.D. Pa. 1994); *see also Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3d Cir. 1994) (courts should choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim").  Because none of the foregoing sanctionable rationales apply here, Plaintiffs are not entitled to an adverse inference.

      A.    **<u>An Adverse Inference Instruction is not Appropriate Because CCA Did Not Act With a Culpable State of Mind</u>**

Plaintiffs allege that CCA's failure to save surveillance footage from May 4 evidences the necessary "culpable state of mind." *Apple Inc.*, 881 F. Supp. 2d at 1146 (citing *Leon v. IDX Sys. Corp.,* 464 F.3d 951, 959 (internal citations omitted) ("A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were *potentially* relevant to the litigation before they were destroyed."); *Unigard,* 982 F.2d at 368 n. 2.  Because CCA could not have known that anyone would

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

seek surveillance footage from May 4 to prove staffing levels, there is absolutely no basis for Plaintiffs' assertion that "CCA acted with a culpable state of mind when it allowed the video footage [of May 4] to be destroyed." Dkt. 224-1 at 9.

The security camera system at ICC was set up to automatically record over surveillance data in approximately 30 days. Nobody "destroyed" the digital recording; rather, numerous staff members, as well as Ada County Sheriff's Office investigators, reviewed what had been recorded between May 4 and May 5 and downloaded what they believed at the time was related to the May 5 assault. Recorded footage prior to the morning of May 5, 2012 was not downloaded because it did not appear to shed any light on the circumstances surrounding the incident. Had there been any pertinent information, the facility investigator would have downloaded it. If Ada County had requested that the facility download additional footage, they would have done so. Absent any such requests, the footage was automatically recorded over.[4]

Further, at the time of the May 5, 2012 incident and in the 30 days after, CCA was not aware of the staffing documentation discrepancies at ICC, which started to come to light in December 2012. Thus, absent any evidence that staffing on May 4 contributed to the May 5 incident (there is none), CCA could not have known that staffing documentation discrepancies were occurring and would result in litigants alleging understaffing. *See FBI Concludes Lengthy Investigation of Corrections Corporation of America*, FBI (May 22, 2015), https://www.fbi.gov/contact-us/field-

---

[4] Plaintiffs assert that CCA was on notice of litigation when the Plaintiffs lodged grievances about the May 5 incident. Again, all footage that the facility and Ada County investigators deemed relevant at the time of the May 5 incident had already been preserved at that time, as a result of the incident investigation. None of the Plaintiffs asked about footage from the preceding night, nor mentioned concerns about staffing. Moreover, Plaintiffs' allegations about understaffing on the night of May 4 are unpled in either their original complaint or the operative First Amended Complaint.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

offices/saltlakecity/news/press-releases/fbi-concludes-lengthy-investigation-of-corrections-corporation-of-america (last visited Dec. 1, 2016) (noting, at conclusion of 15-month investigation, that "the evidence showed that the false entries and understaffing could be attributed only to relatively low-level CCA employees.").

Because Plaintiffs cannot show that CCA acted with a culpable mind or was on notice *at the time the footage was overwritten* (30 days after the incident) that the May 4 surveillance footage – which did not appear to trained investigators to have evidentiary value – might have relevance to potential litigation, Plaintiffs are not entitled to an adverse inference instruction.

### B. Plaintiffs Have Not Shown That They Are Actually Prejudiced in Their Ability to Prosecute Their Claim

Plaintiffs contend that the non-downloaded videotape would have shown a "gap in direct supervision of [the inmate janitor] because CCA failed to properly staff the DEF unit on the night of May 4, 2012," Dkt. 224-1 at 2, and "would have advanced the Plaintiffs' theory that a custom of understaffing at ICC violated their Eighth Amendment rights."[5] Dkt. 224-1 at 11.

"In determining whether sanctions are appropriate, the court must first determine whether the missing documents or materials would be relevant to an issue at trial. If not, then the court's analysis stops there." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 244 F.R.D. 614, 621 (D. Colo. 2007). What is relevant about the digital recording – if anything – is that an inmate janitor was disciplined for rigging the janitor's closet door on the night of May 4, thus enabling the assailant inmates to hide in the closet the next

---

[5] Plaintiffs also contend that the video would show an inmate janitor "conferring with the attackers in the DEF unit [and] would advance the Plaintiffs' theory that CCA was deliberately indifferent to the Plaintiffs' safety by allowing gangs to openly cluster and operate in the DEF unit." This purported evidence applies to Plaintiffs' "gang clustering" theory, which was dismissed. *See* Dkt. 236.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

day.  This is an undisputed fact. It is entirely speculative as to whether the recording would have accurately depicted staffing on the pod, however, as Plaintiffs suggest, and speculation is not enough to meet Plaintiffs' burden.  *See* Ex. 3 at 231:13-16; *see Alvariza v. Home Depot*, 240 F.R.D. 586, 590 (D. Colo. 2007) ("[T]he burden is on the aggrieved party to establish a reasonable possibility, based on concrete evidence rather than a fertile imagination, that access to the lost material would have produced evidence favorable to his cause.").  The documentary evidence – shift rosters, employee Time Detail Reports, and logbooks – establishes that the pod was more than fully staffed when the janitor allegedly rigged the closet.  *See* Dec. of K. Myers, Dkt. 129-01.  The fact that he was not caught is therefore indicative, not of understaffing, but, if anything, officer negligence. Plaintiffs' conjecture about what the video might have shown is the epitome of a "fertile imagination."[6]  *Alvariza*, 240 F.R.D. at 590.

    **C.**    **Foreseeing Plaintiffs' Theory of the Case with Respect to May 4 was Not a Reasonable Expectation**

Plaintiff surmises that the non-downloaded digital recording would have shown whether F1 was appropriately staffed on May 4.  Although a defendant has a duty to preserve evidence once it knows, or should know, that litigation is imminent, that duty is not indefinite.  *See Cache La Poudre Feeds, LLC*, 244 F.R.D. at 623 n.10 ("organizations need not preserve 'every shred of paper, every e-mail or electronic document, and every backup tape'" and "'a party does not have to go to 'extraordinary measures' to preserve all potential evidence ... [i]t does not have to preserve every single scrap of paper in its business'").  It is unreasonable to have expected CCA to foresee Plaintiffs' staffing claim with respect to the night *preceding* the actual assault, and unreasonable to expect CCA to

---

[6] CCA filed surveillance footage of the pod in support of its Motion for Summary Judgment.  From that footage, one can see that the entire pod is not visible, and the level of detail limited.  *See* Dkt. 167-01.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

anticipate that Plaintiffs would want surveillance recordings to ascertain staffing levels – especially when the staffing issues at ICC had not yet come to light. This was an inmate-on-inmate assault. What was pertinent was evidence of the assault itself and the response, which was timely downloaded and preserved.

## III.     CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Sanctions.

DATED this 1st day of December 2016.

STRUCK WIENEKE & LOVE, P.L.C.

By     /s/ Tara B. Zoellner
Daniel P. Struck
E-mail:  dstruck@swlfirm.com
Tara B. Zoellner
E-mail:  tzoellner@swlfirm.com

Kirtlan G. Naylor, Of the Firm
Naylor & Hales, P.C.
E-mail:  kirt@naylorhales.com

Attorneys for Defendant
Corrections Corporation of America, Inc.

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of December 2016, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Thomas J. Angstman
Wyatt Benton Johnson
Anthony M. Shallat
mindy@angstman.com

Nikki Rachelle Ramirez-Smith
Nikkismithlaw@gmail.com

Attorneys for Plaintiffs Knight, Russell, Jordan, Judd, Ford-Bridges and Bryant

Kirtlan G. Naylor
kirt@naylorhales.com

Attorney for Defendant Corrections Corporation of America

/s/ Mica Mahler

**DEFENDANT CORRECTIONS CORPORATION OF AMERICA'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS BASED UPON SPOLIATION OF EVIDENCE [DKT. 224]**

**13**