Thomas J. Angstman
Anthony M. Shallat
ANGSTMAN JOHNSON
3649 N. Lakeharbor Lane
Boise, Idaho  83703
Telephone: (208) 384-8588
Facsimile:  (208) 853-0117
tj@angstman.com
anthony@angstman.com
Angstman ISB:  5738
Shallat ISB: 9572

Nikki Ramirez-Smith
Ramirez-Smith & Tvinnereim
1000 W. Sanetta Street
Nampa, Idaho 83651
Telephone:  (208) 461-1883
Facsimile:  (208) 461-1680
nsmith@nrsdt.com
nikkismithlaw@gmail.com
Ramirez-Smith ISB: 9030

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OMAR CASTILLON, DUSTY KNIGHT, JUSTIN PETERSON, LEON RUSSELL, CHRISTOPHER JORDAN, JACOB JUDD, MICHAEL FORD-BRIDGES, AND RAYMOND BRYANT,<br><br>          Plaintiffs,<br><br>vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, INC.,<br><br>          Defendant. | Case No. 1:12-CV-559-DVB<br><br>PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES INSTRUCTION |

Plaintiffs, by and through their counsel of record, ANGSTMAN JOHNSON, submit this Memorandum on § 1983 standard for punitive damages in the Ninth Circuit.

On Friday, February 17, 2017, the Court requested supplemental briefing addressing the standard applicable in the Ninth Circuit regarding what a plaintiff must show to put the issue of punitive damages to the jury on a § 1983 claim. Plaintiffs hereby submit the following Memorandum of Points and Authorities in response to the Court's request.

## I.    LEGAL STANDARDS

The most sensible starting point for this inquiry is with the Ninth Circuit Pattern Civil Jury Instructions, which precisely address the issue. The comments to model instruction "5.5 Punitive Damages" include the following:

> As to § 1983 claims, "[i]t is well-established that a 'jury may award punitive damages . . . either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others.'" *Morgan v. Woessner*, 997 F.2d 1244, 1255 (9th Cir.1993). In *Dang v. Cross*, the Ninth Circuit held this "statement of the law of punitive damages is incomplete, however. The standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases. . . . [M]alicious, wanton, or oppressive acts or omissions are within the boundaries of traditional tort standards for assessing punitive damages and foster 'deterrence and punishment over and above that provided by compensatory awards.' . . . Such acts are therefore all proper predicates for punitive damages under § 1983." 422 F.3d 800, 807 (9th Cir.2005) (citing *Smith v. Wade*, 416 U.S. 30, 49 (1983)). The *Dang* court held it was reversible error to decline to instruct that "oppressive acts" were an alternative basis for punitive damages in a § 1983 case.

Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, 2007 ed. (last updated Jan. 2017), p. 82 (*available at* http://www3.ce9.uscourts.gov/jury-instructions/sites/default/files/WPD/Civil_Instructions_2017_1.pdf). Importantly, neither actual intent nor malice are required for punitive damages to be assessed under § 1983. *See Larez v. Los Angeles*, 946 F.2d 630, 639 (9th Cir. 1991); *see also Smith*, 416 U.S. at 48–49. Further, the

PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES
INSTRUCTION – PAGE 2

decision to impose punitive damages is "within the exclusive province of the jury." *See Castro v. Cnty. Of Los Angeles*, 797 F.3d 654, 669–670 (9th Cir. 2015) *reh'g en banc granted*, 809 F.3d 536 (9th Cir. 2015) ("*Castro I*").[1]

Under *Dang v. Cross*, the burden of proof for punitive damages under § 1983 is **preponderance of the evidence**. 422 F.3d 800, 808 (9th Cir. 2005) (agreeing with the Seventh Circuit's conclusion in *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984), that a jury instruction stating the burden as preponderance of the evidence complied with *Smith v. Wade*).

The Plaintiffs' § 1983 claim in this case is a "failure-to-protect" claim arising under the Eighth Amendment. Prisoners have a "constitutional right . . . to be free from violence at the hands of other inmates." *See Castro I*, 797 F.3d at 663 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994)). "'[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners' because corrections officers have 'stripped [the inmates] of virtually every means of self-protection and foreclosed their access to outside aid.'" *Id.* (quoting *Farmer*, 511 U.S. at 833).

The applicable standard for an Eighth Amendment failure-to-protect claim under *Farmer* and its progeny in the Ninth Circuit is whether the defendant demonstrated "deliberate indifference to a substantial risk of serious harm to an inmate." *See Farmer*, 511 U.S. at 828. As applied to individual prison officials, the deliberate indifference inquiry is a subjective test, requiring that the official "knew of an excessive risk to inmate health or safety that the defendant deliberately ignored." *See Grenning v. Miller-Stout*, 739 F.3d 1235, 1239 (9th Cir. 2014). As applied to municipalities, however, the deliberate indifference inquiry is objective. *See Castro v. Cnty. Of L.A.*, 833 F.3d 1060, 1076 (2016) (en banc) ("*Castro II*"). This is necessarily so for the

---

[1] As discussed further below, the section of *Castro I* in which this quotation appears was incorporated by reference in the subsequent *en banc* decision.

practical reason that government entities, unlike individuals, do not themselves have states of mind: 'Needless to say, moreover, considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official.' *Id.* (quoting *Farmer*, 511 U.S. at 841).

Here, CCA is a corporate entity, not a municipality. Accordingly, the *Castro II* holding that deliberate indifference is an objective standard as applied to municipalities does not squarely apply. However, its reasoning undeniably applies: A corporate entity such as CCA is identical to L.A. County, the municipal defendant in *Castro II*, to the extent that it does not have a subjective state of mind.[2] Holding a corporate entity to a subjective standard is just as nonsensical as holding a municipality to a subjective standard. Therefore, the applicable inquiry to examine whether CCA was deliberately indifferent to a substantial risk of serious harm to the Plaintiffs must be an objective inquiry.

The three-judge panel deciding *Castro I* concluded that "[f]or the purpose of awarding punitive damages, no additional evidence is required to make a finding of 'reckless disregard' when a finding of 'deliberate indifference' has been made." *See Castro I*, 797 F.3d at 669. This is consistent with Supreme Court precedent under *Smith*: "in situations where the standard for compensatory liability is as high as or higher than the usual threshold for punitive damages, most courts will permit awards of punitive damages without requiring any extra showing." *See Smith*, 461 U.S. at 53. "[S]ociety has an interest in deterring and punishing *all* intentional or reckless

---

[2] Of course, CCA is drastically different from a municipality in other ways—including, critically, that although a municipality is immune from punitive damages under § 1983, a private entity is not. *See Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981); s*ee also Woods v. Graphic Communications*, 925 F.2d 1195, 1205 (9th Cir. 1991) (denying immunity from punitive damages under § 1983 to unions because "[a]t common law, municipalities have long enjoyed immunity from punitive damages. Unions, by contrast, have not." (citation omitted)); *and Bruins v. Osborn*, No. 2:15-CV-00324-APG-VCF, 2016 U.S. Dist. LEXIS 15075, at *12 (D. Nev. Feb. 5, 2016) ("Local governments are immune from punitive damages under § 1983. Therefore, as Robin concedes, he cannot recover punitive damages from [Las Vegas Metropolitan Police Dep't]. However, Naphcare is a private entity against which punitive damages may be assessed." (citation omitted)).

PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES
INSTRUCTION – PAGE 4
A◆J; Matter: 8591-003

invasions of the rights of others, even though it sometimes chooses not to impose any liability for lesser degrees of fault." *Id.* at 54–55. There is no incremental showing necessary to reach the issue of punitive damages in a failure-to-protect claim under § 1983 after the plaintiff has made a showing of the defendant's deliberate indifference. *Id.*; *Castro I*, 797 F.3d at 669.

In *Castro II*, decided by the Ninth Circuit *en banc*, the Court expressly incorporated by reference the three-judge panel's opinion as to punitive damages contained in section II.C. of *Castro I. See Castro II*, 833 F.3d at 1066 n.2. Thus, the *Castro I* holding that a finding of deliberate indifference suffices to make the issue of punitive damages appropriate for jury consideration remains the law of the Circuit despite *Castro II* overruling other portions of *Castro I.*

Here, as will be argued more specifically below, the Plaintiffs have shown that a jury could reasonably find that CCA acted with deliberate indifference. Accordingly, under *Smith* and *Castro II*, they have necessarily met their burden to put the issue of punitive damages to the jury.

As a final statement of governing law, Plaintiffs also provide citations to applicable law regarding the various independent bases under which a jury can award punitive damages in a § 1983 action. Again, a "jury may award punitive damages . . . either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." *See Morgan*, 997 F.2d at 1255. Additionally, "malicious, wanton, or oppressive acts . . . are . . . all proper predicates for punitive damages under § 1983." *See Dang*, 422 F.3d at 807.

Ninth Circuit jurisprudence has not thoroughly defined "reckless or callous indifference." However, *Castro I* (and *Castro II* via incorporation by reference) does provide some guidance, by offering the following acknowledgment:

The precise distinction between "deliberate indifference" and "reckless or callous indifference" remains an open question. As discussed above, "deliberate indifference" is defined in this circuit as "the conscious choice to disregard the consequences of one's acts or omissions." *See* 9th Cir. Civ. Jury Instr. 9.7 (2007). Furthermore, when the Supreme Court articulated the deliberate-indifference standard for failure-to-protect claims in *Farmer*, it defined the standard as one of criminal recklessness. *See Farmer*, 511 U.S. at 837–39. The circular nature of these definitions gives rise to the inference that the terms are synonymous. Juries in these cases thus have the discretion to impose punitive damages if they believe further punishment above and beyond compensatory damages is appropriate, without having to make any additional factual findings. *See Smith*, 461 U.S. at 56.

*See Castro I*, 797 F.3d at 669. Thus, as stated above, Plaintiffs meet the standard to put the issue of punitive damages to the jury merely by showing CCA's "deliberate indifference to a substantial risk of serious harm to an inmate." As shown below, they have met this standard.

Separately, "[a]n act or omission is oppressive . . . if done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity as by misuse or abuse of authority or power or by taking advantage of some weakness or disability or the misfortunes of another person." *See Dang*, 422 F.3d at 809 (internal quotation marks omitted). "When a jury is instructed that it may award punitive damages for oppressive acts, the jury must consider the relative positions of power and authority between the parties and determine whether the defendant misused his power or authority or abused the plaintiff's weakness in the course of the wrongful conduct." *Id.* at 810.

Here, the Plaintiffs' "weakness" was that they were incarcerated with no ability to defend themselves. That is, corrections officers "stripped [Plaintiffs] of virtually every means of self-protection and foreclosed their access to outside aid." *See Farmer*, 511 U.S. at 857. CCA's "abuse" of that weakness was in failing to provide adequate staff to ensure Plaintiffs' safety in spite of known risks. Under *Dang*, a jury could reasonably find that this constitutes an oppressive omission sufficient to assess punitive damages against CCA. Accordingly, the Plaintiffs have

met the standard to put the issue of punitive damages to the jury under *Dang* and Ninth Circuit precedent.

The issue of punitive damages should go to the jury under any or all of three bases. First, because the Plaintiffs have made a showing of CCA's "deliberate indifference," they are entitled to a jury determination of punitive damages under *Castro II* and the "reckless or callous indifference" basis for assessing such damages. Second, because the Plaintiffs have made a showing of CCA's "abuse of the Plaintiffs' weakness in the course of the wrongful conduct," they are entitled to a jury determination of punitive damages under *Dang* and the "oppressive omissions" basis for assessing such damages. Third, evidence has already been admitted that persons with authority above Managing Director Myers and VP of Operations Conry pushed directives down the chain to the wardens to cut staffing levels with no mention to safety of inmates, this financial motive is an "evil motive" that warrants punitive damages since there is evidence in record that CCA motivated the decision makers, deliberately, to cut staffing with promises of large bonuses.

The backdrop to all this evidence is that CCA was under a consent decree to increase its staffing levels and had already conducted an extensive study in March 2010 at ICC that determined there was a substantial need, as reflected in the Unit Plan, Exhibit 1024, for a much higher level of staffing in DEF.  Critically, Plaintiffs were attacked less than one day after they were moved into the F-1 Unit.  As Mr. Myers testified, the February and May 2012 reduction to ICC's staffing budget was "done for them" by the executives in Nashville.  Any of these bases is sufficient alone to put the issue of punitive damages to the jury.

## II.    ARGUMENT

Evidence in the Record demonstrates that the Plaintiffs have already met the Ninth Circuit punitive damage standard. Critically, the Plaintiffs only have to prove by a preponderance of evidence that CCA acted with recklessness or deliberate indifference to the Plaintiffs' rights in staffing decisions.  Clearly a factfinder may conclude that CCA knew understaffing the prison would create "a substantial risk from the very fact that the risk was obvious." *See Farmer*, 511 U.S. at 842.

There is sufficient evidence so the jury could reach that conclusion due to the obvious risk of harm at the facility.

**1.   Mr. Myers and Mr. Conry knew understaffing created a "serious safety issue", but never sufficiently increased the staff at ICC or in DEF.**

In the spring of 2010, Warden Wengler sent an email to Kevin Myers telling him that he needed more staff because understaffing was "a morale and safety issue." PLAINTIFFS' EXHIBIT 1111. Warden Wengler later sent an additional email in June 2010 that he needed 24 full-time staff members. PLAINTIFFS' EXHIBIT 1313. Warden Wengler even informed Mr. Myers that the ICC unit had "historically" been understaffed during the night shift after lockdown. PLAINTIFFS' EXHIBIT 1218. However, Mr. Myers only requested 15-20 part-time staff from Mr. Conry in September 2010. PLAINTIFFS' EXHIBIT 1233. This request included a spreadsheet showing vacancies during the night shift and a request that DEF receive an additional staff member, increasing the unit's number to five staff members posted at night. Mr. Conry testified that he "didn't know" if DEF ever received the fifth officer, but the budgeted staffing plan which CCA operated off of in 2012 reflects that another staff member was never added to the DEF unit. PLAINTIFFS' EXHIBIT 1001 at p. 422.

Moreover, despite Mr. Myers' contention that the 15-20 PRNs were approved, he could not point to this change on a change sheet to the budgeted staffing plan in the contract. In November 2010, Myers again was informed that additional staff were needed during the night shift. Myers received a spreadsheet that requested two rec officers be added to the DEF night posts. PLAINTIFFS' EXHIBIT 1251 at p. 3. This would add an additional 19.8 staff to the budgeted staffing plan with 2.2 for DEF and, by staffing other areas appropriately, it would alleviate the problem of staff being called from DEF to other areas of the prison where "coverage is needed". *Id.* However, CCA never approved this increase to the budget. Finally, Mr. Myers testified the ICC facility operated without a Chief of Unit Management (the person responsible for ensuring the Unit Plans were followed) for 4-6 months in 2010. Instead of filling the post, CCA chose to leave it and an assistant warden position vacant.

A reasonable jury could conclude that CCA was reckless when Managing Director Myers consciously disregarded informing Mr. Conry that 24 staff were needed to be added to the ICC staffing plan to correct the life and safety issue Mr. Wengler brought to his intention. Alternatively, a reasonable jury could conclude that CCA was reckless when Mr. Conry consciously disregarded adding another position to the DEF night shift even though Mr. Myers had told him another position was needed because it was a close custody unit. Critically, since CCA had conducted a study with IDOC in 2010, it knew about the risk of harm and failed to take the steps identified, adding staff in DEF, as the 2010 study advised. CCA knew and should have known that a close custody unit housed violent offenders and, therefore, that failing to add an extra staff member consciously disregarded a known risk to safety.

PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES
INSTRUCTION – PAGE 9
A♦J; Matter: 8591-003

**2. Mr. Myers told Mr. Jepsen to "shut the hell up" and "deal with it" after Mr. Jepsen requested more staff.**

After Mr. Myers knew about the morale and safety issue and the historic understaffing, Chief of Security Shane Jepsen again asked Mr. Myers for more staff in 2010 and 2011. These requests came after Mr. Myers requested 19.8 new staff members and authority to over-hire by 10 from Mr. Conry. Despite this warning that understaffing created a serious safety issue, Mr. Jepsen testified that Mr. Myers told him the staffing pattern was never going to change, he had to deal with it, and to "shut the hell up." A reasonable jury could conclude that CCA acted with recklessness or callous indifference when Managing Director Myers told the Chief of Security to "shut up" when he asked for more staff.

**3. Judge Carter found that CCA was on notice of the risk of understaffing to inmates at ICC, but failed to take necessary measures to ensure understaffing did not persist.**

In 2011, CCA entered into a settlement agreement with the *Kelly* inmates promising that it would staff the prison according to the contract, provide direct supervision of inmates, and add three additional staff members called "the wardens crew." This settlement was specifically designed to compel CCA to comply with the Eighth Amendment.

As stated in the Plaintiffs' memorandum in support of proposed *Kelly v. Wengler* redactions, the parties entered into a settlement specifically designed to reduce and eliminate the violence at ICC, which included a number of staffing provisions such as providing enough staff so offenders would be directly supervised when they were out of their cell and abiding by the staffing requirements in CCA's contract with the State of Idaho. The *Kelly* court held that CCA "clearly violated the staffing requirements" in its decision, finding CCA in contempt of the *Kelly* settlement agreement. PLAINTIFFS' EXHIBIT 1004. Moreover, the *Kelly* court held that CCA

PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES
INSTRUCTION – PAGE 10
A◆J; Matter: 8591-003

"had compelling reasons to regularly and thoroughly check that they were complying with the staffing requirements in the IDOC contract and Settlement Agreement…[but] did not take all reasonable steps to comply with the Settlement Agreement." PLAINTIFFS' EXHIBIT 1004 at p. 2. These findings show a clear record of CCA's failure to staff the ICC facility adequately in the weeks leading up to the May 5, 2012 attack. Judge Carter found persistent understaffing was occurring at ICC one month before the Plaintiffs were attacked. In fact, Mr. Higgins testified that only 2 of the 3 additional staff members mandated by the *Kelly* settlement were posted the night of May 4, 2012 at ICC.

Moreover, Judge Carter found that "this responsibility to check on mandatory staffing posts falls higher than Wengler's subordinates: it falls on him, and it falls on CCA." PLAINTIFFS' EXHIBIT 1004 at p. 15. A reasonable jury could conclude that CCA knew or should have known, but chose not to check to see if it was complying with the staffing requirements under *Kelly* and the IDOC contract which were designed to protect inmates from harm.

### 4. The DEF unit plan required 10 staff members posted during the day.

CCA's own internal unit plan, the "blueprint for success" for the DEF unit, required 10 staff members be posted in the DEF unit during the day. PLAINTIFFS' EXHIBIT 1024 at p. 25. However, CCA only budgeted 6 staff members for the DEF Unit. PLAINTIFFS' EXHIBIT 2244. A reasonable jury could conclude that the very fact that CCA chose not to staff the DEF unit in accordance with the unit plan that was developed to ensure staff and inmate safety as willful and oppressive omission. This conclusion is even more reasonable when considered with the additional evidence in the record, showing that the DEF unit was significantly more violent than other areas of the prison and therefore required a higher amount of staff. This Unit Plan

PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES
INSTRUCTION – PAGE 11
A◆J; Matter: 8591-003

also states that "The Officers are assigned specific Pods on a daily basis allowing direct supervision." PLAINTIFFS' EXHIBIT 1024 at p. 25. A reasonable jury could conclude that CCA demonstrated deliberate indifference and/or continued an oppressive omission because it knew of the risk of not staffing in accordance with the Unit Plan would deviate from the direct supervision model which was implemented to make DEF safe after the March 2010 Security and Safety study.

**5. The violence "Goal" in DEF was three times higher than the rest of the prison.**

On February 1, 2012, Assistant Warden Kessler, Chief Jepsen, and the captains held a meeting in which Mr. Jepsen stated that the violence goal for DEF was 44.1 per year, almost three times higher than the JKL unit's goal of 17.1 per year. PLAINTIFFS' EXHIBIT 1073. Despite this fact, the DEF unit had the same "budgeted staffing levels" as other areas of the prison DEF, but did not receive any increase in staff in the winter and spring of 2012. Moreover, a violent attack had occurred in DEF in June 2011 in which inmates hid in a closet and started a violent incident, the exact same modus operandi as in the attack that so seriously harmed the Plaintiffs. A reasonable jury could conclude that CCA's failure to increase the amount of staff in the DEF Unit for both the day and night shift when it knew that unit was much more violent was either a conscious disregard to the safety of inmates or even a malicious or wanton act or omission.

**6. Staff testified that DEF was the most violent area of the prison, and that they did not have enough manpower to enforce the rules or abide by policy.**

Mr. Skogsberg, Mr. Mills, and Mr. Carrick all testified that DEF was known as the most violent area of the prison. CCA has not put on any evidence that DEF was less violent or equally violent than other parts of the prison. Mr. Carrick and Mr. Mills specifically testified that the

staff at ICC could not follow CCA policy or enforce the rules because there was not enough manpower at ICC. Chief Jepsen confirmed this and testified he repeatedly asked for more staff. A reasonable jury could conclude that CCA was put on notice that DEF was more violent and that the general staffing levels at ICC were insufficient to implement safety policies such as properly performing prisoner counts and enforcing rules such as removing window coverings from the windows. Deputy Warden Higgins confirmed that this was a safety issue in his letter to CCA sent in January 2012. PLAINTIFFS' EXHIBIT 1032.  Any of this is sufficient to allow a jury to conclude that CCA was deliberately indifferent to known risks of harm and housed Plaintiffs in that area anyway in conscious disregard for the right to be safely housed while incarcerated.

### 7.   Bonuses at CCA were awarded based upon increasing profit.

Despite all of the signs that ICC, and specifically DEF, needed more staff in 2010, 2011, and 2012, CCA continued to award the majority of its bonuses based upon increasing profitability. Seventy-five percent of Managing Director Kevin Myers' bonuses were based upon increasing profit for the company. PLAINTIFFS' EXHIBIT 1082. This incentive structure persisted even as CCA received knowledge that ICC did not have enough staff to safely run the facility.  One example of CCA's knowledge is the *Kelly v. Wengler* settlement specifically entered into by CCA to attempt to bring ICC in compliance with the Eighth Amendment.

Mr. Conry told Mr. Myers that the salary and wages were the primary lever to manipulate to impact a facility budget—implying that the best way to decrease cost was to decrease staff. Managing Director Myers even suggested running the prison without a hospital staff to meet the budget demands of FSC.  PLAINTIFFS' EXHIBIT 1309. Mr. Myers even insinuated in an e-mail to Warden Wengler about "turnips and blood" five days before the attack on the Plaintiffs

that constant directives to cut costs made operating ICC extremely difficult. PLAINTIFFS'

EXHIBIT 1210. A reasonable jury could conclude that CCA should have known that continuing

to award bonuses to ICC management for increasing profitability while it was on notice that the

staffing levels had been inadequate at ICC. Clearly the incentive package for management was a

reckless and deliberately indifference policy.

### III.     CONCLUSION

Plaintiffs have shown that, under Ninth Circuit law, sufficient evidence has been

presented in this case that the issue of punitive damages should be put to the jury. The

established punitive damages standard in the Ninth Circuit allows a jury to award punitive

damages if a plaintiff demonstrates by a preponderance of evidence that a defendant acted

recklessly or with deliberate indifference in regards to their constitutional rights. The Plaintiffs

have met this standard with evidence already in the record. Critically, the decision to impose

punitive damages is "within the exclusive province of the jury." See *Castro v. Cnty. Of Los

Angeles*, 797 F.3d 654, 669–670 (9th Cir. 2015) *reh'g en banc granted*, 809 F.3d 536 (9th Cir.

2015). Therefore, the Court should allow the Plaintiffs' punitive damage argument.

DATED this 20th day of February, 2017.

/s/
THOMAS J. ANGSTMAN
Attorney for Plaintiffs

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of February, 2017, I filed the foregoing PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES INSTRUCTION electronically through the CM/ECF system, which caused the following parties to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Kirtlan G. Naylor | kirt@naylorhales.com |
| Daniel P. Struck | DStruck@swlfirm.com |
| Nikki Smith | nikkismithlaw@gmail.com |
| Jacob H. Naylor | jake@naylorhales.com |
| Tara B. Zoellner | TZoellner@swlfirm.com |

Any others as listed on the Court's ECF Notice.

I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:

None

/s/
Thomas J. Angstman

PLAINTIFFS' BENCH MEMORANDUM REGARDING PUNITIVE DAMAGES
INSTRUCTION – PAGE 15
A◆J; Matter: 8591-003